UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

QUEENS BOROUGH PUBLIC LIBRARY,

                Plaintiff,

    -against-

DYNIX CORPORATION, SIRSI
HOLDINGS CORP. and SIRSI CORPORATION,

        Defendants.

---------------------------------------------------------------- X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUL 0 2 2009 ★

BROOKLYN OFFICE

Civil Action No.

**COMPLAINT**

**JURY TRIAL
DEMANDED**

     Plaintiff Queens Borough Public Library (the "Library"), by its attorneys, Thompson

Hine LLP, as and for its complaint herein against Defendants Dynix Corporation ("Dynix"), Sirsi

Holdings Corp. ("Sirsi Holdings") and Sirsi Corporation ("Sirsi Corp.," and together with Dynix

and Sirsi Holdings, "Defendants"), alleges as follows:

### PRELIMINARY STATEMENT

    1.  This case involves a fraudulent bait and switch scheme by Defendants against not

only the Queens Borough Public Library, the highest circulating library in the nation, but other

libraries as well.

    2.  Essentially, the Library wanted to update its "integrated library system" ("ILS") to

manage all aspects of the Library's core services, Website and customer transactions.

    3.  As a result, the Library issued a Request for Proposal ("RFP") to multiple vendors,

including Sirsi Corp., then a completely separate entity from Dynix (and a competitor), which

submitted a response to the Library's RFP.  The Library, however, rejected Sirsi's proposal, on

valid substantive grounds.

Dockets.Justia.com

4.  Instead, after an exhaustive process, the Library decided to award the contract to Dynix.

5.  During the negotiations, Sirsi Corp. purchased Dynix (although it was misleadingly described in the press as a "merger") and, upon information and belief, proceeded to strip Dynix of the assets needed to perform under the license agreement.  Thus, Dynix, in cooperation with and at the direction of Sirsi Holdings and Sirsi Corporation, negotiated and entered into a license agreement with the Library to provide the Library with a multi-million dollar, state-of-the-art ILS.

6.  Upon information and belief, Dynix (and Sirsi Holdings, which guaranteed Dynix's performance) fraudulently misrepresented that it would perform its obligations to provide the contracted for software system when it had no intention or ability to do so, and Sirsi Corp. tortiously interfered with the license agreement and guaranty by inducing breach of these agreements by Dynix and Sirsi Holdings, or by otherwise preventing and hindering any actual performance.

7.  After two years and spent millions of the Library's dollars, Defendants announced that Dynix would not provide the promised software (in fact, no software was ever provided) and attempted to foist Sirsi Corp.'s previously rejected and technologically inferior software on the Library.

8.  Upon information and belief, this "bait and switch" was exactly what Defendants intended from the time they began the discussions that led to Sirsi Corp. acquiring Dynix. Indeed, upon information and belief, other libraries across the United States were faced with the same dilemma.

9.  Upon learning that Dynix and Sirsi Holdings would not, as they repeatedly promised, deliver the software the Library contracted for, the Library demanded that Dynix and Sirsi Holdings perform in accordance with the agreements.  Dynix and Sirsi Holdings declined to do so.

10. This suit follows.

11. By this Complaint, the Library seeks compensatory damages, punitive damages, treble damages, and attorneys fees arising out of breach of contract, fraudulent inducement, tortious interference with contract and other unlawful conduct in connection with Defendants' wrongful scheme.

12. The facts and claims alleged herein are based upon the Library's investigation to date, which is ongoing.  The Library reserves the right to amend this Complaint upon the discovery of additional facts warranting such amendment.

## THE PARTIES

13.     The Library is a New York not for profit corporation with its principal offices located at 89-11 Merrick Boulevard, Jamaica, New York 11432.

14.     Upon information and belief, defendant Dynix is a corporation organized and existing under the laws of the State of Utah, with a principal place of business located at 55-400 Dynix Drive, Provo, Utah 84604.

15.     Upon information and belief, defendant Sirsi Holdings is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 101 Washington Street SE, Huntsville, Alabama 35801.

16.     Upon information and belief, defendant Sirsi Corp. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 55-400 Dynix Drive, Provo, Utah 84604.

3

## BASIS FOR JURISDICTION

17.    This court has subject matter jurisdiction over this case and controversy, and the claims within this Complaint, which arise under the laws of the State of New York, pursuant to diversity jurisdiction under 28 U.S.C. 1332(a)(1), in that the Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds seventy-five thousand dollars ($75,000) exclusive of costs and interest.

18.    This Court has *in personam* jurisdiction over Defendants because they are found in this district, transact business in this district or are otherwise subject to jurisdiction pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules.

19.    Moreover, Plaintiff, Dynix and Sirsi Holdings have expressly agreed that any legal action arising out of or in connection with the Purchase and License Agreement dated March 6, 2006 between Dynix and the Library, (the "License Agreement") and ¶ 15 of the separate Guaranty Agreement of the same date entered into between Sirsi Holdings and the Library (the "Guaranty" and, collectively with the License Agreement, the "Agreements"), shall be brought solely to the Federal Courts located in the City of New York, State of New York.

20.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this Judicial District.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.    BACKGROUND

21.    The Library is an autonomous library system composed of more than 70 libraries, Adult Learning Centers and Family Literary Centers located throughout the County and Borough of Queens in the City of New York. The Library serves a population of over 2,200,000, and is the second largest public library system in the United States in terms of the size of its collections.

Across its various locations, the Library maintains a robust catalog of books. During its 2009 fiscal year, more than 23,041,425 items from the Library's collection were circulated.

22.    The Library system provides an extensive collection of print resources and other materials in electronic format. The Library also provided in fiscal year 2009 alone more than 25,000 free educational, cultural and literary programs for all age groups. The Library's development of the proprietary self-service kiosks, which operates using Radio Frequency Identification chips has enabled the staff to better serve customers, act as Information Guides to the Library's electronic and print resources, help with school work, and has fostered interaction with the community.

23.    As a result, use of the Library has increased to approximately 14,800,000 customer visits per year. The Library has had the highest circulation of any library in the nation for many years, serving the most ethnically diverse county in the United States.

24.    To meet the needs of its diverse patrons, the Library has expended significant time and resources to ensure that the Library's technology has kept pace with the technology evolution and prides itself in offering its patrons state-of-the-art access to the Library's collections.

25.    The Library has been recognized nationally as a role model and innovator, earning it many recognitions and awards, including the prestigious Library Journal 2009 Library Journal of the Year Award.

**B.    INTEGRATED LIBRARY SYSTEMS**

26.    As most large libraries and library systems do, the Library relies on its ILS software to manage all aspects of the Library's core services, Website, customer transactions, receive, invoice, catalog, circulate and track the materials in its collection.

27.     ILS software also allows Library patrons to search the Library's catalog and rapidly identify and locate particular items in the Library's collection.  If a particular item, such as a book, is not available at the branch visited by the patron, but is in the Library's collection and available at another branch, the ILS software allows the patron to request that the book be shipped to the patron's branch via inter-library loan.

28.     The Library's use of ILS software is absolutely critical to its operations.

29.     In May 1990, the Library began using ILS software known as the "DRA System" provided by DRA Corp.

30.     The DRA System included two software modules, known as "DRA Classic" and "Web II," which were modified to meet the Library's specific requirements.

31.     Upon information and belief, in or about 2001, defendant Sirsi Corp. purchased DRA Corp.

32.     In early 2005, the Library engaged a consultant to evaluate its technology needs as the Library was informed that DRA Classic was no longer being further developed and support resources were being scaled back by Sirsi Corp and/or DRA Corp.  As a result, the DRA System was fast becoming outdated and obsolete.

33.     Accordingly, and in keeping with the Library's standards as a premier innovative library system and institution, the Library decided to replace the DRA System with a cutting edge, state of the art, custom ILS.

## C.     **THE PROCUREMENT PROCESS**

34.     To that end, on May 4, 2005, the Library issued a Request for Proposal for a Next Generation Integrated Library System and Related Services (the "RFP") to a select number of known and high-quality software vendors in order to obtain proposals for development of an ILS which would meet the Library's requirements.

35.     The Library's patrons are among the most diverse in the United States.   This, together with the size of the Library's system, the breadth of its collection, the volume of transactions, and the demanding needs of the Library staff, were among the factors that each responding vendor needed to take into consideration in responding to the RFP.

36.     Of absolute importance to the Library was the competence and suitability of both the vendor selected and the specific ILS software being proposed.

37.     The vendor to be awarded with the contract needed to be capable and willing, based upon specified criteria and goals, to develop and support a fully-integrated, extremely advanced library software system, and to modify it as needed in the future to maintain the high standard required by the Library.

38.     As part of the response to the RFP, each vendor was to provide a detailed presentation of its requirements and qualifications. In addition, the Library required that each vendor submitting a proposal be willing and able to customize its products to meet the Library's needs, including inter-operability with the Library's separate orders and acquisitions software and enhanced patron self-service features such as multi-lingual user interfaces.

39.     The ILS software that would be chosen needed to satisfy a demanding set of criteria, and each vendor was required to set forth in detail a full description of the vendor's proposed software system, as well as to respond to a number of specific questions designed to gauge the suitability of the proposed system, e.g., how the proposed system currently deals with such issues as technology environment and system support, database maintainance and cataloging, archives management, interlibrary loan activities, maintaining the bibliographic database, etc.

7

40.   Timing was also of critical importance.  The RFP specifically indicated that the Library's required "Go Live" date – the date by which the system chosen was required to be fully installed, operational and in use – was the second quarter of 2006.

41.   A number of vendors, including both Dynix and Sirsi Corp. provided responses to the RFP.

## D.   THE DYNIX PROPOSAL

42.   On June 15, 2005, Dynix responded to the RFP with a detailed proposal that was based upon a new version of its "Horizon" ILS software system (the "Dynix Proposal").

43.   Dynix's Proposal specifically addressed each of the Library's questions and concerns:

Because of the diversity of the patron population of Queens, the size of your system, the breadth of the collections, the volume of transactions, and the demanding needs of Queens Borough Public Library staff and users, we see the migration of [the Library] to new ILS technology as a exciting challenge for Dynix, one that we feel we are uniquely positioned to meet.  We are honored to respond to your request, and look forward to working with you throughout the selection process.

Our proposal details Horizon, our state-of-the-art ILS product and an array of companion products which will enable [the Library] to provide system-wide library automation services at each and every branch.  Our proposal includes hardware, software (all modules and services requested in your RFP), implementation, training, hardware/software support, and custom integration between Horizon and your SAP system.

In response, we have detailed how Dynix can support your goals for a fully-integrated and extremely advanced library software system. . . .

*   *   *

We also want to take this opportunity to express or willingness to work with you to build upon the flexibility and customizability of Horizon to fit the needs of [the Library].  The proposed Horizon ILS is technically advanced, completely integrated, and based on a sound architectural design that will transport [the Library] into the next generation of library automation.  It is a feature-rich and mature system that is in use by many library systems and consortiums both large and small.  The back-end technology of Horizon 8.0 will provide [the Library]

8

with automatically upgraded Java Swing clients, database independence, and open APIs for easy integration with external applications.

We have installed Horizon in many different types of libraries throughout the world, including large public libraries and library consortia, Academic Research Libraries, corporate and law libraries, historical archives, and so on.   Our implementation team has successfully migrated data from a number of legacy systems (including DRA), and we can ensure a successful data extraction and conversion process.

Dynix has been in the library industry for over 20 years, starting with the deployment of our legacy Dynix system in thousands of libraries worldwide. For the last 10 years, we have been developing and installing the Horizon ILS with its graphical interface and multi-tiered architecture which allows us to take advantage of new technology as it becomes available.   We will be releasing our 4th generation ILS product, Horizon 8.0, later this year.  Many key features from Horizon 8.0 are highlighted throughout our proposal; your proposed Go Live date should enable you to install 8.0 as [your] initial release.

44.    In the Dynix Proposal, Dynix proposed providing the Library with Horizon 8.0, a program which Dynix asserted it would be releasing by the end of 2005.

45.    Dynix represented that Horizon 8.0 was "built on current technology which provides efficiency, scalability, flexibility and the capability to integrate with other library tools and applications."

46.    In response to the Library's question to vendors of whether the proposed systems had been tested running behind a firewall, Dynix wrote that it had "conducted extensive firewall testing with the Horizon system using every practical measure to try to corrupt the system. The system works well behind a firewall."

47.    The Dynix Proposal also discussed some of the capabilities of the Horizon 8.0 software in the present tense, asserting, *inter alia*, that while Dynix's then current Horizon release "requires you to choose what form of MARC [Machine Readable Cataloguing] you're using in your database . . . Horizon 8.0 enables you to import, export, and store MARC records

9

created in multiple MARC standards in a single database" and that "[l]inked family records functionality is available in Horizon 8.0."

48.    The Dynix Proposal represented that no software or subsystems not available at the time Dynix submitted the Dynix Proposal were necessary to implement the proposed system.

49.    Section 3 of the Dynix Proposal was a more than 220 page long response to the technical requirements described by the Library in the RFP. Dynix represented that its proposed system complied with the majority of the Library's requirements.

50.    In that same section, Dynix described some requested features it listed as non-compliant as "planned for a future release of Horizon" or "under development."

51.    With respect to at least one requirement, Dynix described its proposed system as "[c]ompliant as of Horizon 8.0."

52.    Dynix further represented that "[t]he software [it had] proposed is available now. Horizon 7.4 is available now; Horizon release 8.0 is tentatively scheduled for delivery in January 2006 . . ."

53.    The Dynix Proposal disclosed that Dynix was developing new architecture for the Horizon 8.0 software.

54.    After the Library carefully reviewed all of the written proposals submitted in response to the RFP, the Library selected the top three vendors and invited them to provide demonstrations of their recommended ILS software for a two-day evaluation by the Library.

55.    One of the finalists was Dynix.

56.    Over a two-day period, Dynix provided a demonstration of its Horizon 8.0 ILS software's modules and functionality to the Library.

57.     In reliance on the representations contained in the Dynix Proposal and the demonstration of Horizon 8.0 ILS software, the Library selected Dynix as the vendor to be awarded the ILS contract and the described Horizon 8.0 software as its new ILS software solution.

58.     Moreover, the Library rejected competing proposals submitted by other vendors, including the one submitted by Sirsi Corp. two days prior to Dynix's which proposed that the Library use its "Unicorn" ILS software.

59.     The proposal submitted by Sirsi Corp. was rejected as it was deficient in meeting the functional prerequisites of the ILS the Library sought to obtain.  By way of example, Sirsi Corp.'s Unicorn system was inadequate as it had significant architecture issues and failures, operability and integration problems and was deficient in a number of other key respects.

**E.     SIRSI CORP. "ACQUIRES" DYNIX**

60.     Upon information and belief, and unbeknownst to the Library, at or around the time of the RFP process, Sirsi Corp., Dynix, Sirsi Holdings and other corporate affiliates of Defendants were in active discussion regarding a potential merger or acquisition of Dynix by Sirsi Corp.

61.     Based upon information obtained in connection with the investigation by the Library leading up to the filing of this Complaint, it appears that on or about June 21, 2005 Sirsi Corp. purchased Dynix, just six days after Dynix submitted its response to the Library's RFP and eight days after Sirsi Corp. submitted its response to the Library's RFP as well.

62.     Notwithstanding the transaction between Dynix (or its owners) and Sirsi Corp., as detailed below, Dynix was the entity which actually entered into the License Agreement with the Library.

63.     Upon information and belief, according to the records of the Secretary of State of Utah, Dynix currently continues to be a corporation in good standing organized and existing under the laws of Utah.

64.     Upon information and belief, at the time of the transaction between Dynix and Sirsi Corp. or thereafter, Defendants or their owners and affiliates caused substantially all of the assets of Dynix to be transferred out of Dynix, rendering Dynix incapable of performing its obligations under the License Agreement.

65.     The License Agreement was never assigned from Dynix to any other entity.

66.     Upon information and belief, Sirsi Corp. induced Dynix to breach the License Agreement and/or prevented Dynix from satisfying its obligations pursuant to the terms of the License Agreement.

67.     Upon information and belief, Sirsi Corp. induced Sirsi Holdings to breach the Guaranty and/or prevented Sirsi Holdings from satisfying its obligations pursuant to the terms of the Guaranty.

68.     The Library was unaware of the fact that Dynix was rendered unable to or prevented from performing under the License Agreement and continued to have discussions with Dynix culminating in the License Agreement between Dynix and the Library.

69.     Upon information and belief, at the time that Dynix entered into the License Agreement as detailed below, Dynix had no intention of fulfilling its obligations under the License Agreement or knew (or should have known) that it would not be able to perform its obligations.

70.     Upon information and belief, at the time that Sirsi Holdings entered into the Guaranty as detailed below, Sirsi Holdings had no intention of fulfilling its obligations under the

License Agreement or knew (or should have known) that it would not be able to perform its obligations.

## F.   **THE NEGOTIATIONS**

71.   Having selected Dynix as the vendor and its Horizon 8.0 as the chosen ILS software, the Library entered into negotiations with Dynix for formal agreements pursuant to which Dynix would develop, install, license and support the proposed new system.

72.   During the fall of 2005 and early 2006, Dynix performed an analysis of the differences between the functionality included in the version of the DRA System then in use by the Library and the functionality of the proposed Horizon 8.0 system (the "GAP Analysis").

73.   The purpose of the Gap Analysis was to identify functionality required by the Library but which Dynix had not to that date included in Horizon 8.0 (the "Gap Analysis Functionality").

74.   During that same period, Dynix and the Library negotiated the terms of the Agreements.

75.   On June 21, 2005, <u>six days after Dynix submitted the Dynix Proposal and eight days after Sirsi Corp. submitted its proposal to the Library</u>, a public press release proclaimed that "Sirsi Corporation and Dynix Corporation have announced that the two companies are merging to form SirsiDynix, a single company that, according to the announcement, is positioned more strongly that either company on its own to develop and deliver information technology solutions for libraries and consortia around the world."

76.   Based upon information discovered to date, it appears that this was not a "merger," but in fact, a transaction by which Sirsi purchased Dynix and stripped it of its assets, but kept the shell as an existing corporation.

77.     The Library learned of the public announcement of the "merger," and specifically asked Dynix, prior to further negotiations and execution of any agreements, to provide assurances that Dynix would be able to perform in accordance with its response to the RFP.

78.     On or about July 18, 2005, Dynix responded in writing to this inquiry as follows:

> The merger of Sirsi and Dynix is a positive step for both companies and potentially for [the Library], as it greatly enriches the development resources and product lines of the new combined company.
>
> SirsiDynix plans to continue to aggressively develop the Horizon platform for the foreseeable future, including Horizon release 8.0 and beyond. There are no plans to discontinue product development for Horizon; both Horizon and Unicorn customers will be supported for the foreseeable future. In fact, the Horizon 8.0 platform is very well suited for ongoing growth and development, based on the infinitely flexible Java Swing technology and database independence. The incorporation of continuous Open APIs also allows Horizon to be integrated with current and future library applications.

## G.     THE LICENSE AGREEMENT

79.     On or about March 6, 2006, Dynix and the Library entered into the License Agreement. The entity which entered in to the License Agreement with the Library is specifically identified as "Dynix Corporation" – the same entity that had been awarded the contract pursuant to the RFP process. At no time prior to or at execution was the Library ever advised that Dynix either could not or would not be able to satisfy its obligations under the License Agreement.

80.     In the License Agreement, Dynix represented that Horizon 8.0 would be available in general release by March 31, 2006.

81.     In addition, Dynix agreed to provide both the Gap Analysis Functionality and certain other modifications or functionality required by the Library prior to the Go Live date.

82.     Indeed, in the License Agreement, Dynix agreed it would meet various specified dates (the "Milestone Delivery Dates") for the delivery of certain versions of the proposed

system, each of which would include certain required functionality as specified in the License Agreement, and that Dynix would "take all actions necessary to assist the Library" to meet the scheduled Go Live date of February 5, 2007.

83.    The agreed upon Milestone Delivery Dates set forth in the License Agreement included dates for:

- Delivery and installation by Dynix of interim versions of the proposed system on or about March 31, 2006, August 1, 2006, October 1, 2006 and January 1, 2007, each of which were to be fully functional versions of the licensed software, including Horizon 8.0 as then modified for the Library to include all functionality identified in the License Agreement as required to be included as of the applicable date; and

- Delivery of other required functionality on various dates specified in the License Agreement.

84.    Each of the Milestone Delivery Dates were carefully chosen by the Library and Dynix in order to allow Dynix sufficient time to test, make corrections to the system and perform the other tasks necessary to meet the Library's scheduled Go Live date.

85.    Dynix explicitly agreed that if it missed the October 1, 2006 Milestone Delivery Date by more than two months it would issue the Library a credit in an amount equal to 20% of the total annual maintenance fee it charged the Library, and if it missed the scheduled Go Live date by more than sixty days, Dynix would issue the Library a credit in the amount of a monthly maintenance fee for each month or partial month by which the delivery was delayed.

86.    In addition, Dynix agreed that if it was not able to comply with certain of the Milestone Delivery Dates, the Library could terminate the License Agreement without providing Dynix an opportunity to cure and that Dynix would immediately refund all monies paid under the License Agreement.

87.    Dynix also agreed in the License Agreement to provide "Implementation Services" (as defined in the License Agreement) pursuant to Schedule 2 to the License

15

Agreement, to provide the Library with the services of a "Custom Development Team" (as defined in the License Agreement) and that no hardware, software or services not expressly set forth in the Purchase and License Agreement would be required to operate the proposed Horizon 8.0 system.

88.     Section 17 of the License Agreement provides that the term "Damages and Costs" shall mean "all damages and costs, losses, liabilities, claims, judgments and/or expenses (including, without limitation attorneys fees)" emphasis added.

89.     Section 18 of the License Agreement provides in relevant part that "[Dynix] agrees to indemnify, defend and hold the Library harmless from, any and all Damages and Costs, claims or proceedings arising out of . . . a breach by [Dynix] of any warranty, representation or obligation under this Agreement . . . ."

## H.     **THE GUARANTY**

90.     On the same date that Dynix and the Library entered into the License Agreement, Sirsi Holdings and the Library entered into the Guaranty.

91.     Sirsi Holdings acknowledged that it was providing the Guaranty "as an inducement to [the] Library to enter into the License Agreement."

92.     Pursuant to the Guaranty, Sirsi Holdings "irrevocably and unconditionally guarantee[d] to Library the prompt and full performance and discharge by [Dynix] of all of [Dynix's] covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement and all amendments and all other documents executed pursuant thereto (collectively, the 'Obligations')."

93.     Sirsi Holdings agreed that, upon a default by Dynix, it would "perform or cause to be performed such [defaulted] Obligation."

94. In addition, Sirsi Holdings agreed that its obligation under the Guaranty was a primary obligation and that the Library was not required to seek recourse against Dynix prior to demanding payment or performance under the Guarantee.

95. The Guarantee recites that it is binding on Sirsi Holdings' successors and assigns.

## I.   THE LIBRARY'S PERFORMANCE

96. Pursuant to the governing terms of the License Agreement and the Guaranty, the Library was required to and did undertake performance of its obligations at a substantial cost to the Library.

97. As part of its performance obligations, the Library, among other things, dedicated significant and separately earmarked Library resources to the project, purchased the requisite hardware and third party software, and substantially performed under each Agreement.

98. Defendants were fully aware at all times of the Library's undertakings and expenditures in connection with the Library's performance.

## J.   DYNIX AND SIRSI HOLDINGS BREACH THE AGREEMENTS

99. Horizon 8.0 was not made available in general release as scheduled.

100. Indeed, Dynix has not met **any** of the Milestone Delivery Dates.

101. In a Monthly Status Report dated June 30, 2006, issued only 3 months after the parties executed the Agreements (Agreements that were the subject of almost a year long negotiation and detailed analysis) Dynix advised the Library that it had not yet delivered the processed record information to the Library to meet the requirements of Schedule 5, Exhibit A of the License Agreement. This Report also provided that Dynix "believes that even with the altered delivery date, [Dynix] will still be able to meet the remaining deadlines in the project implementation schedule."

102.    Thereafter, on or about July 28, 2006, Dynix notified the Library that it would not be able to meet the Milestone Delivery Dates and requested that they be pushed back from six to nine months (varying by functionality), with a new Go Live date scheduled for September 2007.

103.    Also in September 2006, Dynix proposed amending the License Agreement to, among other things, modify the specifications for the hardware which would be required for the operation of the proposed system.  These new hardware specifications would have required the Library to expend significant additional funds to purchase hardware.

104.    Then, in October 2006, Dynix provided the Library with notice that the Milestone Delivery Dates would need to be further delayed.

105.    By letter dated October 6, 2006, the Library responded to the proposed amendment, setting out the issues that would need to be addressed before it could agree to any amendment of the License Agreement, including, *inter alia*, allocation of additional hardware costs, additional financial credit to the Library and several of the Library's technical concerns.

106.    Between October 6, 2006 and March 13, 2007, managers of Dynix and the Library engaged in communications and meetings, as required by the License Agreement, to try to address the outstanding issues.  Despite the efforts of both parties, the outstanding issues were not resolved.  No amendment was ever executed.

107.    By letter dated March 13, 2007, Dynix informed the Library that it would not be releasing Horizon 8.1 (the name given by Dynix to the version of Horizon 8.0 that was being developed for the Library).  Instead, Dynix indicated that it intended to create a new platform (called "Rome") which was to be based on Sirsi Corp's Unicorn system (which the Library had previously rejected during the RFP procurement process).  Dynix indicated that its first release of

Rome was scheduled to be available in the fourth quarter of 2007, while a second release was targeted for late 2008.

108. Based on the fact that Dynix now informed the Library that it had no intention to deliver the Horizon 8.0 software for which the Library contracted, the Library conducted a detailed gap analysis of the Sirsi Rome platform to determine whether it would meet the Library's needs outlined in detail in its RFP.

109. Soon thereafter, a detailed deficiency report was provided to Dynix explaining why the Rome platform was not a viable option for the Library. Dynix acknowledged the deficiencies in the Rome platform and could not assure the Library that each deficiency could be rectified within the time frame clearly set forth in the Library's RFP which Dynix previously assured the Library it could do with Horizon 8.0.

110. At the same time, Dynix announced that, as of February 28, 2009, it would cease providing any support for DRA Classic. DRA Classic was an integral component of the DRA System that the Library was still using due to Dynix's failure to meet any of the Milestone Delivery Dates.

111. On March 30, 2007, the Library provided Dynix with Notice of Material Breach of its obligations under the License Agreement (the "Breach Letter"). The Breach Letter set forth Dynix's breach of multiple provisions of the License Agreement including, *inter alia*, failure to meet any of the Milestone Delivery Dates, Dynix's failure to provide the required modifications, failure to make Horizon 8.0 available in general release, failure to provide the Library with a Custom Development Team and breach of the warranty that the Library would need no new hardware to run Dynix's proposed system.

112. The Library declared a material breach of the License Agreement, and demanded that Dynix cure its breaches and provide the Library with a detailed written plan of how it intended to do so. In addition, the Breach Letter sought another meeting between the managers of the respective parties. Finally, the Breach Letter demanded that Dynix issue to the Library the credits to which it was entitled by virtue of Dynix's failures to meet the Milestone Delivery Dates and Go Live date.

113. Also on March 30, 2007, the Library provided Sirsi Holdings with written notice under the Guaranty (the "Guaranty Notice") of Dynix's material breach of its obligations under the License Agreement and demanded that, as required under the Guaranty, Sirsi Holdings perform or cause to be performed those obligations of Dynix under the License Agreement which Dynix has failed to perform.

114. By letter dated April 5, 2007, Dynix, acknowledged receipt of the Breach Letter and advised the Library that Dynix refused to make Horizon 8.0 (or any previously planned subsequent version) available in general release or to the Library. Dynix also refused to provide the Library with any credits under the License Agreement on the basis that, since Dynix would not be issuing Horizon 8.0, Dynix would not be charging the Library maintenance fees with respect to Horizon 8.0 for the credits to be issued against.

115. Despite their efforts, the managers of Dynix and the Library were unable to resolve the issues arising out of Dynix's breach of the License Agreement.

116. As required by the License Agreement, in October 2007, the issues arising out of Dynix's breach of the License Agreement were escalated to the executives of Dynix and the Library, who met to discuss Dynix's serial breaches of the License Agreement and the issues arising from those breaches.

117.   Dynix has steadfastly refused to cure its breaches and Dynix and the Library have been unable to resolve the ongoing issues.

118.   To date, Dynix has still not provided the Library with any reliable version of the proposed system and has not otherwise cured its material breaches of the License Agreement as described in the Breach Letter.

119.   To date, Sirsi Holdings has failed to comply with its obligations under the Guaranty to provide the Library with "the prompt and full performance and discharge by [Dynix] of all of [Dynix's] covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement," including their obligation to perform or cause to be performed those obligations of Dynix under the License Agreement which Dynix failed to perform.

120.   As a result of the breaches and failures identified herein, the Library did not meet its scheduled "Go-Live" date of February 5, 2007 and has incurred substantial damages.

121.   The Library's damages that are a direct and proximate result of Defendants conduct include, but are not limited to, the costs it expended in performing under the License Agreement and Guaranty, the costs incurred by the Library in purchasing the requisite hardware and third party software, and the costs of obtaining replacement ILS software after Defendants breached their obligations to the Library.

### AS AND FOR A FIRST CAUSE OF
### ACTION AGAINST DEFENDANT DYNIX
### (Breach of Contract)

122.   The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 121 above as if fully set forth herein.

123.   The License Agreement constitutes a legal and binding agreement between the Library and Dynix.

124.    The Library substantially performed its obligations pursuant to the License Agreement.

125.    Defendant Dynix repeatedly breached the License Agreement as described herein by, *inter alia*, failing to meet any of the Milestones contained in the License Agreement and failing to deliver the Horizon software which the Library contracted for in the License Agreement.

126.    Dynix's refusal to perform was willful, wonton, unconscionable, oppressive and undertaken with malice, particularly given that it knew all along that the Horizon product would be phase out.  Dynix engaged in a scheme and device to string the Library along with false promises of delivery, all the while knowing that Dynix would not perform its obligations under the License Agreement.  Based upon the actions and inactions of Dynix, the Agreements have failed in their essential purpose.

127.    Dynix's conduct in stringing the Library along was aimed specifically at putting the Library in such a position that, when Dynix finally divulged that it would not perform (which it knew all along), the Library would be under economic and operational duress such that Dynix (and the other Defendants) could force the Library into accepting the (already reject) Sirsi Unicorn-based system.

128.    At the time that Dynix announced that it would not fulfill any of its obligations under the License Agreement, the Library could not purchase any equivalent system to the Horizon product on the open market.

129.    As a result of Defendant Dynix's breach of the License Agreement, the Library has suffered substantial damages caused by Dynix in an amount to be proved at trial, but not less than $5,000,000, plus interest.

22

130.    In addition, pursuant to the License Agreement, the Library is entitled contractually to recover its reasonable attorneys fees in connection with this controversy and action.

### AS AND FOR A SECOND CAUSE OF
### ACTION AGAINST DEFENDANT DYNIX AND SIRSI HOLDINGS
### (Unjust Enrichment)

131.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 130 above as if fully set forth herein.

132.    The Library conferred a benefit to Dynix and Sirsi Holdings by performing its obligations in connection with the development of the Horizon software the Library purchased from Defendant Dynix.

133.    Indeed, in the Guaranty, Sirsi Holdings acknowledged that it "will receive substantial economic and other benefits from Library entering into the License Agreement with [Dynix]."

134.    Defendants Dynix and Sirsi Holdings knew that the Library was performing its obligations in the development of the Horizon software and, as a result, benefitted from the Library's performance.

135.    As a result, Defendants Dynix and Sirsi Holdings were unjustly enriched by the Library's performance and the Library has suffered damages caused by Dynix and Sirsi Holdings in an amount to be proved at trial, but not less than $5,000,000.

### AS AND FOR A THIRD CAUSE OF
### ACTION AGAINST DEFENDANTS DYNIX AND SIRSI HOLDINGS
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

136.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 135 above as if fully set forth herein.

137.   New York law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the State of New York

138.   Under this covenant, the parties to a contract must deal with each other honestly and in good faith not only with respect to the performance of the contract, but also in their enforcement of the terms of the contract.

139.   As detailed above, Dynix and Sirsi Holdings acted in such a way as to deprive the Library of the benefit of its bargain under the License Agreement and the Guaranty, and otherwise prevented and frustrated the Library from obtaining the contracted for benefits thereunder. Based upon the actions and inactions of defendants Dynix and Sirsi Holdings, the Agreements have failed in their essential purpose.

140.   As a result of the actions of Dynix and Sirsi Holdings detailed above, Dynix and Sirsi Holdings have violated the implied covenant of good faith and fair dealing contained in the License Agreement and the Guaranty.

141.   As a result Dynix and Sirsi Holdings breach of the implied covenant of good faith and fair dealing, the Library has suffered damages caused by Dynix and Sirsi Holdings in an amount to be proved at trial, but not less than $5,000,000.

142.   In addition, pursuant to the License Agreement and the Guaranty, the Library is entitled contractually to recover its reasonable attorneys fees in connection with this controversy and action..

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
#### (Fraud)

143.   The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 142 above as if fully set forth herein.

24

144.   Dynix and Sirsi Holdings made knowing and intentional false statements in the Dynix Proposal, in their submission of answers to specific questions posed by the Library, in their public statements, and in their negotiations and discussions with the Library prior to execution of the License Agreement and the Guaranty, as set forth above and including, but not limited to:

- that the proposed system could be implemented using software and subsystems extant at the time the Dynix Proposal was submitted;

- that the proposed system was "compliant" with various Library technical requirements when, upon information and belief, the required functionality had not yet been developed in Horizon 8.0;

- that the proposed system had been tested running behind a firewall when, upon information and belief, Horizon 8.0 had not been so tested;

- use of screenshots in the Dynix Proposal which, upon information and belief, were intended to be understood as screenshots from the proposed system but which, upon information and belief, were actually screenshots from prior versions of Horizon;

- that Horizon 8.0 had "linked family functionality" and enabled the import, export and storage of multiple MARC formats in a single database when, upon information and belief, Horizon 8.0 had no such functionality at the time of the Dynix Proposal;

- that required features to enable staff and customers to request Library materials was in compliance with the Library's requirements, when, upon actual use, the Library's staff and Dynix's staff were unable to make this feature work with any degree of success.  As a result, the state of the Horizon Software was such that it was unable to match Library materials with the corresponding requests;

- that Horizon would meet the Library's transactional volume set forth in the RFP was false when, upon information and belief, the software suffered from significant response time problems, which was publicly admitted by the CTO of Dynix at the 2006 User Group Meeting; and

- that Sirsi Holdings would "irrevocably and unconditionally guarantee[d] to Library the prompt and full performance and discharge by [Dynix] of all of [Dynix's] covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement and all amendments and all other documents executed pursuant thereto (collectively, the 'Obligations')" and that, upon a default by Dynix, it would "perform or cause to be performed such [defaulted] Obligation."

145.   Upon information and belief, the Dynix Proposal was drafted in a way to contain statements calculated to lead the Library to believe and rely upon the fact that the development of Horizon 8.0 was nearly complete and/or did not face significant obstacles.

146.   Upon information and belief, the statements set forth above were false.

147.   Upon information and belief, Sirsi Corp. colluded with and acted in concert with the other Defendants in making these false statements to the Library.

148.   Upon information and belief, Defendants were aware at the time that Dynix and Sirsi Holdings entered into the License Agreement and the Guaranty that they would not be making Horizon 8.0 available in general release by March 31, 2006 (or thereafter), as represented, and would not be satisfying any obligations under the License Agreement and the Guaranty.

149.   Upon information and belief, the Library was intended by Defendants to rely on each of the false statements made.

150.    The Library was unaware of the falsity of each of these material statements at the time they were made.

151.    Upon information and belief, neither Dynix nor Sirsi Holdings had any intention of performing their obligations under the License Agreement and the Guaranty at the time they executed each Agreement.

152.    The Library did reasonably rely the accuracy of each of the above material statements.

153.    Upon information and belief, Defendants acted in concert in connection with the fraud alleged herein, and as a result, are jointly and severally liable for all damages that flow therefrom.

154.    Had the Library known that the representations made by Defendants were not true, the Library would not have entered into the License Agreement and the Guaranty with Dynix and/or Sirsi Holdings.

155.    As a direct and proximate result of Defendants' fraud, the Library has suffered damages in an amount to be proved at trial, but not less than $5,000,000.

156.    Dynix's and Sirsi Holdings' misrepresentations were intentional and willful and wanton.  Accordingly, the Library should be awarded punitive and exemplary damages in an amount to be awarded at trial, but not less than $5,000,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### (Violation of New York State General Business Law § 349)

157.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 156 above as if fully set forth herein.

158.    By its actions as described above, Dynix violated New York State General Business Law § 349 and was aided and abetted in such violation by Sirsi Corp. and Sirsi Holdings.

159.    The Library is entitled to recover on account of its having been victimized by the violations of General Business Law § 349 committed by defendants Dynix and Sirsi Corp., such damages as provided by law, along with attorneys' fees, the final amount of which shall be determined at trial, for which Dynix and Sirsi Corp. are jointly and severally liable.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANT SIRSI HOLDINGS**
**(Breach of Guaranty)**

160.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 159 above as if fully set forth herein.

161.    Contemporaneously and as an inducement to the Library to enter into the License Agreement, Sirsi Holdings provided a separate Guaranty.

162.    Pursuant to the governing terms of the Guaranty, Sirsi Holdings agreed to "irrevocably and unconditionally guarantee[] the prompt and full performance and discharge by [Dynix] of all of [Dynix's] covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement . . . (collectively, the 'Obligations')."

163.    Sirsi Holdings further agreed in the Guaranty that its obligations thereunder were "direct, immediate and primary" obligations and liabilities of Sirsi Holdings, and that the Library would not be required first to seek recourse against Dynix before demanding payment or performance from Sirsi Holdings under the Guaranty.

164.    The Guaranty specifically provides that it: (i) was continuing in nature; and (ii) the Library's agreement to enter into the License Agreement with Dynix (thereby giving rise to all obligations thereunder) was "conclusively presumed" to be in reliance upon the Guaranty, by

28

which Sirsi Holdings agreed, among other things, that upon any default by Dynix (Sirsi Holdings' wholly owned subsidiary), Sirsi Holdings would "perform or cause to be performed such [defaulted] Obligation."

165.    Contemporaneously with the Library's delivery to Dynix of the March 30, 2007 Breach Notice (described above), the Library provided Sirsi Holdings with written notice of Dynix's material breach of its obligations under the License Agreement, the Guaranty Notice, and therein demanded that (as required by the Guaranty) that Sirsi Holdings perform or cause to be performed those obligations of Dynix under the License Agreement that Dynix had failed and refused to perform.  Based upon the actions and inactions of Sirsi Holdings, the Agreements have failed in their essential purpose.

166.    To date, Sirsi Holdings has failed and refused to comply with its obligations under the Guaranty and has not provided the Library with "the prompt and full performance and discharge by [Dynix] of all of [Dynix's] covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement," including its obligation to perform or cause to be performed those obligations of Dynix under the License Agreement that Dynix has failed to perform.

167.    The Guaranty constitutes a legal and binding agreement between the Library and Sirsi Holdings.

168.    The Library substantially performed its obligations pursuant to the Guaranty.

169.    Sirsi Holdings repeatedly breached the Guaranty as described herein by, inter alia, failing to meet its contractual performance obligations as required by the Guaranty.

170.    By reason of the foregoing, Sirsi Holdings is liable under the Guaranty for those damages sustained by the Library on account of Dynix's material breach of the terms and conditions of the License Agreement (as described herein).

171.    The Library has suffered damages as a direct result of Sirsi Holdings' breaches in an amount to be proved at trial, but not less than $5,000,000.

172.    In addition, pursuant to the License Agreement and the Guaranty, the Library is entitled contractually to recover its reasonable attorneys fees in connection with this controversy and action.

**AS AND FOR A SEVENTH CAUSE OF ACTION
AGAINST DEFENDANTS SIRSI CORP.**
**(Tortious Interference With Contract)**

173.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 172 above as if fully set forth herein.

174.    The License Agreement as between Dynix and the Library is a valid and binding contract between the Library and Dynix.

175.    The Guaranty as between Dynix and Sirsi Holdings is a valid and binding contract between the Library and Sirsi Holdings.

176.    Sirsi Corp. is not a party to either the License Agreement or the Guaranty.

177.    Upon information and belief, at all relevant times, Sirsi Corp. was fully aware of the existence of the License Agreement and the Guaranty, and was fully aware that the terms of the License Agreement and Guaranty obligated Dynix and/or Sirsi Holdings to perform as required pursuant to the terms of the respective Agreements.

178.    Upon information and belief, Sirsi Corp. was aware that its actions in preventing Dynix and/or Sirsi Holdings from their required performance obligations would result in a breach of the License Agreement and the Guaranty by Dynix and Sirsi Holdings respectively.

30

179. With this knowledge, Sirsi Corp. intentionally, improperly, maliciously, wilfully, wantonly and without justification procured and induced Dynix's and Sirsi Holdings' breaches of the License Agreement and Guaranty, respectively, by wrongfully inducing and influencing Dynix and Sirsi Holdings to withhold performance that was required under the agreements, by hindering and/or preventing the performance of the obligations of Dynix and Sirsi Holdings and by the acts otherwise described above.

180. Dynix and Sirsi Holdings would not have breached the License Agreement and the Guaranty as described herein but for Sirsi Corp.'s wrongful, knowing, intentional, unjustified and malicious actions.

181. In interfering with the License Agreement and Guaranty, Sirsi Corp. had directly and proximately caused damages to the Library.

182. As a result of Defendant Sirsi Corp.'s tortuous interference with the License Agreement and Guaranty, the Library has suffered damages caused by Sirsi Corp. in an amount to be proved at trial, but not less than $5,000,000, plus interest.

183. Sirsi Corp.'s misrepresentations were intentional and willful and wanton. Accordingly, the Library should be awarded punitive and exemplary damages in an amount to be awarded at trial, but not less than $5,000,000.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
### (Fraudulent Conveyance)

184. The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 183 above as if fully set forth herein.

185. Upon information and belief, at the time of the transaction between Dynix and Sirsi Corp. or thereafter, Sirsi Corp. and Sirsi Holdings transferred, or caused Dynix to transfer, substantially all of Dynix's assets out of Dynix, leaving Dynix a shell corporation unable to

perform its obligations or satisfy its liabilities as required pursuant to the terms of the License Agreement.

186.    The License Agreement was never assigned from Dynix to any other entity.

187.    Upon information and belief, Sirsi Corp., Sirsi Holdings, and or their affiliated companies used their dominion and control over Dynix to cause the improper conveyance of Dynix's assets and prevented Dynix from satisfying its obligations pursuant to the terms of the License Agreement.

188.    Sirsi Corp and Sirsi Holdings have fraudulently conveyed Dynix's assets in an effort to hinder, delay or defraud the Library.

189.    In view of the foregoing, the Library is entitled to have the fraudulent conveyances of the assets set aside and/or have a constructive trust imposed over such assets to satisfy any judgment entered in this action.

### AS AND FOR A NINTH  CAUSE OF ACTION
### AGAINST DEFENDANTS DYNIX AND SIRSI HOLDINGS
### (Breach of Express and Implied Warranties)

190.    The Library here repeats and realleges each and every allegation of the Complaint contained in Paragraphs 1 through 189 above as if fully set forth herein.

191.    Based upon the actions and inactions of defendants Dynix and Sirsi Holdings, the Agreements have failed in their essential purpose.

192.    Defendants Dynix and Sirsi Holdings have breached the express warranties made in connection with the transactions alleged herein and have also breached the warranties implied by law, including but not limited to the implied warranties of quality, merchantability and fitness for a particular purpose.

193.    The Library has suffered damages as a direct result of Defendants Dynix's and Sirsi Holdings breaches of warranties in an amount to be proved at trial, but not less than $5,000,000.

**WHEREFORE**, the Library demands judgment against Defendants as follows:

(i)    With respect to the Library's First Cause of Action against defendant Dynix for breach of contract, awarding the Library compensatory damages against Dynix in the aggregate amount, not less than $5,000,000, plus reasonable attorneys fees, together with accrued and accruing interest, costs, the final amount of which shall be determined at trial;

(ii)    With respect to the Library's Second Cause of Action against defendants Dynix and Sirsi Holdings for unjust enrichment, awarding the Library compensatory damages against Dynix in the aggregate amount, not less than $5,000,000, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial;

(iii)    With respect to the Library's Third Cause of Action against defendants Dynix and Sirsi Holdings for breach of the covenant of good faith and fair dealing, awarding the Library compensatory damages in an amount not less than $5,000,000, plus reasonable attorneys fees, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial;

(iv)    With respect to the Library's Fourth Cause of Action against all Defendants for fraud, awarding the Library compensatory damages against Dynix in an amount of not less than $5,000,000, and punitive damages in an amount not less than $10,000,000, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial;

(v)    With respect to the Library's Fifth Cause of Action against all Defendants for violation of New York State General Business Law § 349 awarding the Library (a) damages as provide by law, together with accrued and accruing interest, costs, the final amount of which shall be determined at trial; and (b) reasonable attorneys pursuant to General Business Law § 349(h);

(vi)    With respect to the Library's Sixth Cause of Action for breach of the Guaranty against defendant Sirsi Holdings, awarding the Library compensatory damages against Sirsi Corp. in an amount of not less than $5,000,000, plus reasonable attorneys fees, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial;

(vii)    With respect to the Library's Seventh Cause of Action for tortious interference against defendant Sirsi Corp, awarding the Library damages against Sirsi Corp. in an amount of not less than $5,000,000, and punitive damages in an amount not less than

$10,000,000, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial;

(viii)   With respect to the Library's Eighth Cause of Action for fraudulent conveyance against all Defendants, awarding the Library judgment setting aside the fraudulent conveyances of the assets and/or imposing a constructive trust over such assets to satisfy any judgment entered in this action;

(ix)   With respect to the Library's Ninth Cause of Action for breach of express and implied warranties against defendants Dynix and Sirsi Holdings, awarding the Library compensatory damages in an amount of not less than $5,000,000, together with accrued and accruing interest, costs, fees, the final amount of which shall be determined at trial; and

(x)   granting to the Library such other further and/or different relief as to this Court may deem just and proper.

Dated: New York, New York
        July 2, 2009

**Thompson Hine LLP**

By: _____

Rebecca Brazzano
Richard De Palma
Attorneys for Plaintiff
Queens Borough Public Library
335 Madison Avenue, 12th Floor
New York, New York  10017-4611
Tel: 212.344.5680
