**EXECUTION COPY**

**DYNIX CORPORATION**

**and**

**QUEENS BOROUGH PUBLIC LIBRARY**

**PURCHASE AND LICENSE AGREEMENT**

**Dated March 6, 2006**

## TABLE OF CONTENTS

**Page**

1.  FURNISHING OF SOFTWARE AND SERVICES ...........................................................1

2.  CONTRACT DOCUMENTS .......................................................................................1

3.  DEFINITION OF TERMS .........................................................................................2

4.  SITE PREPARATION...............................................................................................4

5.  DELIVERY OF LICENSED SOFTWARE AND INSTALLATION OF
    HARDWARE AND LICENSED SOFTWARE.................................................................4

6.  RISK OF LOSS......................................................................................................13

7.  SERVICES............................................................................................................13

8.  DOCUMENTATION ...............................................................................................19

9.  ACCEPTANCE TESTS.............................................................................................19

10. WARRANTY .........................................................................................................21

11. DEDICATED SERVERS ..........................................................................................26

12. MAINTENANCE ....................................................................................................27

13. INVOICING; PAYMENT SCHEDULE .......................................................................27

14. TAXATION............................................................................................................27

15. SOFTWARE LICENSE; ESCROW .............................................................................28

16. OWNERSHIP OF DATA ..........................................................................................31

17. INTELLECTUAL PROPERTY CLAIMS .....................................................................32

18. OTHER INDEMNIFICATION; LIMITATION OF LIABILITY........................................33

19. INSURANCE..........................................................................................................34

20. LICENSED SOFTWARE ENHANCEMENTS AND NEW RELEASES .......................35

21. TERM AND TERMINATION ...................................................................................36

22. CONFIDENTIALITY...............................................................................................39

23. ASSIGNMENT.......................................................................................................40

24. DISPUTE RESOLUTION .........................................................................................40

25.   NON-APPROPRIATION OF FUNDS ............................................................................. 40

26.   GENERAL ................................................................................................................. 41

BRMFS1 627942v16

## TABLE OF SCHEDULES

SCHEDULE 1    SIRSIDYNIX SOFTWARE, SERVICES, AND THIRD PARTY
              CONFIGURATION

SCHEDULE 2    SCHEDULE OF ACTIVITIES

SCHEDULE 3    DATA CONVERSION, DATA MAPPING, DATA LOAD SERVICES
              AND AUTHORITY CONTROL DETAIL

SCHEDULE 4    PAYMENT SCHEDULE

SCHEDULE 5    ACCEPTANCE TESTS

              SCHEDULE 5 - EXHIBIT A - DATA LOAD TEST
              SCHEDULE 5 - EXHIBIT B - MODULE FUNCTIONALITY TEST
              SCHEDULE 5 - EXHIBIT C - SYSTEM RELIABILITY TESTS
              SCHEDULE 5 - EXHIBIT D - RESPONSE-TIME ACCEPTANCE TEST

SCHEDULE 6    INTENTIONALLY LEFT BLANK

SCHEDULE 7    SYSTEM CAPACITY AND GROWTH PATH WARRANTIES

              TABLE 7-1 – ESTIMATES FOR CONCURRENT LICENSED USERS
              TABLE 7-2 – TRANSACTION VOLUMES

SCHEDULE 8    INTENTIONALLY LEFT BLANK

SCHEDULE 9    CLARIFICATIONS

SCHEDULE 10   MAINTENANCE AND SUPPORT AGREEMENT

SCHEDULE 11   DSI SOURCE CODE ESCROW AGREEMENT

SCHEDULE 12   REQUIRED "GO-LIVE" FUNCTIONALITY

SCHEDULE 13   ADDITIONAL REQUIRED FUNCTIONALITY

SCHEDULE 14   REQUIRED INTERFACES

SCHEDULE 15   INTENTIONALLY LEFT BLANK

SCHEDULE 16   PROJECT LEADERS

SCHEDULE 17   GUARANTEED RESPONSE TIMES

SCHEDULE 18   PARENT GUARANTEE

## PURCHASE AND LICENSE AGREEMENT

This Agreement is made and entered into by and between Dynix Corporation d/b/a SirsiDynix ("SirsiDynix"), having its offices at 400 Dynix Drive, Provo, UT 84604 and the Queens Borough Public Library ("Library or "QBPL"), having its principal offices at 89-11 Merrick Blvd, Jamaica, NY 11432, on this 6th day of March, 2006 (the "Effective Date").

### RECITALS

WHEREAS, Library desires to contract with SirsiDynix to obtain the licenses and services described herein, and SirsiDynix desires to contract with Library to provide said licenses and the services described herein;

NOW THEREFORE, in consideration of the mutual covenants, promises and undertakings contained herein, the parties hereto hereby agree as follows:

**1. FURNISHING OF SOFTWARE AND SERVICES**

Subject to the terms and conditions set forth herein, SirsiDynix agrees to provide and Library hereby agrees to purchase:

A. The licenses for the use of the computer programs and related documentation listed on Schedule 1 hereto (the Licensed Software and Third Party Software).

B. The Implementation Services, including without limitation those listed on Schedules 1 and 3 hereto.

C. The maintenance services listed as provided in a separate Maintenance Agreement.

D. The services, including those of a Custom Development Team, as described in Section 7(B).

**2. CONTRACT DOCUMENTS**

The contract documents are:

A. This Agreement, including the following schedules attached hereto:

Schedule 1—SirsiDynix Software, Services, and Third Party Configuration

Schedule 2—Schedule of Activities

Schedule 3—Data Conversion, Data Mapping, Data Load Services and Authority Control Detail

Schedule 4—Payment Schedule

Schedule 5—Acceptance Tests

Schedule 6—Intentionally left blank

Schedule 7—System Capacity and Growth Warranties

Schedule 8—Intentionally left blank

Schedule 9—Clarifications

Schedule 10—Maintenance Agreement

Schedule 11—DSI Source Code Escrow Agreement

Schedule 12—Required "Go-Live" Functionality

Schedule 13—Additional Required Functionality

Schedule 14—Required Interfaces

Schedule 15—Intentionally left blank
Schedule 16—Project Leaders
Schedule 17—Guaranteed Response Times
Schedule 18—Parent Guarantee; and

B.     The RFP and the Proposal (each as defined in Section 3 below).

Each of these documents is incorporated herein by this reference as if set forth in full, and shall constitute a part of this Agreement.  In the event of a conflict or for purposes of clarification, precedence of documents shall be in the order shown above with this Purchase and License Agreement taking first precedence.

3.     **DEFINITION OF TERMS**

A.     *Additional Required Functionality*: Additional modifications and/or functionality which will be required for inclusion in the Licensed Software after  Day 1 of Production Operations

B.     *Available:*  A system is "available" when such system is up and running and operating in accordance with all requirements set forth in this Agreement, including without limitation, the warranties set forth herein.

C.     *Content:* "Content for the Horizon System" is content obtained either through SirsiDynix or by the Library itself that is used to enhance the bibliographic records in the SirsiDynix database.

D.     *Database Server:* The computer operated by or on behalf of Library to provide database management services in connection with the Licensed Software.

E.     *Day 1 of Production Operations:* The first day of Library's use of the System in production to support Library operations, following completion of successful loading of Library's patron database and bibliographic and item database, and other files as described in Schedules 1 through 3 onto the System. SirsiDynix will certify to Library when this data loading has been completed.  After Library has confirmed this successful data loading and has begun to use the System in production (other than for testing), Library will then promptly notify SirsiDynix that it has begun to use the System in production operations, and the date of Library's notice shall be defined as Day 1 of Production Operations.

F.     *DRA System:* The version of each of the SirsiDynix Classic software product and the WebII software product, as the same are modified by or for and used by the Library at the applicable point in time.

G.     *Hardware:* The Database Server, Horizon Information Portal Servers, Horizon Web Reporter Server and the Test Database Server used in connection with the Licensed Software and any other hardware identified on Schedule 7, as Schedule 7 may be amended by the parties from time to time.

H.     *Horizon Information Portal Server:* The computer operated by or on behalf of Library to provide web access and gateway services to the Database Server in connection with the Licensed Software.

I.     *Horizon Web Reporter Server:* The computer operated by or on behalf of Library to handle reports using the Horizon Web Reporter software and the Library's database housed on the Database Server.

J.     *Implementation Services*: The items listed on Schedule 1 under the subheading *Services*, the services and other activities set forth in Section 5 below, the services set forth on Schedule 3, the other activities set forth on Schedule 2 and the other

implementation and consulting services necessary to implement the Licensed Software and Hardware to make such hardware and software available for use as of Day 1 of Production Operations.

K.   *Library's Operating Hours:* Operating hours for the Library are 24x7x365 (and the last day of leap year).

L.   *Licensed Software (or Software, System or Horizon System):* Each SirsiDynix-developed or SirsiDynix-owned software product, which may include third-party technology, as listed in Schedule 1, and the Third Party Software, including machine-readable object code for such product (and excluding source code, unless Library is provided access to such source code in the event of a release from escrow pursuant to Section 15(L) hereof in which case source code for such product shall thereafter be included), any user documentation for such product, and any other related materials which are furnished to Library for use in connection with such product, as well as any software modules and/or other updates, upgrades, additions, error corrections, modifications, enhancements and conversions that are made subsequent to the Effective Date of this Agreement ("Updates").   Notwithstanding the foregoing or any other provision to the contrary, Licensed Software shall also include a new system(s) that SirsiDynix makes available, to the extent that (i) such new system has the same or similar functionality to the product(s) identified in the immediately preceding sentence (whether or not such new system has the same name as the other product) and (ii) the Library elects to replace its then-current system(s) with such new system(s).

M.   *Other Data:* Includes but is not limited to holdings, patron records, item status, fines or fees, holds or reserves, and item records.

N.   *Proposal:* SirsiDynix' response to the RFP dated June 15, 2005 ("Response to RFP"), Response to RFC for Queens Borough Public Library, dated July 18, 2005 ("Response to RFC") and Response to RBFO for Queens Borough Public Library dated August 30, 2005 ("Response to RBFO").

O.   *RFP:* The Library's Request for Proposals for a Next-Generation Integrated Library System and Related Services, Specification #0405-1.

P.   *Required "Go-Live" Functionality:* Functionality which will be required to be included in the Licensed Software prior to delivery to the Library of the version of the Licensed Software which will be used by the Library on Day 1 of Production Operation; which functionality will include, without limitation, the Identified Required "Go-Live" Functionality (as such term is defined in Section 5(A)(1)(b) below).

Q.   *Required "Go-Live" Modifications and Enhancements:*   Modifications and additional functionality which will be required to be included in the Licensed Software to ensure that the Licensed Software includes all of the Required Functionality.

R.   *Software Customizations:*   means the development of (a) Updates which are included on the SirsiDynix product roadmap or any other SirsiDynix list of planned new and/or enhanced functionality to be included in the Licensed Software ("SirsiDynix Updates") which roadmap or list is provided by SirsiDynix to Library but are provided on an accelerated schedule as requested by Library

and agreed to by SirsiDynix and (b) Updates or other new functionality or module requested by Library which are not SirsiDynix Updates.

S.   *Test Database Server:* The computer operated by or on behalf of Library to provide a separate testing and training environment for software and operating system upgrades prior to implementation.

T.   *Third Party Software:* Software listed on Schedule 1, or procured hereunder subsequent to the Effective Date pursuant to an agreement by the parties, which is owned by an entity other than SirsiDynix. As of the Effective Date, Third Party Software includes but is not limited to Oracle database software, Horizon Enriched Content, MicroStrategy software (Horizon Web Reporter), the Envisionware Enterprise eCommerce Suite and IVR software included in the IVR system.

U.   *Workstation:* An end user machine on which client software operates to access the Database Server and which meets or exceeds SirsiDynix's minimum specifications for operation of the Licensed Software, as set forth in Schedule 7.

## 4.   SITE PREPARATION

Because the Library is purchasing central site hardware directly from a third party hardware vendor, the Library will have the third party hardware vendor confirm that the Library's central site computer room meets the specifications for the Hardware (the "Computer Room Certification"). SirsiDynix will, at SirsiDynix's sole cost and expense, (A) upon the Library's reasonable request, provide the third party hardware vendor with any requested information and other assistance in performing the Computer Room Certification; and (B) upon the Library's request, make any required modifications and corrections to the Certified Computer Room and the applicable Hardware for which the hardware vendor has provided the Computer Room Certification (the "Certified Hardware"), and otherwise remedy any issues which arise in connection with the Certified Computer Room or Hardware, in order for the Licensed Software to operate in accordance with the requirements for the Licensed Software as set forth in this Agreement using the Certified Hardware.

## 5.   DELIVERY OF LICENSED SOFTWARE; PROOF OF CONCEPT/BENCHMARKING; SIP; INSTALLATION OF HARDWARE AND LICENSED SOFTWARE AND REACTIVATION OF DRA SYSTEM

A.   *LICENSED SOFTWARE*

1.   **Gap Analysis; Required Functionality; Cost and Development Schedule for Additional Functionality**

a.   <u>*Gap Analysis.*</u> Prior to the Effective Date, SirsiDynix, with the assistance of the Library, performed an analysis of the differences between the functionality included in the version of the DRA System being operated by the Library and the functionality of version 8.0 of the Horizon System (including without limitation the Horizontal Information Portal) (the "GAP Analysis"). As part of the GAP Analysis, the Library, with the assistance of SirsiDynix, has identified certain functionality which will be required to be included in the Licensed Software prior to delivery to the Library of the version of the Licensed Software which will be used by the Library on Day 1 of Production Operations (the "GAP Analysis

Functionality"). A list of the GAP Analysis Functionality is set forth in the portion of Schedule 12 labeled item C, *Functionality identified by Gap Analysis.*

b.      *Required Functionality.*   The Library, with the assistance of SirsiDynix, has (i) identified certain functionality, in addition to the GAP Analysis Functionality, which will be required to be included in the Licensed Software prior to delivery to the Library of the version of the Licensed Software which will be used by the Library on Day 1 of Production Operations (the "Additional Required Go-Live Functionality") (the Additional Required Go-Live Functionality, together with the GAP Analysis Functionality, is hereinafter collectively referred to as the "Identified Required "Go-Live" Functionality"); (ii) identified certain modifications and additional functionality which will be required to be included in the Licensed Software to ensure that the Licensed Software includes all of the Identified Required "Go-Live" Functionality (the "Identified Required "Go-Live" Modifications and Enhancements"); and (iii) identified certain additional modifications and/or functionality which will be required for inclusion in the Licensed Software after Day 1 of Production Operations ("Identified Additional Required Functionality"). The parties agree to meet, in accordance with the timeframes set forth in Schedule 2, to discuss and agree upon the date for the delivery of each portion of such Identified Additional Required Functionality (which delivery date will not be later than the date (if any) identified in Schedule 13 with respect to such functionality). The Identified Required "Go-Live" Functionality is included in the list of functionality set forth in Schedule 12 and the Identified Additional Required Functionality is included in the list of functionality set forth in Schedule 13. The parties acknowledge and agree that, without limiting the foregoing, (A) the Library's functional requirements for its Integrated Library System include (i) any and all of the GAP Analysis Functionality and (ii) any and all of the functionality which SirsiDynix states in the Proposal is included in the Licensed Software (the "Proposed Functionality"), (B) SirsiDynix agrees that the functionality of the Licensed Software will include (in its general release) all of the GAP Analysis Functionality and the Proposed Functionality, (C) SirsiDynix represents that all of the products included in the Licensed Software (including the Third Party Software) are fully integrated and do not require further integration or interfaces to operate together in accordance with the requirements of this Agreement and (D) the Library has relied on the representations set forth in item (C) of this sentence in working with SirsiDynix to prepare and in agreeing to the content of Schedules 12, 13 and 14 to this Agreement.

c.      *Cost and Development Schedule for Additional Functionality.* By not later than March 31, 2006, SirsiDynix will provide the Library with a cost estimate for the services to be provided by the Custom Development Team in order to develop the Identified Additional Required Functionality, and a development schedule for, the Identified Required "Go-Live"

Modifications and Enhancements and the Identified Additional Required Functionality so that they can be delivered to the Library on the schedule required by the terms of this Agreement. For avoidance of doubt, SirsiDynix will not charge the Library in connection with any services or other costs incurred to develop Identified Required "Go-Live" Modifications and Enhancements and/or the Identified Additional Required Functionality which are (a) Required Interfaces included as Required "Go-Live" Functionality; (b) GAP Analysis Functionality; (c) Proposed Functionality (d) modifications or corrections made to the Licensed Software or workarounds to correct a breach of warranty or to correct an error in accordance with its obligations pursuant to Schedule 10, and (e) the screen customizations which are included as customizations to be performed as Implementation Services.

2.      As of the Effective Date, the parties acknowledge that the Required "Go-Live" Functionality will include, without limitation, the functionality set forth in Schedule 12 and the Additional Required Functionality will include, without limitation, the functionality set forth in Schedule 13. The parties acknowledge and agree that (i) SirsiDynix will charge no more than the Customization Services Fees for two members or more as required by Library of the Custom Development Team in connection with the services required to provide the Required "Go-Live Functionality which is set forth in Schedule 12, Schedule 13 and Schedule 14 as of the Effective Date; (ii) at any time prior to thirty (30) days after the Effective Date, the Library shall have the right in its sole discretion to request changes from time to time to the Required "Go-Live" Functionality set forth in Schedule 12 without affecting the cost or timelines set forth in this Agreement; (iii) at any time on or after the date which is thirty (30) days after the Effective Date, the Library shall have the right in its sole discretion to request changes from time to time to the Required "Go-Live" Functionality set forth in Schedule 12 or add additional functional deliverables as Required "Go-Live" Functionality, but such request(s) will be treated as Change Notice(s) pursuant to Section 7(H); and (iv) at any time prior to the acceptance of a particular portion of the Additional Required Functionality, the Library shall have the right in its sole discretion to request changes from time to time to the applicable portion of the Additional Required Functionality, in each case pursuant to the procedures set forth in Section 7(H). SirsiDynix will develop, test and incorporate into the Licensed Software all of the Required "Go-Live" Modifications and Enhancements by not later than the dates set forth in Schedule 12; provided however that SirsiDynix agrees to use its reasonable efforts to complete the development, testing and incorporation of the Required "Go-Live" Modifications and Enhancements into the Licensed Software as early as possible prior to October 1, 2006.

3.      SirsiDynix expects version 8.0 of the Horizon portion of the Licensed Software to be available in general release on March 31, 2006, at which time SirsiDynix will deliver and install on the Library's hardware (or such

other hardware designated by the Library), a development instance and a quality assurance/test instance of a fully functional version of the then-current version of the Licensed Software, which version includes all of the then-existing Required "Go-Live" Functionality. SirsiDynix will provide the Library with written notice when SirsiDynix has successfully completed such installation of the Licensed Software at Library's site(s).

4.     As soon as reasonably practical after completion of the development of each of the Required "Go-Live" Modifications and Enhancements, SirsiDynix will provide the Library with written notice of such completion and, upon the Library's request, deliver and install on the Library's hardware (or such other hardware designated by the Library) a development instance and a quality assurance/test instance of a fully functional version of the then-current version of the Licensed Software, which version includes all of the then-existing Required "Go-Live" Functionality. SirsiDynix will provide the Library with written notice when SirsiDynix has successfully completed such installation of the Licensed Software at Library's site(s).

5.     By not later than August 1, 2006, SirsiDynix will deliver and install on the Library's hardware (or such other hardware designated by the Library), a separate development, quality assurance/test and training instances of a fully functional version of the then-current version of the Licensed Software, which version includes all of the GAP Analysis Functionality and all of the additional functionality set forth in Section D of Schedule 12.  SirsiDynix will provide the Library with written notice when SirsiDynix has successfully completed such installation of the Licensed Software at Library's site(s).

6.     By not later than each of the dates set forth on Schedule 12, SirsiDynix will deliver and install on the Library's hardware (or such other hardware designated by the Library) separate production, development, quality assurance/test, training and disaster recovery instances of a fully functional version of the Licensed Software, which version includes all of the Required "Go-Live" Functionality (including without limitation all GAP Analysis Functionality) other than functionality which had a "Due" date (as set forth on Schedule 12) after such date, all in anticipation of meeting the scheduled date of February 5, 2007 for Day 1 of Production Operations and later due dates for Required "Go-Live" Functionality. SirsiDynix will provide the Library with written notice when SirsiDynix has successfully completed each such installation of the Licensed Software at Library's site(s).

7.     The parties acknowledge and agree that, if version 8.2 of the Horizon portion of the Licensed Software is available in general release on or before January 1, 2007, the Library may elect that such version be included in the version of the Licensed Software (with all Required "Go-Live" Functionality) which the Library will operate on Day 1 of Production Operations and SirsiDynix will, upon the Library's election and at no additional fee, deliver and install such version 8.2 on the

Library's hardware (or such other hardware designated by the Library) to be included in the version of the Licensed Software which the Library will operate on Day 1 of Production Operations. Without limiting the foregoing, as part of the Implementation Services and for no additional fee, SirsiDynix will take all actions necessary to assist the Library to meet the scheduled date of February 5, 2007 for Day 1 of Production Operations of the Licensed Software with all Required "Go-Live" Functionality. Unless otherwise agreed by the parties, SirsiDynix will deliver the Additional Required Functionality on the schedule identified and agreed to by the parties as set forth in item 1(b) of this Section 5(A).

8.    SirsiDynix shall immediately notify the Library Director in writing, with a copy to the Library's General Counsel and SirsiDynix's CEO, if it determines at any time that one or more of the milestones included in the project plan for the activities to be completed to meet the scheduled date of February 5, 2007 for Day 1 of Production Operations of the Licensed Software with all Required "Go-Live" Functionality (the "Scheduled "Go-Live" Date") (including the performance of Implementation Services and the development services to be provided hereunder) will be completed more than thirty (30) days after the scheduled completion date for such milestone(s) or that the parties may not meet the Scheduled "Go-Live" Date.

9.    In addition to the notices to be provided pursuant to Section 5(A)(8) above, SirsiDynix shall immediately notify the Library in writing if it determines at any time that it will not be able to fully and timely comply with the August 1, 2006 delivery date for the Licensed Software as set forth in Section 5(A)(5), the October 1, 2006 delivery date for the Licensed Software with all Required "Go Live" Functionality (other than the functionality for which a later "Due" date is set forth in Schedule 12) or any scheduled delivery date for Required "Go-Live" Functionality, Additional Required Functionality or other Software Customization(s) or that the parties may not meet the Scheduled "Go-Live" Date (collectively, the "Development Delivery Dates"). The parties acknowledge and agree that the Development Delivery Dates represent the reasonable expectations of the parties as to the timing for the delivery of the applicable deliverables pursuant to this Agreement. SirsiDynix recognizes that failure to meet the Development Delivery Dates will result in expense and damage to the Library. If SirsiDynix shall fail to deliver any deliverable on the applicable Development Delivery date for such deliverable:

(i) the Library shall be entitled to terminate this Agreement without opportunity to cure, and

(ii) SirsiDynix shall immediately refund to the Library any and all sums paid by the Library to SirsiDynix pursuant to this Agreement.

Queens Borough Public Library- Page 8
CONFIDENTIAL AND PROPRIETARY

The parties further acknowledge and agree that:

(a) SirsiDynix has assured the Library that as of the Effective Date, version 8.0 of the Horizon portion of the Licensed Software has been and is in beta testing with several SirsiDynix customers;

(b) the Library considered the proposals of other vendors which already had versions of their proposed systems available in general release at the time of the proposal;

(c) the Library accepted SirsiDynix's Proposal, established its project plan, with a "Go-Live" date of February 5, 2007 for the Library's use of the Licensed Software in production, and entered into this Agreement based upon the assurances set forth in item (a) of this sentence and SirsiDynix's assurance that the Development Delivery Dates set forth in Section 5(A)(6) and Schedule 12 represent reasonable expectations as to the timing for the delivery of the applicable deliverables set forth in such section and schedule, and

(d) the milestones of the Library's project plan, including the Scheduled "Go-Live" Date, will be delayed and the Library will incur significant expense and damages, if SirsiDynix fails to meet the Development Delivery Date set forth in Section 5(A)(6) or Schedule 12 or if Day 1 of Production Operations is not on the Scheduled "Go-Live" Date. Therefore, the parties further acknowledge and agree that, in addition to the other rights and remedies which the Library would have pursuant to this Section:

(i) if SirsiDynix fails to meet the October 1, 2006 delivery date for the Licensed Software with all Required "Go Live" Functionality (other than the functionality for which a later "Due" date is set forth in Schedule 12) as set forth in Section 5(A)(6) and does not deliver the Licensed Software with all Required "Go Live" Functionality (other than the functionality for which "Due" date, as set forth in Schedule 12, of later than October 1) on or before December 1, 2006, then SirsiDynix will issue the Library a credit in an amount equal to twenty percent (20%) of the total Annual Maintenance Fees for the Licensed Software as set forth in Schedule 1;

(ii) if the parties do not meet the Scheduled "Go-Live" Date due to an act or omission of SirsiDynix, then

(A) if Day 1 of Production Operations has not occurred on or before the date which is sixty (60) days after the Scheduled "Go-Live" Date, SirsiDynix will issue the Library a credit in the amount of the total maintenance fees for one month of maintenance services for each month (or partial month) after the date which is sixty (60) days after the Scheduled "Go-Live" Date until Day 1 of Production Operations has occurred and

(B) at any time prior to Day 1 of Production Operations,

(1) the Library shall be entitled to terminate this Agreement without opportunity to cure, and

(2) SirsiDynix shall immediately refund to the Library any and all sums paid by the Library to SirsiDynix pursuant to this Agreement; and

(iii) if SirsiDynix fails to meet the Development Delivery Dates set forth in Section 5(A)(6) or the parties do not meet the Scheduled "Go-Live" Date due to an act or omission of SirsiDynix, then, notwithstanding any other provision to the contrary, the Library's obligation to make payments pursuant to the terms of this Agreement will immediately be suspended until Day 1 of Production Operations.

Neither party shall have any liability or responsibility for delay caused solely by the actions or inactions of the other party. Notwithstanding the foregoing, the Development Delivery Dates may be adjusted by the mutual written agreement of the parties.

10. All Required "Go-Live" Functionality, Additional Required Functionality and subsequently defined Software Customizations which are developed will, once developed (a) be included in a general release version of the Licensed Software which is within two general releases of SirsiDynix's most current general release of the Licensed Software which is available as of the time the applicable functionality/customization is/are developed, and (b) be deemed to be part of the Licensed Software and each new release of the Licensed Software and (c) be supported and maintained in accordance with the provisions of this Agreement regarding maintenance services, at no additional fee beyond the maintenance fees otherwise set forth in this Agreement either (i) in the same manner as all other Licensed Software or (ii) through APIs which will not be rolled into the Licensed Software release (but which APIs will, at all times, be supported like other Licensed Software), as mutually agreed by the parties.

11. In addition, to the extent that the Library has paid for services in connection with the development of Updates or other new functionality or modules requested by the Library which are not SirsiDynix Updates and for which SirsiDynix charges a separate license fee, in the event that such Update is licensed to other customers of SirsiDynix or any agent or reseller of SirsiDynix and SirsiDynix receives a fee for such license, SirsiDynix shall issue a credit to the Library equal to 50% of SirsiDynix's margin (i.e. profit) with respect to such license; provided however that in no event will the total credits issued to the Library pursuant to this paragraph equal more than two times the total amount of Customization Services Fees which SirsiDynix charged the Library (including those amounts against which a credit is applied) in connection with the provision of the Update to the Library.

B.   **PROOF OF CONCEPT/BENCHMARKING**

1. By not later than March 31, 2006, SirsiDynix will complete a test of the Licensed Software to determine whether the Licensed Software functions as intended when used with the occurrence of various transaction volumes and transaction mixes.

2.   By not later than the later of (a) October 1, 2006, (b) the date which is four (4) months prior to the then-scheduled date for Day 1 of Production Operations or (c) such other date as is designated by the Library, SirsiDynix will complete a test of the then-current version of the Licensed Software (which, unless otherwise agreed, is operating on the Library's production hardware) to determine whether such version of the Licensed Software functions in accordance with the requirements of this Agreement when used with the transaction volumes and transaction mixes which are the same as those of the Library's operations in production when the Library is operating at it peak volumes (which shall include, without limitation, the transaction volumes and transaction mixes listed in Tables 7-1 and 7-2 of Schedule 7).

3.   If the parties mutually agree to the performance of a third performance test, by not later than the date which is thirty (30) days prior to the then-scheduled date for Day 1 of Production Operations, SirsiDynix will complete a test of the then-current version of the Licensed Software (which, unless otherwise agreed, is operating on the Library's production hardware) using the Library's then-current database to determine whether such version of the Licensed Software functions in accordance with the requirements of this Agreement when operated using the Library's then-current database and with the transaction volumes and transaction mixes which are the same as those of the Library's operations in production when the Library is operating at it peak volumes (which shall include, without limitation, the transaction volumes and transaction mixes listed in Tables 7-1 and 7-2 of Schedule 7). The cost for this third performance test will be paid for by the Library unless the test results for the first and/or second test show that the Licensed Software did not function in accordance with the requirements of the applicable test (as set forth above) when used in connection with the transaction volumes and transaction mixes being tested, in which case SirsiDynix will pay the costs and expenses of this third test.

4.   With respect to each of the test performed pursuant to this Section 5(B), (a) unless otherwise set forth herein or mutually agreed by the parties, the tests will be performed by SirsiDynix at its sole cost and expense (i.e. at no cost to the Library) (b) SirsiDynix will provide the Library with the following (i) as soon as reasonably possible after such information becomes available, results of the applicable test and (ii) as soon as reasonably possible after such information is requested, such additional information about the test which is reasonably requested by the Library; and (c) if the test results show that the Licensed Software did not function in accordance with the requirements of the applicable test (as set forth above) when used in connection with the transaction volumes and transaction mixes being tested, then SirsiDynix will, at its sole cost and expense, correct or modify or make any other enhancements or other Updates to the Licensed Software that are required so that the Licensed

Software will function in accordance with such requirements under the parameters which were tested.

C. **STANDARD INTERCHANGE PROTOCOL (SIP)**

1. The parties acknowledge and agree that the use of Standard Interchange Protocol (SIP) is business critical to the operations of the Library. SirsiDynix further agrees that (a) the version of SIP licensed pursuant to this Agreement will work with the products of vendors which are either (i) identified on SirsiDynix's website as being "certified" by SirsiDynix or (ii) otherwise "certified" by SirsiDynix and (b) SirsiDynix will "certify" the products of any vendor with which the Library does business provided that such vendor (i) completes each applicable requirement of SirsiDynix's standard process for certification, (ii) meets SirsiDynix's standard requirements for certification and (iii) pays the applicable standard fees which SirsiDynix charges third party vendors for certification.

2. The license for SIP granted hereunder (i) includes, without limitation a license for CIP, SIP2 and Enriched SIP2, and (ii) is an unlimited enterprise-wide license for use by an unlimited number of users.

3. SirsiDynix will, pursuant to Section 7(B)(4) below, provide all changes and additions or extensions to SIP protocols or extensions thereto which are requested by the Library.

D. **HARDWARE**

1. SirsiDynix shall, by not later than November 30, 2006, furnish all necessary labor, materials, and other services required to accomplish the complete installation (as defined in Section 5(D)(3) below) of all of the production Hardware at the sites specified by Library. Library shall make all the necessary arrangements to allow SirsiDynix personnel sufficient work space and access to the installation locations during normal business hours or at such other times as may be mutually agreed upon.

2. In addition to and without limiting its obligations pursuant to Section 5(D)(1) above, SirsiDynix shall, pursuant to the timeframes set forth in Schedule 2, furnish all necessary labor, materials, and other services listed on Schedule 1 and 3 required to accomplish installation of the Hardware and Licensed Software at the sites specified by Library. Library shall make all the necessary arrangements to allow SirsiDynix personnel sufficient work space and access to the installation locations during normal business hours or at such other times as may be mutually agreed. upon.

3. When the Hardware for each server has been successfully installed and operated at Library's site for twenty-four (24) hours of consecutive materially error-free operation, SirsiDynix shall certify in writing to Library that the Hardware installation for that server is complete.

E. **REACTIVATION OF DRA SYSTEM**

In the event that Library determines, in good faith, that the Licensed Software is not working properly upon the "cut-over" of the Library's production to the use of Licensed Software, then, immediately upon the Library's request, SirsiDynix shall

reactivate the DRA System for use in production with a full data restore (i.e. the complete restoration of all data up to the time that the DRA System is reactivated for use in production, including without limitation the repopulation of the DRA System with all transactions which occurred while the Licensed Software was used in production) so that the DRA System is fully functional immediately upon such reactivation. SirsiDynix's obligations under this paragraph will remain in effect for so long as the Library requests their continuation and the Library will continue to pay the then-applicable maintenance fee for the DRA System for each month during which such obligations so remain in effect.

6.   **RISK OF LOSS**
SirsiDynix is responsible for (a) all loss or damage to Hardware which occurs from SirsiDynix's receipt of the Hardware until delivery of the Hardware is made inside Library premises; and (b) any other loss or damage to Hardware caused by SirsiDynix or its employees, contractors or other agents in the process of installation or otherwise.

7.   **SERVICES**
   A.   *IMPLEMENTATION SERVICES*
SirsiDynix will provide the Implementation Services pursuant to the timeframes set forth in Schedule 2. Without limitation of the foregoing, as part of the Implementation Services, SirsiDynix will (i) perform the activities and otherwise provide the services set forth in Section 5 above, (ii) as further set forth in Schedules 1, 2 and 3, extract data from Library's DRA System and convert these data to formats required for loading into the System, and load Library data into the System; (iii) provide training sessions on the operation and use of the Licensed Software for Library's personnel as described in Schedule 1 at times specified by Schedule 2; and (iv) provide the Library with procedures to maintain data integrity (the "Data Integrity Procedures"). SirsiDynix agrees to provide, upon the Library's request and at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*, periodic review sessions and training then being offered. Any additional training requested as a result of Hardware upgrades and/or Licensed Software upgrades to the System purchased under this Agreement will be provided as agreed upon by SirsiDynix and Library.

   B.   *DEVELOPMENT SERVICES*
In addition to the Implementation Services, SirsiDynix will provide the following services and other information to the Library in connection with the development of the Licensed Software:

   1.   By not later than ten (10) business days after the Effective Date, SirsiDynix will provide the Library with release plans for versions 8.1 and 8.2 of the Horizon system of the Licensed Software. Thereafter, on a periodic basis to be agreed upon by the parties, but in any event no less than quarterly, SirsiDynix will, at no cost to the Library, provide Library with the SirsiDynix product roadmap and a list of any other new and/or enhanced functionality SirsiDynix plans to include in the Licensed Software. Any information provided by SirsiDynix pursuant to this Section 7(B)(1) is provided subject to the provisions of Section 22.

2.     For a period of two (2) years commencing on or after April 1, 2006, but in any event no later than July 1, 2006 (the "Custom Development Period") SirsiDynix will provide Library with the services of a minimum of two (2) personnel of SirsiDynix (with the exact number of people and the work to be performed by such personnel as mutually agreed upon by the Library and SirsiDynix) (the "Custom Development Team") to develop Software Customizations. SirsiDynix will use its best efforts to provide the services of the Custom Development Team by (or as soon as possible after) April 1, 2006, and thereafter will make the services of the Custom Development Team available, in the quantity and otherwise pursuant to the terms of this Agreement, at all times during the Term of this Agreement. The Library may, at any time, request an increase or reduction of the number of personnel to be provided as the Custom Development Team, and the parties will mutually agree to such increase or reduction (it being hereby agreed that any fees or charges payable for the services of the Custom Development Team will be as set forth in the portion of Schedule l labeled *Custom Development Team*); provided that the Library shall not reduce the Custom Development Team to less than two (2) personnel at any time during the Custom Development Period. SirsiDynix and the Library will also work together in good faith to agree on the actual work to be performed by the Custom Development Team, and the relevant priorities in connection with such work. The expectation of the parties is that the services to be provided by the Custom Development Team will be provided remotely at a site off the Library's premises. SirsiDynix shall ensure that throughout the Custom Development Period and thereafter for so long as services of the Custom Development Team are being provided hereunder, the Custom Development Team shall be fully dedicated to developing Software Customizations for Library.   Library shall pay SirsiDynix Customization Service Fees for the services rendered by the Custom Development Team as more particularly described in Schedule 1 under the subheading *Custom Development Team*.   Notwithstanding anything to the contrary, SirsiDynix (and its agents or subcontractors, as applicable) shall be the employer in law and in fact of all persons assigned to provide services to Library under this Agreement (including, without limitation, the Custom Development Team) and shall have the sole responsibility for payment of salaries, wages, bonuses, benefits (including health insurance, retirement and other similar benefits, if any) and other compensation, of all such persons. SirsiDynix shall be responsible for the payment of all federal, state, and local withholding taxes and workers compensation. SirsiDynix shall take all necessary efforts and precautions to protect Library and Library affiliates from co-employment status including, but not limited to: (a) establishing, maintaining and ensuring SirsiDynix's employer status with all of its employees through proactive measures; (b) incorporating similar protective co-employment provisions into all of its subcontracting agreements; (c) monitoring all hours worked by persons performing services for the Library so as to avoid any potential

finding of liability against Library and Library affiliates pursuant to Section 414(n) of the Internal Revenue Code of the United States or otherwise.

3.   At any time during the term of this Agreement, the Library can request that SirsiDynix provide a cost estimate for a Software Customization specified by the Library, in which case SirsiDynix shall, by not later than five (5) business days after the date of such request and at no cost to the Library, provide an initial cost estimate; and, unless the Library withdraws its request with respect to the applicable Software Customization, SirsiDynix will, by not later than ten (10) business days after the date on which the initial cost estimate is due, provide a more complete cost estimate, as well as an estimated delivery and implementation schedule for the Software Customization and an initial design specification and Gantt Chart showing (on a time line) the tasks assigned to each member of the team proposed by SirsiDynix to provide such Software Customization. If the Library approves the cost estimate provided for a Software Customization (or the parties otherwise agree on the cost for a particular Customization), (a) to the extent that there are enough resources available in the Custom Development Team to develop the Software Customization, SirsiDynix will provide the services of the Custom Development Team to develop the Software Customization or (b) to the extent that there are not enough resources in the Custom Development Team to develop the Software Customization, SirsiDynix shall notify the Library of the amount of additional resources which will be required, and the Library shall either (i) re-prioritize the work of the Custom Development Team in order for the team to perform services to develop the Software Customization in place of a current priority, (ii) direct SirsiDynix to add one or more additional team member(s) at Library's cost, which cost will be calculated at the cost for such services as set forth in the portion of Schedule l labeled *Custom Development Team*; (iii) withdraw its approval of the cost estimate. The parties agree to negotiate in good faith as to the terms of the development of each Software Customization, including without limitation the delivery and implementation schedule for such Software Customization.   Any Software Customization to be provided by SirsiDynix hereunder will be provided on the delivery and implementation schedule provided with the cost estimate for such Software Customization or such other schedule as is mutually agreed upon by the parties.

4.   The parties acknowledge and agree that Software Customizations requested by the Library may include changes and additions or extensions to the Standard Interchange Protocol (SIP) (or extensions thereto) used by the Library.   To the extent that the Library requests any changes and/or additions or extensions to any SIP protocols or extensions thereto, the Library has approved the cost estimate provided for a Software Customization (or the parties otherwise agree on the cost for a particular Customization) and the Library has not withdrawn its approval of the cost estimate pursuant to Section 7(B)(3) above, SirsiDynix shall complete the

development of and deliver to the Library, by not later than sixty (60) days after its receipt of the Library's approval or such other period as may be mutually agreed to by the parties, a fully functional version of SIP with such change, addition or extension, which has been programmed and tested in accordance with the Library's requirements.

C. **TRAINING SERVICES**

Without limiting any other portions of this Agreement which describe training services, the parties acknowledge and agree that (i) SirsiDynix will provide all of the training services set forth in Schedule 1, (ii) the training days referred to in the section of Schedule 1 labeled *Education & Consulting Services – Horizon Training* will be provided on-site at the Library's facilities on a schedule to be mutually agreed upon by the parties (which schedule may include the provision of training services after Day 1 of Production Operations); (iii) SirsiDynix's Manager of Training Services will meet and consult with the Library on the timeframes set forth in Schedule 2, and thereafter work and otherwise cooperate in good faith to agree to a curriculum and schedule for the training services to be provided to train the Library on all modules of the Licensed Software (which curriculum and schedule will be consistent with the specifications for training which are set forth in the RFP and which training services may include services to be provided after Day of Production Operations); and (iv) SirsiDynix will develop the curriculum, training courses and related materials in accordance with the requirements for the curriculum agreed to by the parties.

D. **PROJECT LEADERS**

SirsiDynix shall appoint a SirsiDynix Project Leader to coordinate all SirsiDynix activities in connection with the provision of the services and the performance of SirsiDynix's other obligations hereunder and who shall devote sufficient time to the Library's project to meet the schedule set forth in the Schedule 2 and SirsiDynix other delivery obligations. The Library shall provide one employee of the Library to act as the Library's Project Leader to coordinate the Library's activities in connection with the provision of the services. The names of the personnel appointed, as of Effective Date, to be the SirsiDynix Project Leader and the Library's Project Leader are set forth in Schedule 16. The parties agree that they will not change their Project Leaders (other than for cause) without the prior consent of the other party, which consent will not be unreasonably delayed or withheld.

E. **PERSONNEL**

SirsiDynix will submit to the Library the minimum qualifications and proposed job description (where applicable) for each member of the Custom Development Team for the Library's review, comments and approval, and the parties shall, with respect to each such minimum qualifications and job description, mutually agree to such minimum qualifications and applicable job description (if any) prior to assignment of the applicable team member. In the event that any SirsiDynix employee or subcontractor performing services is found to be unacceptable to the Library for cause, including, but not limited to, demonstration that he or she is not qualified to perform, the Library shall notify SirsiDynix of such fact and SirsiDynix shall immediately remove said employee or subcontractor from

performing services for the Library and, if requested by the Library, promptly provide a qualified replacement. In the event that any SirsiDynix employee or subcontractor is found to be unacceptable to the Library for any other reason, the Library shall notify SirsiDynix of such fact in writing and SirsiDynix shall promptly take reasonable and appropriate action. SirsiDynix agrees to use best efforts to ensure the continuity of SirsiDynix personnel assigned to perform services under this Agreement. Any reassignment by SirsiDynix of those of its employees assigned to perform services under this Agreement must be with the Library's prior written consent. In the event SirsiDynix reassigns any of its personnel assigned to perform services under this Agreement, SirsiDynix shall promptly provide a qualified replacement acceptable to the Library.

F.   *PROGRESS REPORTS AND MEETINGS*

1.   SirsiDynix will, as soon as possible after Library's request, and in any event at least once per week, provide the Library with a report as to the status of the work being performed by SirsiDynix which will impact the Library, including without limitation any development work being performed pursuant to this Agreement, and participate in a meeting with the Library to discuss the progress of such work. At such meetings the SirsiDynix Project Leader shall present a report to the Library with respect to implementation and development status and progress. SirsiDynix will also, at least once per month, provide the Library with a written status report. Each report to be provided hereunder shall include a summary of the accomplishments and serious difficulties, including without limitation reported issues, during the prior reporting period, and the anticipated results during the next reporting period.

2.   The Library will also have the option to participate in the "Sprint Review" conference calls which SirsiDynix holds for its development staff to discuss the status of the development work being done to the extent the calls apply to custom development projects for the Library.

G.   *MANAGEMENT*

SirsiDynix shall be responsible for the management of its personnel in performance of its obligations hereunder, integrity and quality of all services and deliverables, and periodic reporting, as required, of the status of the services and deliverables to the Library. SirsiDynix shall ensure that its employees, servants and agents who are working on-site at the Library's location(s) abide by all reasonable directives issued by the Library, including, without limitation, all on-site rules of behavior, work schedules, security procedures and other standards and procedures as established by the Library from time to time.

H.   *CHANGE CONTROL PROCESS*

The Library may at any time request modification to the scope of the services and/or any deliverables to be performed pursuant to this Agreement by written request to SirsiDynix specifying the desired modifications (each, a "Change Notice"). Within ten (10) business days of receipt of a Change Notice, SirsiDynix shall, at no additional charge to the Library, provide to the Library a written estimate of the impact of the proposed changes on both the then-current schedule for the delivery and/or performance of the services to be provided under this

Agreement, and the fees and expenses under this Agreement (each, an "Impact Statement"). Following any negotiation by the parties (in which both parties will participate in good faith), SirsiDynix shall deliver a final Impact Statement to the Library, and upon the Library's agreement thereto and execution thereof, the terms of this Agreement shall be deemed amended thereby.

I.    *ADDITIONAL SERVICES*

The parties may agree from time to time, pursuant to the Change Control Process, that SirsiDynix will perform services that are outside the scope of the Implementation Services and development services set forth in this Agreement, which services may include without limitation Oracle DBA services and/or Webportal development and support services (the "Additional Services"). The performance of such Additional Services shall be governed by this Agreement and the terms and conditions of a separate Statement of Work agreed to by the parties and/or amendment to the relevant provisions of this Agreement, including its Schedules, where applicable. Upon the Library's request for Additional Services, SirsiDynix will negotiate in good faith with the Library to agree to the terms pursuant to which such Services shall be provided. The parties further agree that SirsiDynix shall provide the Additional Services at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services,* or at such other rates or fixed price as is mutually agreed upon by SirsiDynix and the Library.

J.    *TRAINING MATERIALS*

To the extent that the services provided hereunder include the provision of instruction, training materials and/or training, the Library shall have the right, at its expense, to videotape and/or audiotape training sessions and to copy and distribute the training materials, and to copy and display the videotape to train its personnel in the use of the Licensed Software without additional charge by SirsiDynix on account thereof. The Library hereby acknowledges SirsiDynix's assertion that SirsiDynix is the owner of copyright in such training materials.

K.    *COOPERATION*

SirsiDynix shall cooperate, and coordinate any services being provided hereunder, with the Library and the agents, contractors, consultants and/or third party vendors of the Library (including without limitation, Tech-Logic and any company providing outsourcing services to the Library) that perform(s) services for or provides products to the Library ("Third Parties") in connection with the permitted use of the Licensed Software hereunder (including without limitation, the use of the Licensed Software with third party products) to the extent reasonably required by the Library, such cooperation to include without limitation providing: (i) in writing, all information required so that the Licensed Software may be utilized by the Library and such Third Parties as permitted hereunder; and (ii) assistance and support to the Library and such Third Parties in connection with their permitted use of the Licensed Software.

L.    *SIRSIDYNIX ACCESS TO LIBRARY'S HARDWARE, PREMISES AND/OR THE LICENSED SOFTWARE*

To the extent that SirsiDynix is given access to the Library's facilities, the Hardware and/or the Licensed Software being run by, or on behalf of, the Library,

such access will be provided solely upon a schedule which is mutually agreed upon by SirsiDynix and the Library.

M.    **SUBCONTRACTING**
The unique abilities, knowledge and skills of SirsiDynix and its employees constitute material consideration of this Agreement. SirsiDynix agrees that it shall not employ any agent or subcontractor in connection with the performance of the Services without the prior written consent of the Library. SirsiDynix shall provide the Library with evidence of said agent's or subcontractor's compliance with the provisions of Section 22 of this Agreement, Confidential Information, prior to the disclosure of Confidential Information (as defined herein) to, or the performance by, any such agent or subcontractor in connection with or pursuant to this Agreement.

**8.    DOCUMENTATION**
SirsiDynix shall provide the Library, at the time of delivery of each version of the Licensed Software (or portion thereof), with an electronic version of the complete standard documentation and training manuals for such version of the Licensed Software (or portion thereof), including but not limited to those described in Schedule 1 for the operation and maintenance of the System.   The Library may print, photocopy or otherwise reproduce and distribute the SirsiDynix documentation and training materials for training or otherwise for its own uses, the use of the other users of the system and otherwise as needed to exercise the rights granted hereunder, provided that SirsiDynix's statement of copyright is included on each copy. SirsiDynix hereby grants permission to Library to put SirsiDynix training materials and information on a restricted Library Web site, but prohibits Library from posting or otherwise publishing documentation for the Envisionware Enterprise eCommerce Suite for access outside the Library's or The Queens Library Foundation's organization other than by the agents, contractors or consultants of the Library or The Queens Library Foundation.

**9.    ACCEPTANCE TESTS**
A.    Except where otherwise stated herein, the testing of the System shall be conducted by Library without the assistance of SirsiDynix.

B.    Library agrees that it will perform or waive acceptance tests as described in Schedule 5, Exhibits A through D. Library agrees to commence the performance of or waive acceptance tests of Software products that are in use by Library on Day 1 of Production Operations with the System, within thirty (30) days following Day 1 of Production Operations. Upon completion of these tests, Library shall inform SirsiDynix in writing that each test has been waived, conducted and considered successful, or conducted and considered unsuccessful. In the event that a test is considered by Library to be unsuccessful, it will be repeated according to the provisions of Schedule 5.

C.    Following the delivery, installation, configuration and implementation, on the Library's hardware as set forth in Section 5(A)(6) above, of the fully functional version of Licensed Software which includes all of the Required "Go-Live" Functionality (including without limitation all GAP Analysis Functionality) other than functionality which had a "Due" date (as set forth on Schedule 12) after October 1, 2006, the Library shall perform those of the acceptance tests as described in Schedule 5, Exhibits A through D, if any, that the Library deems

appropriate, and such other tests and/or review deemed reasonably necessary by the Library to ensure that the Licensed Software operates and performs in material conformance with its Documentation (as defined in Section 10(A)(1)) and this Agreement, and contains the Required "Go-Live" Functionality (collectively, the "Acceptance Criteria"). If the Library accepts the Licensed Software, the Library shall acknowledge its acceptance ("Initial Acceptance") of the Licensed Software by providing written notice of such Initial Acceptance. If the Library rejects the Licensed Software, the Library shall provide SirsiDynix with written notice of rejection, including a description of the deviation(s) alleged. SirsiDynix shall, at SirsiDynix's sole cost and expense, cure such deviation(s) and redeliver the failed Licensed Software to the Library as soon as possible using continuous efforts, but in any event by no later than sixty (60) days after becoming aware of the deviation(s), provided further that, notwithstanding the foregoing, SirisiDynix shall cure (and redeliver the corrected version of the failed Licensed Software to the Library) prior to December 1, 2006. The corrected Licensed Software shall thereafter be subject to the same testing and acceptance procedure set forth above. Initial Acceptance shall not constitute a waiver of, or be construed to diminish, SirsiDynix's obligations with respect to maintenance and/or support services, any warranty or any other agreement for the performance of services.

D.       In addition to the acceptance testing described in Section 9(C) of this Agreement, beginning upon the Day 1 of Production Operations and continuing until the Licensed Software has operated in production in accordance with the Acceptance Criteria for a period of sixty (60) consecutive days ("Production Test Period"), the Library will perform the acceptance tests as described in Schedule 5, Exhibits A through D (unless waived by the Library) and shall have the right to perform such other tests and/or review deemed reasonably necessary by the Library to ensure that the Licensed Software operates and performs in production in material conformance with the Acceptance Criteria. If the Library accepts the Licensed Software in production pursuant to this Section 9(D), the Library shall acknowledge its acceptance ("Go-Live" Acceptance") of the Licensed Software by providing written notice of such Go-Live Acceptance. If the Library rejects the Licensed Software in production, the Library shall provide SirsiDynix with written notice of rejection, including a description of the deviation(s) alleged. SirsiDynix shall, at SirsiDynix's sole cost and expense, cure such deviation(s) and redeliver a corrected version of the failed Licensed Software to the Library as soon as possible, but in any event in a reasonable timeframe consistent with the timeframes specified in Section 3(H) of Schedule 10. The corrected Licensed Software shall thereafter be subject to the same testing and acceptance procedure set forth above. Unless Library provides SirsiDynix with a written notice of rejection pursuant to this paragraph on or before one hundred and twenty (120) days after Day 1 of Production Operations, it will be presumed that the System has met all criteria for purposes of "Go-Live" Acceptance. "Go-Live" Acceptance shall not constitute a waiver of, or be construed to diminish, SirsiDynix's obligations with respect to maintenance and/or support services, any warranty or any other agreement for the performance of services.

E.   With respect to each portion of the Required "Go-Live" Functionality which had a "Due" date (as set forth on Schedule 12) after October 1, 2006, each portion of the Additional Required Functionality, each subsequently defined Software Customization and each other Update provided to the Library (each, a "Deliverable") and the services to be provided hereunder, upon (i) delivery and successful installation of a completed Deliverable on the Library's hardware, and/or (ii) the Library's receipt of a written notice from SirsiDynix's of SirsiDynix's completion of a service provided hereunder, as applicable, the Library shall thereafter have thirty (30) days, or such time as is otherwise agreed by the parties, to review and test the Deliverable and/or the results of the service(s), as applicable, for compliance with the requirements under this Agreement, specifications and/or documentation for the same (the "Requirements") and either accept or reject such Deliverable and/or service(s) in writing. Should the Library determine that the applicable Deliverable and/or service(s) fail(s) to comply with all Requirements, it shall notify SirsiDynix of such non-compliance and SirsiDynix shall, at no cost to the Library, correct and redeliver such Deliverable to the Library and/or reperform such service(s), in each instance within ten (10) business days of such notice, or such other time period as may be agreed to in writing by the parties. The corrected Deliverable and/or service(s) (as applicable) shall thereafter be subject to the same testing and acceptance procedure set forth above. Should a Deliverable and/or service(s) fail a second time to comply with applicable requirements, the Library may require further correction according to the foregoing procedure, or may terminate this Agreement and/or the services in connection with the applicable Deliverable and/or service (as applicable), upon which SirsiDynix shall promptly provide the Library a full refund of the fees and expenses paid by the Library for the applicable Deliverable and/or service(s) and any amount which the Library has paid for any terminated Deliverable and/or service(s), as well as the fees corresponding to any other product, deliverable and/or service(s) rendered substantially unusable by the termination.

F.   The parties agree that (1) acceptance of any portion of the Licensed Software, Deliverable and/or service shall not constitute a waiver of, or be construed to diminish, SirsiDynix's obligations with respect to maintenance and/or support services, any warranty or any other agreement for the performance of services and (2) failure of any portion of the Licensed Software, Deliverable and/or service to satisfy the applicable acceptance criteria shall constitute a breach of this Agreement by SirsiDynix.

## 10.   WARRANTY

### A.   WARRANTIES

1.   SirsiDynix represents and warrants that, during the Warranty Period (as defined below in this Section 10(A)(1)), the Licensed Software will unless otherwise mutually agreed by the parties, contain the Identified Required "Go Live" Functionality and other features and functionality described in, and operate in accordance with, the contract documents and applicable user manuals described by Sections 2 and 8 of this Agreement and by the Documentation listed in Schedule 1 (collectively, the "Documentation"),

so long as (i) the Library is no more than two (2) major releases back from the current major release of the Licensed Software and (ii) the Library has incorporated into the version of the Licensed Software that it is then using all corrections to such version of the Licensed Software that SirsiDynix has made available to Library. For purposes of this Agreement "Warranty Period" shall mean the period beginning on the Effective Date and continuing until one (1) year after the "Go-Live" Acceptance, and thereafter as long as the maintenance terms set forth in Schedule 10 (or other terms for the provision of maintenance and support of the Licensed Software) are in effect; provided however that, for purposes of this Section 10(A)(1), with respect to a particular component of the Third Party Software, the term Warranty Period shall mean the period beginning on the Effective Date and continuing until one (1) year after delivery to the Library of such component of Third Party Software.

2. SirsiDynix represents and warrants that (a) each of its personnel assigned to perform services shall have the proper skill, training and background so as to be able to perform in a competent and professional manner, (b) the services provided pursuant to this Agreement, including without limitation those listed in Schedule 1, will be performed in a competent and professional manner consistent with industry standards reasonably applicable to the performance of such services, and (c) it, and each of its personnel and other contractors and agents, does and shall comply with all applicable laws and regulations.

3. SirsiDynix represents and warrants (a) that it has all necessary rights, in and to the Licensed Software, including any Third Party Software, to grant the licenses herein, (b) that it is an authorized distributor of the Third Party Software, (c) that Library has the right to use the Licensed Software, including any Third Party Software, needed for operation of the System in accordance with the terms and conditions of this Agreement, (d) it has all necessary rights, authorizations and licenses to provide the services and deliverables which it will provide hereunder, and (e) that it has the full legal right and corporate power and authority to enter into and perform all its obligations under this Agreement and to comply with all terms and conditions of this Agreement.

4. SirsiDynix represents and warrants that during operation of the System under normal business conditions during Library's Operating Hours in which the activities of users are not scripted to create pre-defined transaction mixes for purposes of stress-testing the System or the response-time performance or capacity of the System, the System shall perform all interactive transactions with average response times equal to the response times set forth in Schedule 17. On demand by the Library during the time Library is using the System, a thirty (30)-minute response-time test can be conducted by Library to determine whether the System is meeting the warranted response times set forth in Schedule 17 using Workstations connected to the System server via a $\geq 1.5$ mbps WAN. The transactions active at the time shall be those occurring under normal

business conditions during Library's Operating Hours including the transaction volumes shown by Schedule 7, in Table 7-1 that specifies the minimum transaction volume capacity for the number of users shown therein, with the Hardware configured to meet or exceed the minimum configuration as specified by Schedule 7.

5.      SirsiDynix represents and warrants that, during the Warranty Period, other than in the case of a Hardware failure, network failure, natural disaster, computer virus, an error in software owned by a party other than SirsiDynix or its parent or affiliate or Library operator error which causes the Licensed Software to be unavailable for a reason other than (a) an error in the Database Software licensed hereunder or the Licensed Software which is owned by SirsiDynix, its parent or affiliate, or (b) a failure of SirsiDynix to perform its maintenance or support obligations hereunder, including without limitation those set forth in Schedule 10, the Licensed Software will be up and running and perform and operate in production in accordance with all requirements set forth in this Agreement ninety-nine and nine-tenths (99.9%) percent of the time on a 24x7x365 basis (and on the last day of leap year), including without limitation during the performance of file maintenance, back-ups and/or file purges, regardless of what other operations are taking place in connection with the Licensed Software and Hardware, such as the performance of file maintenance, back-ups and/or file purges. SirsiDynix further represents and warrants that, during the Warranty Period, in the event of a situation where (a) either (i) users cannot use the Licensed Software, (ii) the production system is down, (iii) data corruption is occurring and/or (iv) a failure has occurred which severely limits use of a major function in the application and no effective detour or other workaround is provided to the Library and (b) the Library has followed the prescribed backup routines on a schedule recommended by SirsiDynix; (A) in addition to the requirements set forth in Schedule 10, SirsiDynix will (1) diagnose the cause of the situation and (2) restore the Licensed Software within twelve (12) hours from when the Library has recovered the Hardware and commences recovery of the Software, (B) SirsiDynix has (and will have at the time of such occurrence) programs available to use and to provide to the Library for its use which will allow any and all corrupted or missing data and applications to be rebuilt within twenty four (24) hours from when the Library has recovered the Hardware and commences such data/application rebuild (the "Recovery Programs") and (C) in the event that such situation was caused by an error in the Licensed Software, SirsiDynix will use its best efforts to fix the error within a reasonable time frame consistent with the timeframes set forth in Section 3(H) of Schedule 10, which efforts will include assembling the best team of SirsiDynix personnel to fix such error and making such personnel available (including onsite at the Library's location where necessary) at all times necessary to fix such error. SirsiDynix agrees that it shall demonstrate to the Library, on or about January 15, 2007, and within thirty (30) days of the

BRMFS1 627942v16

anniversary of the prior demonstration for each year thereafter during the Term of this Agreement that it has Recovery Programs and that the Recovery Programs operate on the Library's hardware (or such other hardware designated by the Library) as required pursuant to this Section. Provided that the Library has complied with reasonable Data Integrity Procedures provided by SirsiDynix, in connection with corruption of data, or a loss of or other damage to data which occurs in the data input or otherwise housed in the Licensed Software at any time during the Warranty Period, whether caused by any act or omission of SirsiDynix or its agent or by a cause outside of SirsiDynix's control or otherwise, SirsiDynix shall be responsible to, within eight (8) hours of being notified or otherwise becoming aware of such data corruption, loss and/or damage, (y) correct the cause of such data corruption, loss and/or damage, as applicable, and (z) restore the corrupted, lost or otherwise damaged data, at no cost or expense to the Library, so that the data is accurate.

6.      For a one year period following Day 1 of Production Operations, and thereafter during the Warranty Period, if the System fails to perform within the response-time performance levels as warranted in Section 10.A.4 above, at the system availability level warranted in Section 10(A)(5) above, or with the functions and capabilities or otherwise in accordance with the requirements described in Section 10.A.1 above, SirsiDynix will correct or modify or make other enhancements or other Updates to the System or the applicable Hardware (which may include expansion of the Hardware) that are required to provide the contracted levels of performance, system availability and functionally as specified by this Agreement, within a reasonable time frame consistent with the timeframes set forth in Section 3(H) of Schedule 10 (and in any event within ninety (90) days after first becoming aware of such failure), at no cost to Library and without the use of the Custom Development Team unless the Library consents to such use, provided that, solely with respect to the compliance with Section 10.A.4 and subject to the Library's right (as set forth in Section 20 and pursuant to Schedule 10) to continue to operate the prior major releases of the Licensed Software, Library has completed necessary hardware upgrades to run future releases of Horizon being operated in production by the Library, if required. In the event of degradation of response time SirsiDynix will make its best efforts to bring the System into compliance with the response time requirements detailed in the contract documents and in Section 10.A.4 above at no additional cost to the Library and without the use of the Custom Development Team unless the Library consents to such use and within a reasonable time frame consistent with the timeframes set forth in Section 3(H) of Schedule 10.

7.      SirsiDynix represents and warrants that the System as delivered shall have the capacities and growth path as described by Schedule 7; and that the Hardware is configured according to the Minimum Configuration Requirements as specified in Schedule 7 and is capable of supporting the number of concurrent users shown in Schedule 7 at the required response

BRMFS1 627942v16

times warranted above, provided that the Hardware is configured according the Minimum Configuration Requirements as specified by Schedule 7.

8.   SirsiDynix represents and warrants that, at the time of delivery to the Library, the Licensed Software does not and will not contain any viruses, time bombs, or other device capable of disabling or interfering with the use of the Licensed Software or other systems used by the Library and/or any cardholder or other user of the Library or the Licensed Software.

9.   SirsiDynix represents and warrants that the Documentation provided hereunder with respect to each portion of the Licensed Software accurately reflects the functionality and performance of the applicable portion(s) of the Licensed Software.

10.   SirsiDynix represents and warrants that the inclusion of the open source software in the Licensed Software will not affect the Library's use of the License Software or the use of, and/or the Library's sole and exclusive ownership rights in, the results of the Library's use of the Licensed Software.

11.   SirsiDynix represents and warrants that during the Warranty Period the Licensed Software will operate on the Hardware (or other hardware used by the Library to operate the Licensed Software which has been certified by SirsiDynix, which certification will not be unreasonably delayed or withheld when requested) when such hardware is configured as set forth in Schedule 7 (or as otherwise certified) and will interoperate with and properly transmit information and data to and from the other systems of Library, including without limitation those systems listed in Schedule 14. The Library is responsible for updating and/or replacing the Hardware as necessary to accommodate future releases of the Horizon System beyond version 8.2 of the Horizon System if such releases require Hardware changes. The parties acknowledge and agree that, notwithstanding the foregoing, no new Hardware will be required to operate any version of the Licensed Software prior to, and including, version 8.2 of the Horizon System.

12.   SirsiDynix represents and warrants that the media on which the Licensed Software and Updates are delivered are free from material defects at the time they are delivered to Library and for a period of ninety (90) days thereafter.

13.   SirsiDynix represents and warrants that, except as otherwise expressly set forth in this Agreement, the Licensed Software requires no other hardware, software or services for the full and complete operation and use of such Licensed Software in accordance with the terms of this Agreement and the applicable documentation or other specifications for such Licensed Software.

B.   **REMEDIES**
If Library believes there has been a breach of a warranty in subsection 10.A above and so notifies SirsiDynix, then SirsiDynix will promptly investigate the matter to determine the nature of the suspected error. If there has been a breach

of any warranty, then, in addition to the Library's other remedies available at law, in equity or pursuant to this Agreement, SirsiDynix will (at SirsiDynix's sole cost and expense, without the use of the Custom Development Team unless the Library consents to such use, and in a timely manner) correct or modify the Licensed Software or services to make the System perform as warranted or to re-perform the services. If SirsiDynix is unable, after repeated efforts, to correct a breach of subsection A above, Library will be entitled to an equitable adjustment in the monies owing under this Agreement, to reflect any reduction in the value of the Licensed Software or services as a result of the uncorrected error.

C.   **NO BREACH OF WARRANTY**

Unless the applicable nonconformity would still have occurred in the absence of the items set forth in items (i), (ii) or (iii) of this sentence, SirsiDynix is not responsible for any claimed breach of any warranty caused by: (i) modification(s) made to the System by anyone other than SirsiDynix or its agent, unless such modification was performed with SirsiDynix's prior written consent or under the direction of SirsiDynix's customer support and the Library or its agent performs the changes in accordance therewith; or (ii) Library's use of a version of the Licensed Software which is more than two (2) major releases back from the current major release of the Licensed Software; (ii) the Library's failure to incorporate into the version of the Licensed Software that it is then using all corrections to such version of the Licensed Software that SirsiDynix has made available to Library; or (iii) SirsiDynix's adherence to Library's specifications or instructions for custom work provided SirsiDynix notifies Library that custom work may affect contract warranties.

D.   **NO ADDITIONAL WARRANTIES**

**THE WARRANTIES SET FORTH IN THIS AGREEMENT ARE IN LIEU OF, AND THIS AGREEMENT EXPRESSLY EXCLUDES TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, INCLUDING, WITHOUT LIMITATION, (i) ANY WARRANTY THAT THE LICENSED SOFTWARE IS ERROR-FREE; AND (ii) ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT, AND (iii) ANY AND ALL IMPLIED WARRANTIES ARISING FROM STATUTE, COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.**

E.   **THIRD PARTY WARRANTIES**

The parties acknowledge that, without limiting SirsiDynix's warranty obligations set forth in this Agreement, Third Party products may also come with a manufacturer's warranty. Such warranties begin on shipment of the Third Party products from the manufacturer, whether shipment is to SirsiDynix or to Library.

11.   **DEDICATED SERVERS**

All servers that are part of the Hardware and are used by the Library to operate the Licensed Software in production shall be dedicated servers and shall only contain Software and Content for the Horizon System, and shall only be operated for the purposes

of the Horizon System; except for the use of one Horizon server on which proxy software will be used.

**12.  MAINTENANCE**

The Library hereby agrees to enter into a separate Maintenance Agreement, a copy of which is included in Schedule 10 of this Agreement, for maintenance of the Hardware and Licensed Software, including Third Party Software.  Pursuant to the maintenance terms listed in Schedule 10, SirsiDynix shall maintain the Licensed Software modules (unless Schedule 10 provides otherwise with respect to the Third Party Software), at SirsiDynix's expense for a period of one year from Day 1 of Production Operations.

**13.  INVOICING; PAYMENT SCHEDULE**

    *A.*    The fees for the license and services to be provided hereunder are set forth on Schedule 1.  Other than said fees set forth in Schedule 1 and as otherwise expressly set forth in this Agreement, the Library shall not be liable for any costs or expenses incurred by SirsiDynix with respect to this Agreement.

    *B.*    SirsiDynix shall submit all invoices to Library, on the schedule set forth in Schedule 4, at the address shown in the first paragraph of this Agreement. Library is solely responsible for payment of all undisputed invoices.  SirsiDynix will not provide multiple invoices or bill entities other than Library, including consortium members or governing boards, unless stated otherwise in this Agreement. Undisputed invoices shall be considered past due if not paid in accordance with the payment schedule detailed in Schedule 4.

    *C.*    The Library shall have the right to audit SirsiDynix's books and records as the same pertain to performance of services under this Agreement.  Such audits may be either an operational audit or accounting audit or both.  The Library shall give reasonable notice to SirsiDynix of such audits.  SirsiDynix agrees that the services provided by SirsiDynix under this Agreement are subject to audit by the Library's internal auditors and/or its independent auditors and/or other Library designee. SirsiDynix will cooperate fully with the Library or its designee in connection with the Library's audit functions.  If, as a result of any audit, it is determined that the Library has overpaid SirsiDynix, SirsiDynix will promptly pay to the Library the amount of the overpayment, plus interest at the then-current prime rate, as announced from time to time in *The Wall Street Journal* (or, if lower, the maximum amount allowed by law), calculated from the date of the Library's payment of the overage amount until the date of full reimbursement by SirsiDynix to the Library.  The failure or inability of SirsiDynix to promptly resolve any material audit exceptions shall be a material breach of this Agreement.

**14.  TAXATION**

Library represents that it is exempt from taxes. Unless otherwise noted, the prices in this Agreement do not include taxes.  Library agrees to pay directly or reimburse SirsiDynix for any taxes arising out of this Agreement or SirsiDynix's performance under this Agreement for which Library is not exempt, excluding taxes on SirsiDynix's income, capital stock and/or assets and other property and franchise taxes.

## 15.  SOFTWARE LICENSE; ESCROW

A.   SirsiDynix hereby grants Library and The Queens Library Foundation a non-exclusive, non-transferable (except to the extent transfer or assignment is permitted pursuant to the terms of this Agreement, including without limitation Section 23, Assignment, below) and limited use license to copy and use the Licensed Software on the Hardware, the Workstations and any other hardware necessary to operate the Licensed Software, including without limitation executing and displaying, maintaining, upgrading, modifying and enhancing the Licensed Software (and to permit, through a sublicense or otherwise, other organizations that use the Library's services (excluding other library systems which are not located in Queens and are not defined by the Effective Date of this Agreement), cardholders and other library users, agents, contractors and consultants of Library and/or The Queens Library Foundation, including without limitation any company providing outsourcing and/or hosting services to Library and/or The Queens Library Foundation, to do any of the foregoing), solely in the conduct of the business of the Library and/or The Queens Library Foundation. For avoidance of doubt, the parties acknowledge and agree that the license granted hereunder is for an unlimited number of users, except for any restrictions expressly set forth in Schedule 1.

B.   For the avoidance of doubt, and notwithstanding any other provision to the contrary, the parties agree that the Library may (i) in the event the Library and/or The Queens Library Foundation establishes disaster recovery services, permit testing and storage and, if required upon a disaster, to permit operation, of the Licensed Software and related documentation by an institution in the business of providing computer "disaster" services; (ii) in the event the Library and/or The Queens Library Foundation chooses to outsource the data processing functions of the Library and/or The Queens Library Foundation, permit the use of the Licensed Software and related documentation by a third party outsourcing services provider to operate the Licensed Software for the benefit of the Library and/or The Queens Library Foundation; (iii) for purposes of storage of the Licensed Software, to permit a third party in the business of providing storage services for programs used by the Library and/or The Queens Library Foundation to store the Licensed Software at such third party's storage facilities; and (iv) subject to Section 15(S) below, use the Licensed Software in conjunction with other software products.

C.   Except as otherwise permitted hereunder, Library may not rent or lease the Software to any other entity or use the Software as part of a commercial time-sharing, subscription bureau or service bureau operation unless the other entity has a contractual arrangement with the Library for use of the Software, as in a consortium agreement or in a services agreement with the Library.

D.   The Software is confidential, proprietary, and copyrighted and all rights therein not expressly granted to Library are reserved to SirsiDynix or the Software owner in the case of Third Party Software.

E.   Except as otherwise agreed by the parties, SirsiDynix or the Third Party Software owner retains title to all copies of the Software; all training and procedural materials developed by SirsiDynix in conjunction with the Software; and any additions and supplements to the Software which may be developed for Library

through the reimbursed or unreimbursed efforts of SirsiDynix employees or agents.

F.    The Library may make copies of the Licensed Software as needed to exercise the rights granted hereunder, including without limitation for back-up, archival and testing purposes. Except to the extent permitted by applicable law or pursuant to the terms of this Agreement, Library may not make copies of the Software, nor shall it disassemble, decompile, or reverse-engineer the Software.

G.    SirsiDynix may update and modify the Software from time to time, as it deems necessary, provided that such update or modification does not affect the performance of the Licensed Software as per the performance standards set forth in this Agreement.

H.    Library acknowledges that any breach or threatened breach of any license involving unauthorized use of SirsiDynix's intellectual property rights may result in irreparable harm to SirsiDynix for which damages would not be an adequate remedy.

I.    Library may not alter or obscure any proprietary rights notice or the phrase "powered by SirsiDynix" appearing on any SirsiDynix-supplied materials and must include such notices or phrases on any copies.

J.    The placement of a copyright notice on any portion of any Software or any update to such Software will not be construed to mean that such portion has been published and will not derogate from any claim that such portion contains proprietary and confidential information of SirsiDynix or other Software owner.

K.    Upon termination of this license for the Software, Library shall destroy or return to SirsiDynix all copies of the Licensed Software.

L.    Copies of the Licensed Software (with the exception of Third Party Software, but including without limitation all Software Customizations and modifications (where possible and to the extent allowed by SirsiDynix's third party vendor of the Third Party Software) and interfaces made to the Third Party Software by SirsiDynix and/or any agent of SirsiDynix) in a compiled running version as well as the associated machine-readable source code (in the internally documented form) along with any and all SirsiDynix internally-developed software tools, compilers, install shields, and other development aids used in developing the Licensed Software have been deposited with Iron Mountain f/k/a Data Securities International, Inc., of San Diego, California (the "Escrow Agent"), under and pursuant to the terms of a deposit agreement, a copy of which is attached hereto as Schedule 11 (the "Escrow Agreement"). In addition, SirsiDynix will place with the Escrow Agent an updated copy of the materials in escrow following any Updates to them, and in any event at least once every 180 days from the Effective Date. As soon as reasonably practical after the Effective Date, SirsiDynix will, at the Library's cost and expense, establish, and at all times thereafter during the duration of the Library's license to the Licensed Software under this Agreement maintain, the Library's status as a beneficiary and Registered Licensee under the Escrow Agreement or successor deposit agreement. SirsiDynix shall at its expense (i) maintain in good force for the duration of the Library's license to the Licensed Software under this Agreement, the Escrow Agreement or a deposit agreement (the terms of which are acceptable to both parties) with an escrow

agent which is acceptable to both parties, the terms of which will at all times comply with the provisions of this Section 15(L) and be substantially similar to those set forth in Schedule 11, (ii) fulfill its other obligations under this Section, (iii) maintain its escrow deposit with respect to the Licensed Software at all times during the term of the Library's license for the Licensed Software, and (iv) not cancel or modify said deposit agreement without thirty days notice to Library. The Library shall be entitled to access the materials in escrow, and have such materials released to the Library, if (i) Customer is a registered licensee with the Escrow Agent or successor escrow agent and, (ii) according to the Escrow Agreement or successor deposit agreement, essential services cannot be made available to the Library by SirsiDynix or SirsiDynix fails, without cause on the Library's part, to furnish the Library with maintenance and/or support services to the extent provided for under this Agreement (including without limitation Schedule 10 or other terms for the provision of maintenance and support services). Customer may, at its own cost, become a registered licensee either directly with the Escrow Agent or by becoming a member of the Horizon software users' group which is itself a registered licensee. The parties acknowledge and agree that the Escrow Agreement referred to above is (and any successor deposit agreement shall be) an agreement supplementary to this Agreement for purposes of Section 365(n) of the United States Bankruptcy Code.

M.    SirsiDynix, (or a Third Party Software vendor, or an independent audit firm retained by the same, provided such vendor or audit firm has executed an agreement which includes provisions which are at least as restrictive as the provisions of Section 22 of this Agreement) may, upon reasonable notice, examine and audit the records and the Library's use of the Licensed Software to ensure compliance with any license granted hereunder; provided however that SirsiDynix will not have any right to access a computer or computer system on its own and any access to the computer systems shall be obtained only by operation of the applicable system(s) by a representative of the Library. Any audit will be performed during the Library's regular business hours and in a manner which avoids unreasonable interference with the operations of the Library or The Queens Library Foundation.

N.    If the Library exports any of the Software, it must comply fully with all relevant export laws and regulations of the United States to ensure that the Software is not exported, directly or indirectly, in violation of United States law.

O.    The Library is prohibited from making written or oral disclosures to any third party of any results of any benchmark tests on any part of the Oracle Database Software or Horizon Web Reporter software.

P.    Notwithstanding any other provision to the contrary, nothing in this Agreement will prevent the Library from discussing the functioning of the Licensed Software, as needed, with third parties with whom the Library does business (including without limitation the Library's consultants and agents).

Q.    If the Library grants a security interest in the Licensed Software, the secured party shall have no right to use the Licensed Software.

R.    In using Horizon Web Reporter to run reports based on the Library's data as hosted in the Licensed Software, the Library is limited to accessing data only

from data models in Horizon Web Reporter that are provided by SirsiDynix. The Library shall not make any material expansion of the analytic scope or any other substantial modification of any such data models, and from creating any new projects, i.e., a single reporting application residing in the Web Reporter metadata. Any such changes shall only be made by SirsiDynix or its agents as requested by the Library.

S.     The license to use the Oracle Database Software is a restricted license and the Oracle Database Software can only be used in conjunction with the Horizon portions of the Licensed Software in connection with the use pursuant to this Agreement of the Licensed Software and in the business operations of the Library or The Queens Library Foundation. So long as the Oracle Database Software is being used as set forth above in conjunction with the Horizon portions of the Licensed Software, then the Oracle Database Software can also be used with other portions of the Licensed Software and to interface with other systems and software being used by the Library or The Queens Library Foundation. For the avoidance of doubt, notwithstanding the foregoing or any other provision to the contrary, neither the Library nor The Queens Library Foundation will in any way be restricted from using the Oracle Database Software in connection with future development or upgrades of the Licensed Software or other systems being used by the Library, and no additional license will be needed to so use the Oracle Database Software, so long as the Oracle Database Software is used in conjunction with the Horizon portions of the Licensed Software.

T.     Oracle and MicroStrategy are each a third party beneficiary of this license.

U.     Application of the Uniform Computer Information Transactions Act is expressly excluded from this license and the use of the Software.

V.     Some portions of the Licensed Software may include source code that is provided as part of the vendor's standard shipment of the Software, which source code shall be governed by the terms of this license.

W.    Library may not use a previous version or copy of the EnvisionWare Third Party Software after Library has received and successfully installed, configured and implemented a disk replacement set or an upgraded version which properly interoperates with the other Licensed Software. Upon upgrading the EnvisionWare software, all copies of the prior version must be destroyed.

X.     Library may not use a later version of the EnvisionWare Third Party Software than is provided by SirsiDynix unless Library has purchased maintenance for the EnvisionWare software or has otherwise separately acquired the right to use such later version.

## 16.     OWNERSHIP OF DATA

Between SirsiDynix and the Library, Library retains for itself ownership and rights of ownership to all bibliographic, authority, item, patron, and associated transaction records and all other records, information and data it enters into the System's database or that the System creates for it (the "Library Data"). SirsiDynix acknowledges that, between SirsiDynix and the Library, Library so retains ownership and rights of ownership to all of its bibliographic, authority, item, patron, and associated transaction records and all other records, information and data entered into the database or created by the System for it. SirsiDynix shall not, without the written consent of an owning Library, copy or use any

such Library Data of that Library, except to carry out contracted work, and will not transfer such Library Data to any other party not involved in the performance of this Agreement; provided that any use or transfer contemplated by this Section will be subject to the provisions of Section 22, Confidentiality. For avoidance of doubt, the parties acknowledge that Library shall have the right, without the consent of SirsiDynix, to extract as Library's property such Library Data using the System's utilities.

17.   **INTELLECTUAL PROPERTY CLAIMS**

    *A.*    SirsiDynix will, at its sole cost and expense, indemnify, defend and hold harmless the Library, The Queens Library Foundation and its or their respective trustees, directors, officers, employees, agents, contractors, consultants, cardholders and other users, successors and assigns (the "Indemnified Parties") from and against any action, claim or other legal proceeding brought against an Indemnified Party(ies) to the extent it is based on a claim that the Licensed Software, any service provided by SirsiDynix or any original works of authorship written by SirsiDynix under a statement of work or other deliverable resulting from any service provided by SirsiDynix, or the use thereof, infringes, violates or constitutes misappropriation of a third party's intellectual property rights (each, a "Claim"). "Intellectual property rights" means all intellectual property rights, including patents, trademarks, design rights, copyrights, database rights, trade secrets and all other rights of an equivalent nature. SirsiDynix will indemnify and hold the Indemnified Parties harmless from and against all damages and costs, losses, liabilities, claims, judgments and/or expenses (including without limitation attorneys fees) ("Damages and Costs") attributable to or arising out of such Claim, including without limitation any Damages and Costs either settled by agreement or awarded by the court finally determining the case, provided that Library:

        1.    gives SirsiDynix written notice of a Claim in a reasonable period of time after Library learns of the possible Claim or Library does not give such notice in a reasonable period of time and SirsiDynix is not prejudiced in any way by a failure or delay in the provision of such notice;

        2.    gives SirsiDynix sole control of the defense and settlement of the claim, provided settlement fully releases the applicable Indemnified Parties and is solely for monetary damages, and provided further that the applicable Indemnified Parties may (while SirsiDynix retains sole control of the defense and settlement as otherwise set forth herein) participate, at their own expense, in such defense and in any settlement discussions directly or through counsel of its choice;

        3.    provides SirsiDynix, at SirsiDynix's sole cost and expense, with all reasonably available information and assistance relating to the claim and legal proceeding which is reasonably requested by SirsiDynix; and

        4.    does not compromise or settle such claim without SirsiDynix's consent.

    *B.*    If such materials or services, or the use thereof, becomes the subject of a Claim, or in the reasonable opinion of SirsiDynix are likely to be the subject of a Claim, SirsiDynix may (or, if an Indemnified Party is enjoined from using any such materials or services or any portion thereof, SirsiDynix will) attempt to address the situation as described below in (1) and (2):

BRMFS1 627942v16

1.     obtain for Library and/or the other applicable Indemnified Parties the right to use such materials at no cost to the Indemnified Parties;

2.     replace or modify the materials so they become non-infringing, but functionally equivalent.

If neither (1) nor (2) is reasonably achievable through the best efforts of SirsiDynix, SirsiDynix may request the Library to remove such infringing materials and then refund to the Library the 3 year net book value for Third Party Software products; and in the case of other Licensed Software, SirsiDynix will refund the license fees for the Licensed Software; and in each case will also refund the service fees paid under this Agreement less reasonable amortization through the date of such finding based upon a five (5) year useful life and a pro rata portion (based upon the unused portion of the applicable support period) of all annual maintenance and support fees paid to SirsiDynix, if any.

C.     Unless such Claim would still have occurred in absence of the items set forth in items (1) or (2) of this sentence, SirsiDynix has no obligation with respect to any Claim to the extent such Claim results from:

1.     modification of the materials other than modifications performed by SirsiDynix or its agent or otherwise performed at the direction or permission of SirsiDynix, or

2.     use of an infringing version of the materials, if (a) such use occurs after SirsiDynix notified the Library of the infringement and requested that the Library cease its use of the infringing version and (b) the infringement could have been avoided by the use of a different version made available to Library to so avoid the infringement.

**THIS SECTION STATES SIRSIDYNIX'S ENTIRE OBLIGATION TO LIBRARY AND LIBRARY'S SOLE REMEDY FOR ANY CLAIM OF INFRINGEMENT.**

## 18.   OTHER INDEMNIFICATION; LIMITATION OF LIABILITY

    *A.*     ***ADDITIONAL INDEMNIFICATION***

1.     SirsiDynix will indemnify and defend the Library and hold the Library harmless from and against any and all claims, actions or other Damages and Costs for death, personal injury, or property damage arising in any way from negligent acts or omissions of SirsiDynix, its employees or agents from the performance or failure to perform its obligation under this Agreement or other negligence or willful misconduct of SirsiDynix, its employees or agents.

2.     SirsiDynix agrees to indemnify, defend and hold the Library harmless from, any and all Damages and Costs, claims or proceedings arising out of (a) a breach by SirsiDynix of any warranty, representation or obligation under this Agreement  (b) performance of services by SirsiDynix; or (c) any matter for which SirsiDynix is indemnified by a third party.

    *B.*     ***NO LIMITATION OF CERTAIN CATEGORIES OF LIABILITY.***

Notwithstanding any other provision to the contrary, the limitation of liability in this Section 18 shall not apply to:

1.     SirsiDynix's obligations under Section 17 or Section 18(A) (other than for its obligations under Section 18(A)(2) in connection with a breach of warranty);

2.    breach by the applicable party of its obligations under Section 22;

3.    the party's gross negligence and/or willful misconduct; and/or

4.    the non-excludable statutory rights of consumers, e.g., under laws providing for strict product liability.

C.    *LIMITATIONS ON OTHER CATEGORIES OF LIABILITY.*
Subject to subsection B of this Section 18 above and to the extent not prohibited by applicable law:

1.    SirsiDynix's maximum aggregate liability for all claims relating to the Agreement, whether for breach of contract, breach of warranty or in tort, including negligence, will be limited to the greater of (i) the total amount paid by the Library to SirsiDynix under this Agreement or (ii) $2,000,000.

2.    Except for a breach by Library of Section 22 of this Agreement, in no event will the Library and The Queens Library Foundation, collectively, be liable to SirsiDynix under this Agreement, regardless of the form of claim or action, whether for breach of contract, breach of warranty or in tort, including negligence, in an amount that exceeds, in the aggregate, the amounts owed by the Library to SirsiDynix under this Agreement.

3.    **UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH OR ARISING OUT OF THE AGREEMENT (INCLUDING, WITHOUT LIMITATION, LOSS OF BUSINESS, REVENUE, PROFITS, GOODWILL, OR ELECTRONICALLY TRANSMITTED ORDERS), HOWEVER THEY ARISE, WHETHER IN BREACH OF CONTRACT, BREACH OF WARRANTY, OR IN TORT, INCLUDING NEGLIGENCE, AND EVEN IF SUCH PARTY HAS PREVIOUSLY BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**LIABILITY FOR DAMAGES WILL BE LIMITED AND EXCLUDED, PURSUANT TO THE TERMS OF THIS SECTION 18, EVEN IF ANY EXCLUSIVE REMEDY PROVIDED FOR IN THE AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.**

## 19.    INSURANCE

During the performance of this Agreement, SirsiDynix will maintain in full force and effect the following insurance coverage:

A.    **WORKER'S COMPENSATION**
Full Worker's Compensation in full compliance with applicable state statutes.

B.    **GENERAL LIABILITY INSURANCE**
SirsiDynix shall provide sufficiently broad coverage to include:

1.    General Liability Insurance

2.    Personal Injury Liability

The amount of the policy shall be no less than $1,000,000 Single Limit per occurrence and no more than $2,000,000 in the aggregate, issued by an insurer licensed to do business within the State of New York.

C.   **ERRORS AND OMISSIONS INSURANCE**

Errors and Omissions insurance - the amount of the policy shall be no less than one million dollars ($1,000,000) per occurrence.

D.   **EMPLOYERS' LIABILITY INSURANCE**

Employers' Liability Insurance, with minimum limits of coverage of: one hundred thousand dollars ($100,000) per accident, bodily injury (including death) by accident; five hundred thousand ($500,000) policy limit, bodily injury (including death) by disease; and one hundred thousand dollars ($100,000) per employee, bodily injury (including death) by disease

E.   **UMBRELLA LIABILITY POLICY**

Umbrella liability policy in excess of all underlying insurance described in subsections B, C and D above, and Umbrella liability policy with limits of at least ten million dollars ($10,000,000) per occurrence, and which shall attach at the exhaustion point of the required underlying policy so that no gap in coverage whatsoever occurs, and which coverage shall be at least as broad as the underlying insurance described in this subsections B, C and D above.

SirsiDynix will have a certificate of insurance completed and filed with the director of Library within thirty (30) days of the execution of this agreement, which will name the Library as an additional insured. No cancellation, change in coverage, or expiration by the insurance company or the insured shall occur during the term of this contract, without thirty (30) days written notice to Library prior to the effective date of such cancellation or change in coverage. No change in coverage shall result in a reduction of the dollar amount of such coverage as specified above.

20.   **LICENSED SOFTWARE ENHANCEMENTS AND NEW RELEASES**

SirsiDynix may provide, from time to time, and as provided under the Maintenance and Support Agreement, a copy of which is included as Schedule 10, as part of maintenance, modifications of the construction and/or design of the Licensed Software. It is the option of Library to accept or reject the installation and use of the software changes. Except as otherwise provided in this Agreement, should Library choose to accept the new software, SirsiDynix will provide Library the necessary installation software and Library shall be able to install the said modifications at its convenience. SirsiDynix personnel will be available during normal business hours, at no additional fee, for consultation should Library encounter difficulty installing the modifications. In the event that SirsiDynix provides such modifications to Library, SirsiDynix shall supply documentation which shall be sufficient for the installation, use and operation of the System by Library.

Except as otherwise provided in this Agreement, including without limitation the provisions of the next paragraph of this Section, should Library elect to install and use a new release of the Horizon System beyond version 8.2 of the Horizon System, Library shall be responsible for the costs associated with the purchase, installation and maintenance of the computer hardware necessary to operate same. Library understands that all releases must be installed separately and that new enhancements, and some bug fixes, are not made available without accepting such releases. Fixes of Bugs that are data

corrupting or that affect the performance or availability of the System as defined by this Agreement will be provided to Library without requiring that Library install or accept new releases. If the data corruption is occurring at the database level, a new release of the Software may be required to solve the problem.

In the event that, at any time during the term of the Maintenance and Support Agreement as set forth in Schedule 10 (or other terms for the provision of maintenance and support of the Licensed Software are in effect), SirsiDynix, in a new release of the Licensed Software discontinues its support of functionality to interoperate with any of the systems or databases listed in Schedule 14 (the "Previously Supported Systems"), and the Library elects to install and use such new release, SirsiDynix will (i) provide, at SirsiDynix's sole cost and expense, services necessary to implement the interoperation of the Licensed Software with the systems which replace the Previously Supported Systems, (ii) provide, at SirsiDynix's sole cost and expense, documentation and training required to implement the interoperation of the Licensed Software with the systems which replace the Previously Supported Systems, (iii) reimburse the Library for the fees and expenses which it pays its product and service providers in connection with the procurement, license, implementation, training and other consulting services provided to implement the system(s) with which the new release of the Licensed Software interoperates which replace the Previously Supported Systems to make them available for use by the Library in production.

In the event that the Library elects not to install and use a new release of Software, Library may continue to operate the currently installed release of Software, which SirsiDynix will continue to support for at least the longer of (i) two (2) years from the time of the release of the new release of the Software that Library has elected not to install or (ii) until such time as such release is more than two (2) major releases back from the current major release of the License Software.

21. **TERM AND TERMINATION**

    *A.*     *TERM*

        This Agreement and all rights granted hereunder shall commence on the Effective Date and shall continue until Day 1 of Production Operations and thereafter as long as the maintenance terms set forth in Schedule 10 (or other terms for the provision of maintenance and support of the Licensed Software) (the "Maintenance Terms") are in effect (the "Term"). Notwithstanding the foregoing or any other provision to the contrary, if the Library terminates the Maintenance Terms for cause pursuant to Section 21(B)(3) below, or if SirsiDynix terminates the Maintenance Terms other than for cause pursuant to Section 21(B)(2) below, then the Term of this Agreement shall (without affecting the termination of the Maintenance Terms) be extended for a period of two (2) years after the effective date of the termination of the Maintenance Terms. The Term shall continue as set forth in this Section 21(A) unless the Agreement is terminated earlier pursuant to the provisions of this Agreement.

    *B.*     *TERMINATION FOR CAUSE*

        1.     SirsiDynix may terminate this Agreement if (i) the Library fails to make any payment of license fees or services fees (other than fees for

maintenance and support services) due to SirsiDynix under the terms of this Agreement which is not in dispute, (ii) SirsiDynix has provided the Library with two written notices specifying the failure (the second of which was provided by SirsiDynix no less than twenty (20) days after the date on which the Library received the first notice), and (iii) the Library has not corrected the failure within ten (10) days following its receipt of the second written notice.

2.   SirsiDynix may terminate the performance of the maintenance and support services if (i) the Library fails to make any payment of the fees for maintenance and support services due to SirsiDynix under the terms of this Agreement which is not in dispute, (ii) SirsiDynix has provided the Library with two written notices specifying the failure (the second of which was provided by SirsiDynix no less than twenty (20) days after the date on which the Library received the first notice), and (iii) the Library has not corrected the failure within ten (10) days following its receipt of the second written notice.

3.   In addition to the rights of termination specified elsewhere in this Agreement, (i) the Library may terminate this Agreement for cause, and (ii) the Library may terminate the services (or portion thereof) which would otherwise be provided hereunder for cause, in either case, immediately upon written notice if SirsiDynix fails to contest or cure any material breach or provide a written plan of cure acceptable to the Library within 30 days of being notified in writing of such breach. In addition to the foregoing and the other rights of termination specified elsewhere in this Agreement, the Library may terminate this Agreement immediately upon notice for wrongful termination or abandonment of this Agreement by SirsiDynix.

4.   In addition to the rights of termination specified elsewhere in this Agreement, if SirsiDynix, at any time prior to the date which is five (5) years from Day 1 of Production Operations, ceases to actively update the Licensed Software and/or otherwise discontinues its maintenance and support of the Licensed Product, the Library may terminate this Agreement immediately upon written notice to SirsiDynix. In the event that the Library terminates this Agreement pursuant to this Section 21(B)(4), SirsiDynix will (i) refund to the Library, in five (5) equal annual payments, the total amount of any license fees paid by the Library to SirsiDynix for the Licensed Software, which payments will be made as follows: (a) 20% thirty (30) days after the date of the notice of termination, and (b) 20% on each of the first four (4) anniversaries of the date of the notice of termination; (ii) reimburse the Library for the fees and expenses which it pays its service providers in connection with the implementation, training and other consulting services provided to make a replacement system available for use by the Library in production and (iii) upon the Library's request and at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*, provide services in connection with the maintenance and support of the Library's continued

use of the Licensed Software prior to its production use of a replacement system.

C.    **TERMINATION FOR CONVENIENCE**

1.    This Agreement and/or any of the services being provided hereunder (or portion thereof) which would otherwise be provided hereunder, may be terminated by the Library for convenience at any time and for any reason upon the provision of thirty (30) calendar days prior written notice of such termination to SirsiDynix.

2.    Notwithstanding the foregoing or any other provision to the contrary, and in addition to any other termination right which the Library has pursuant to the terms of this Agreement, the Library may terminate this Agreement, if it determines in its good faith evaluation that the Licensed Software is not working properly, at any time on or before the date which is two (2) months after Day 1 of Production Operations. In the event of a termination of this Agreement pursuant to this Section 21(C)(2), SirsiDynix shall (a) immediately refund to the Library any and all sums paid by the Library to SirsiDynix pursuant to this Agreement (other than the applicable license fee paid to SirsiDynix (if any) for Oracle software); and (b) with respect to the Oracle software, (i) prior to the termination of this Agreement, obtain for the Library, at no cost to the Library, the right to continue to use the Oracle software in support of the product with which the Library replaces the Licensed Software or, if item (b)(i) of this sentence is not reasonably achievable through the best efforts of SirsiDynix, refund the license fee paid to SirsiDynix for Oracle software.

D.    **TERMINATION FOR FINANCIAL STANDING**

Either party may terminate this Agreement immediately upon written notice to the other party in the event of (i) the commencement of any voluntary or involuntary bankruptcy or insolvency proceeding by or against the other under any bankruptcy, debtor relief, insolvency, reorganization or similar law or proceeding, (ii) the other party making an assignment for the benefit of its creditor, or (iii) the other party admitting in writing its inability to pay its debts or not paying its debts generally as they become due.

E.    **EFFECT OF TERMINATION**

1.    Following termination of this Agreement (for whatever reason), each party will deliver to the other any property of the other in its possession or control in good condition, reasonable wear and tear excepted; provided however that in the case that the Library continues to use the Licensed Software pursuant to Section 21(E)(2) below, the Library will retain its copies of the Licensed Software and related information and will deliver such materials to SirsiDynix upon its cessation of the use of the Licensed Software.

2.    Notwithstanding the preceding or any other provision to the contrary, (i) should SirsiDynix commit a breach of this Agreement that results in termination, Library and The Queens Library Foundation may continue to use the Licensed Software as long as it complies with the terms of the software license and pays maintenance fees and (ii) in the event of any

other termination of this Agreement by either party or the end of the Term for any reason, the Library and The Queens Library Foundation may continue to use the Licensed Software for a period of up to two (2) years after the end of the Term, pursuant to the terms of Section 15 of this Agreement provided that the Library continues to pay the annual maintenance fees for the Oracle Database Software which would otherwise have been payable if the Agreement was still in effect. At any time during which the Library uses the Licensed Software pursuant to the preceding sentence, the Library's license to the Licensed Software will continue and SirsiDynix will, upon the Library's request and at no additional fee beyond the payment of the applicable maintenance fees, provide services in connection with the maintenance and support of the Library's use of the Licensed Software. During the period of the Library's use of the Licensed Software pursuant to this Section 21(E)(2) the Library may also be entitled to access the source code for the Licensed Software if the requirements for the release thereof are met. In addition, SirsiDynix agrees that upon the request of the Library and at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*, SirsiDynix will cooperate with the Library, at the Library's direction, in the transition of the Library from its use of the Licensed Software to a replacement system.

3.     Neither party will be liable for any damages arising out of the termination of this Agreement pursuant to the terms of this Agreement, provided that such termination will not affect any other right which a party has at law, in equity or pursuant to the terms of this Agreement, including without limitation the right to recover damages sustained by reason of material breach or any payments owing under the Agreement.

## 22.   CONFIDENTIALITY

In the course of the performance of its obligations or exercise of its rights under this Agreement, SirsiDynix and/or the Library may acquire information and/or proprietary materials from the other, which information is not generally known in the relevant trade or industry of either party or third parties with which either party conducts or may conduct business, including without limitation trade secrets and unpublished technical information and data to which it has proprietary rights (all of the foregoing collectively referred to as "Confidential Information"). Notwithstanding and without limiting the foregoing, (i) all Library Data and other data and/or information related to the business of the Library and/or The Queens Library Foundation (including without limitation, information related to its physical assets) is the Confidential Information of the Library and (ii) the Software, the standard documentation and training manuals for the Software, and the SirsiDynix product roadmap and release plans is the Confidential Information of SirsiDynix. Each party shall use the Confidential Information of the other party solely for purposes of its performance under this Agreement and/or for any other purpose expressly contemplated by this Agreement. In addition, each party shall hold the Confidential Information of the other in trust and confidence and use the same means it uses to protect its own information, but in any event not less than reasonable means, to prevent disclosure and to protect the confidentiality of Confidential Information. Neither party

shall disclose or release the Confidential Information of the other party to any person or entity other than to its employees (or, with respect to the Library, to The Queens Library Foundation or its employees) having a need to know such Confidential Information in connection with the performance of its obligations hereunder or, with respect to the Library to exercise its rights hereunder; provided however that, notwithstanding the foregoing or any other provision to the contrary, the receiving party may grant a consultant performing services for that party, access to the disclosing party's Confidential Information, if the consultant executes an agreement which includes provisions which are at least as restrictive as the provisions of this Section. The obligations of either party under this Section 22 will not apply to information that the receiving party can establish (i) was in its possession at the time of disclosure and without restriction as to confidentiality, (ii) at the time of disclosure is generally available to the public or after disclosure becomes generally available to the public through no breach of agreement or other wrongful act by the receiving party, (iii) has been received from a third party without restriction on disclosure and without breach of agreement or other wrongful act by the receiving party, (iv) is independently developed by the receiving party without regard to the Confidential Information of the other party, or (v) is legally required to be disclosed (but only to the extent of such legal requirement).

23.   **ASSIGNMENT**

No assignment of this Agreement or any right or interest herein by either party will be effective unless the other party has given its written consent to such assignment, which consent will not be unreasonably withheld. However, SirsiDynix may (i) assign its rights to receive payments hereunder without Library's consent and (ii) assign this Agreement to its parent or an entity which is wholly-owned by such parent (a "Wholly-Owned Affiliate"), but only in the event that (a) the value of the assets of the parent or Wholly-Owned Affiliate to which the Agreement is to be assigned is equal to or greater than the value of the Assets of SirsiDynix and (ii) the Guaranty Agreement between the Library and Sirsi Holdings Corp. which was signed on the same date as this Agreement is, at the time of the assignment (and thereafter remains), in effect. The terms of this Agreement will be binding upon the parties hereto and their respective successors and permitted assigns.

24.   **DISPUTE RESOLUTION**

The parties will use reasonable efforts to resolve any dispute arising out of the Agreement through a meeting of appropriate managers from each party. If the parties are unable to resolve the dispute, either party may escalate it to its executives. If an executive level meeting fails to resolve the dispute within thirty (30) days after escalation, either party may seek any available legal relief. This provision will not affect either party's right to seek injunctive or other provisional or equitable relief at any time.

25.   **NON-APPROPRIATION OF FUNDS**

This Agreement is conditioned upon an annual appropriation of funds sufficient to pay the compensation due SirsiDynix under this Agreement. If such an appropriation is not made in any fiscal year, and Library lacks funds from other sources to pay the compensation due under this Agreement, Library will be entitled, at the beginning of or during such fiscal year, to terminate this Agreement. In that event, Library will not be

obligated to make any payments under this Agreement beyond the amount properly appropriated for payments in the immediately prior fiscal year. Library will provide SirsiDynix written notice of termination of this Agreement due to the non-appropriation of funds at least 30 calendar days before the effective date of the termination.

**26.**  **GENERAL**

    *A.*    *Force Majeure.* The parties will exercise every reasonable effort to meet their respective obligations hereunder but shall not be liable for delays resulting from force majeure or other causes beyond their reasonable control. This provision does not relieve Library of its obligation to make payments then owing.

    *B.*    *Notices.* All written notices required by this Agreement will be effective upon receipt by the applicable party at the address set forth below or such address which the party identifies to the other as the address for notices through a notice pursuant to this provision. Notices communicated by electronic mail or facsimile will be deemed to be written.

Library:      Name: Library Director
              Attn.: Thomas W. Galante,
        Address: 89-11 Merrick Boulevard
              Jamaica, NY 11432
        Tel:   (718) 990-0796
        Fax:   (718) 291-8936
        e-mail: Tgalante@queenslibrary.org

        with a copy to:
        Name: General Counsel
              Attn.: Darlene Askew Robinson,
        Address: 89-11 Merrick Boulevard
              Jamaica, NY 11432
        Tel:   (718) 990-0796
        Fax:   (718) 291-8936
        e-mail: DAskew@queenslibrary.org

SirsiDynix:   Name: Don McCall
        Address: 101 Washington St. SE
              Huntsville, AL 35801
        Tel: 800-917-4774
        Fax: 256-704-7007
        e-mail: don.mccall@sirsidynix.com

        with a copy to:
        Name: Mike Casale
        Address: 400 W 5050 N.
              Provo, UT 84604

Tel: 801-223-5200
Fax: 801-223-5202
e-mail: mike.casale@sirsidynix.com

C.    **Nondiscrimination.** Neither SirsiDynix, nor any officer, agent, employee, servant or subcontractor of SirsiDynix shall discriminate in the treatment or employment of an individual or groups of individuals on the grounds of race, color, religion, national origin, age, sex or disability unrelated to job performance, either directly, indirectly or through contractual or other arrangements.

D.    **Non-collusion Covenant.** SirsiDynix hereby represents and agrees that it has in no way entered into any contingent fee arrangement with any firm or person concerning the obtaining of this Agreement with the Library. SirsiDynix has received from the Library no incentive or special payments, or considerations not related to the provision of automation systems and services described in this Agreement.

E.    **Publicity.** SirsiDynix agrees to submit to the Library all press releases, advertising, sales promotions, and other publicity matters related to any product furnished by SirsiDynix to the Library wherein the Library's name is mentioned, including the SirsiDynix newsletter, and excluding the SirsiDynix customer list. SirsiDynix shall not publish or knowingly permit to be published, any such material without the prior written consent of the Library.

F.    **Relationship.** This Agreement is not intended to create a partnership, franchise, joint venture, agency, or a fiduciary or employment relationship. Neither party may bind the other party or act in a manner which expresses or implies a relationship other than that of independent contractor.

G.    **Invalidity.** If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired.

H.    **Survival.** Rights and obligations under the Agreement relating to liability, warranties, indemnities, confidentiality or non-disclosure, and all rights and obligations which by their nature should survive will remain in effect after termination or expiration of the Agreement.

I.    **No Waiver.** Any express waiver or failure to exercise promptly any right under this Agreement will not create a continuing waiver or any expectation of non-enforcement.

J.    **Modification.** No modification to this Agreement will be binding unless in writing and signed by an authorized representative of each party.

K.    **Section Headings.** Headings and titles used in this Agreement are for reference purposes only and shall not be deemed a part of this Agreement.

L.    **Entire Agreement.** This Agreement constitutes the parties' entire agreement relating to its subject matter. It cancels and supersedes all prior or contemporaneous oral or written communications, conditions, representations, and warranties not expressly included herein, and prevails over any conflicting or additional terms contained in any quote, purchase order, acknowledgement, or other communication between parties relating to its subject matter during its term.

M.    **Counterparts.** The parties agree that this Agreement may be executed in one or more counterparts, each of which shall constitute an enforceable original of the

Agreement, and that facsimile signatures shall be as effective and binding as original signatures.

N.   ***Governing Law.***  This Agreement shall be governed by the laws of the State of New York, excluding choice of law principles.

O.   ***Venue and Jurisdiction.***  Any legal action, suit or proceeding brought by a party in any way arising out of or relating to this Agreement shall be brought solely and exclusively in the state courts located in Queens County, New York, or the federal courts located in New York City, New York, and each party irrevocably accepts and submits to the sole and exclusive personal jurisdiction of such courts.

P.   ***Parent Guarantee.***  The Parent Guarantee of Sirsi Holdings Corp. is attached hereto as Schedule 18.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement, which shall inure to the benefit of and be binding upon the successors of the respective parties, to be signed and entered into.

Dynix Corporation

By: _____

Name: _____PATRICK C. SUMMERS_____

Title: _____CEO_____

Queens Borough Public Library

By: _____

Name: _____Thomas W. Galante_____

Title: _____Director_____

BRMFS1 627942v16

**Schedule 1**
SirsiDynix Software, Services,
and Third Party Configuration

**SCHEDULE 1**

## SIRSIDYNIX SOFTWARE, SERVICES, AND THIRD PARTY CONFIGURATION

| Qty | Description | Unit Price | Total Price | Annual Maint |
|---|---|---|---|---|
| | **SIRSIDYNIX SOFTWARE** | | | |
| 1 | Horizon Public Library Suite | 755,927 | 755,927 | 90,711 |
| | General | | | |
| | Horizon Cataloging | | | |
| | Horizon Circulation | | | |
| | Horizon Information Portal | | | |
| | Horizon Kids' Information Portal | | | |
| | Horizon Acquisitions | | | |
| | Horizon Community Resources | | | |
| | Horizon Home Service | | | |
| | | | | |
| | **Products Sold Separately** | | | |
| 1 | Horizon Serials Control | 44,800 | 44,800 | 5,376 |
| 1 | Horizon Remote Patron Authentication | 14,000 | 14,000 | 1,680 |
| 1 | Horizon Debt Collect | 14,000 | 14,000 | 1,680 |
| 1 | Horizon Offline Circulation Enhanced (Unlimited Workstations) | 14,000 | 14,000 | 1,680 |
| | **DATABASE SOFTWARE** | | | |
| 1 | Database Software – Oracle Production, Test, and QA Servers | 320,000 | 320,000 | 48,000 |
| | **ADDITIONAL SOFTWARE** | | | |
| 1 | Horizon Enriched Content (Public) – Annual Subscription | 35,650 | 35,650 | |
| | Elements Selected Are: | | | |
| | Fiction & Bio | | | |
| | Table of Contents | | | |
| | Summaries/Annotations | | | |
| | Chapters/Excerpts | | | |
| | Cover Images | | | |
| | PW Reviews | | | |
| | LJ Reviews | | | |
| | SLJ Reviews | | | |
| | Author Notes | | | |
| | Booklist Reviews | | | |
| | CHOICE Reviews | | | |
| | | | | |
| 1 | SmartSource MARC Cataloging Annual Subscription | 15,775 | 15,775 | |
| | URSA 4.0 (includes NCIP) | | | |
| 1 | URSA Base System Licensing Fee including one branch license fee | 25,000 | 25,000 | 3,000 |
| 1 | URSA OCLC/ISO Gateway Service | 10,000 | 10,000 | 1,200 |

| Qty | Description | Unit Price | Total Price | Annual Maint |
|---|---|---|---|---|
| 1 | URSA ASP Annual Hosting Fee | 4,875 | 4,875 | 4,875 |
| | Horizon Enriched SIP | | | |
| 1 | Horizon ESIP License for Consortium | 25,000 | 25,000 | 3,750 |
| | PERIPHERAL SOFTWARE | | | |
| 1 | Horizon Web Reporter Package (including Narrowcast) -- Components and Unit Pricing Listed Below: | 36,200 | 36,200 | 5,418 |
| 2 | Horizon Web Reporter (5 Pack) - Non-Windows (including Narrowcast) | included | included | |
| 5 | Horizon Web Analyst - Non-Windows (Including Narrowcast) | included | included | |
| 5 | Horizon Web Professional - Non-Windows (Including Narrowcast) | included | included | |
| 5 | Horizon Web Reporter System Admin - Non-Windows (Including Narrowcast) | included | included | |
| | Horizon Web Reporter Pro-Maintenance | | | |
| 15 | Horizon Web Reporter OLAP Service | included | included | |
| | ECOMMERCE SUITE | | | |
| 1 | Envisionware Enterprise eCommerce Suite | 14,179 | 14,179 | 1,445 |
| | IVR SYSTEM | | | |
| 1 | Telephone Messaging (IVR) System (12 Lines) | 39,393 | 39,393 | 7,308 |
| | IMPLEMENTATION SERVICES | | | |
| | DATA SERVICES | | | |
| | HORIZON DATA CONVERSION SERVICES | | | |
| 1 | DRA Data Extraction Programs | 20,000 | 20,000 | |
| | HORIZON DATA LOAD SERVICES | | | |
| 1 | MARC Data Load - One Time | 6,000 | 6,000 | |
| 1 | MARC Bibliographic and Item Record Load | 22,000 | 22,000 | |
| 1 | MARC Authority Record Clean-up* (LSSI) *LC Name, Title, and Subject Authorities includes preprocessing and basic machine match | 55,000 | 55,000 | |
| 1 | Circulation Transaction Migration | | | |
| 1 | Over 500,000 bib records | 7,500 | 7,500 | |
| 1 | Patron File Load - On-going | 2,500 | 2,500 | 375 |
| | HORIZON CUSTOM DATA SERVICES | | | |
| 1 | Authority Data Load | 3,500 | 3,500 | |
| 20 | Custom Programming Days for Migration Services | 1,600 | 32,000 | |
| 1 | One-time GAP Analysis | N/C | N/C | |

| Qty | Description | Unit Price | Total Price | Annual Maint |
|---|---|---|---|---|
| | **ONSITE NETWORK ANALYSIS** | | | |
| 1 | 4 Day Trip | 7,300 | 7,300 | |
| | **ADDITIONAL IMPLEMENTATION SERVICES** | | | |
| 1 | Profiling Set-up - One time | 3,000 | 3,000 | |
| | **SERVER STAGING** | | | |
| 6 | Server Staging -- Price Per Server | 2,670 | 16,020 | |
| | Shipping for Sun Equipment as listed in Exhibit A of Schedule 10 (Estimate -- Library's actual cost will be based on actual costs if necessary to stage in Utah instead of doing complete staging work onsite) | 5,000 | 5,000 | |
| | **EDUCATION AND CONSULTATION SERVICES** | | | |
| 1 | **HORIZON CONSULTING** | 30,500 | 30,500 | |
| | On site go live consultation (10Days)** On site post go live consultation (10 Days)** **The fee for any of these consultation days which are not used will be converted into a credit to be used for future services, products or maintenance services. | | | |

**WEB TRAINING**

Unlimited and repeatable access to Web Training (through basic ONline classes and any recorded classes) for software products purchased hereunder, at all times during the period beginning on the Effective Date and continuing until one (1) year after the "Go-Live" Acceptance, and thereafter as long as the maintenance terms set forth in Schedule 10 (or other terms for the provision of maintenance and support of the Licensed Software) are in effect.

Unlimited and repeatable access to Web Training (through intermediate ONline classes and ON-Demand classes) for the following periods:
(i) for software products purchased hereunder and implemented on Day 1 of Production Operations, at all times during the period beginning on the Effective Date and continuing until one (1) year after the "Go-Live" Acceptance
(ii) for software products purchased hereunder and not implemented on Day 1 of Production Operations, at all times during the period beginning on the Effective Date and continuing until one (1) year after the later of (a) acceptance of the applicable portion of the Licensed Software and (b) the date on which the applicable portion of the Licensed Software is used in production.

| Qty | Description | Unit Price | Total Price | Annual Maint |
|---|---|---|---|---|
| 1 | **HORIZON TRAINING** | | | |
| 30 | Total Training Days -- the thirty (30) days to be onsite at Library's location or other location designated by the Library and allocated as requested by the Library (Training Schedule TBD by the Library and the Manager of Training Services) | 1,500 | 45,000 | |

CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

| Qty | Description | Unit Price | Total Price | Annual Maint |
|---|---|---|---|---|
| | **SERVER HARDWARE** | | | |
| 1 | OS Technical Support (Price Per Server = $2,040 Assumes 6 Servers) | | | 12,240 |
| | **SUPPLIES** | | | |
| | Electronic Documentation Bundle | | | |
| 1 | Horizon Public Library Suite Doc And Media | | | |
| 1 | Maintenance for Sun Equipment as per Sun Configuration #T-US-792735-B Dated 2/8/06. Equipment comes with a one year warranty.+ Part Detail Listed below | | | 57,018++ |
| | SYSTEM TOTAL | | 1,624,119 | 245,756 |
| | Shipping: | | 797 | |
| | Discount | | -330,308 | |
| | GRAND TOTAL | | 1,294,608 | 245,756 |

++ This amount represents the pricing under the New York State Requirements Contract for the acquisition of Sun Equipment (the "New York State Requirements Contract"), plus 15% of such amount. The parties agree that if the Library purchases additional Sun Equipment for the use of the Horizon portions of the Licensed Software, (i) the Library may request that SirsiDynix provide maintenance and support services in connection with such equipment, in which case (a) SirsiDynix will be obligated to provide such maintenance and support services pursuant to the provisions of this Agreement; and (b) the fee for such services will be the applicable fee under the New York State Requirements Contract, plus 15% of such amount and (ii) SirsiDynix will provide any necessary server staging services which the Library requests in connection with such equipment for the following fee: (a) if the services are requested on or before the date which is one year after the Effective Date, no more than $2,670 per server, or (b) if the services are requested after the date which is one year after the Effective Date, no more than 95% of SirsiDynix' then-current fee for such services.

+ Part Detail for Sun Equipment

Qty    Description
       Sun Part #
5      W9D-E29-4-24-1
3      W9D-E29BDDPLs-24-1G
1      W9D-E49-24-1G
2      W9D-S4BDPLUS24-1-G
2      W9D-SE3120-24-2G
5      VVMGS-2C99-1PR
1      VVMGS-3B99-1PR
2      EBA9S-E9M9-1PR
2      CLSIS-A999-1PR
1      VSTOR-9999-Medai
2      CLuZs-99M9-Media
1      CLAIS-XR-9999-1PR
1      W9D-SE3120-24-1G

**SCHEDULE 1 (continued)**

**ELECTRONIC DOCUMENTATION**
Horizon Table Structures
Horizon System Administration
Horizon Launcher
Horizon Bimport
Horizon Cataloging User
Horizon Circulation User
Horizon Basics User
Horizon Information Portal System Administration
Horizon Doc Homebound User
Horizon Acquisitions User
Horizon Inventory User
Horizon Media Scheduling User
Horizon Serials User
URSA User
Horizon Web Reporter – System Administration

**PRINT DOCUMENTATION**
Horizon Implementation Forms and Manuals
Horizon Cataloging Setup
Horizon Circulation Setup
Horizon Acquisitions Setup
Horizon Serials Setup
Horizon Training Guides
Oracle System Administration

## SCHEDULE 1 (continued)

## CONFIGURATION OPTIONS

**Options**

| | | | | |
|---|---|---|---|---|
| 1 | Horizon Media Scheduling | 22,400 | 22,400 | 2,688 |
| 67* | Webfeat Translators (Subscription Service) | 795 | 53,265* | |
| 63* | URSA Licensing for Branch Libraries | 2,500 | 157,500* | 18,900* |
| 1 | Horizon Online Training (cost per unit) | 250 | 250 | |
| 1 | Sirsi Content Datastream Additional to Syndetics (Subscription Service) - plus credit for Syndetics only service $35,650 making total uplift only $39,500 (off $75,000 list) | 39,500 | 39,500 | |
| 1 | MARC Hold (Serial) Data Load – over 500K bib rec | 8,500 | 8,500 | |
| 1 | Vendor Data Load for 200 Records | 2,500 | 2,500 | |
| | Live Network (Network Monitoring Service) price per Network node – up to 1500 devices | 7,000 | 7,000 | 6,000 |
| 1 | Dynix Reference Module | 30,937 | 30,937 | 3,712 |
| 1 | SirsiDynix Authority Record Clean-up | 77,000 | 77,000 | |

* These are estimated numbers. The Library may get any quantity and the actual price will be calculated using the per unit price (maintenance will be prorated based on the actual quantity procured).

## CUSTOM DEVELOPMENT TEAM:

The fee for the services of the Custom Development Team ("Customization Service Fees") will be equal to (A) with respect to members of the Custom Development Team who are employees of SirsiDynix, (1) one hundred percent (100%) percent of the actual salary and benefit costs (a) which SirsiDynix pays in connection with the personnel assigned by SirsiDynix to be members of the Custom Development Team; and (b) for which SirsiDynix has provided the Library with the names, salaries and benefits costs and certifications prior to the assignment of such personnel to the Custom Development Team, plus (2) twenty percent (20%) of the amount set forth in subitem (1) of this item (A) and (B) with respect to members of the Custom Development Team who are third party contractors, (1) one hundred (100%) percent of the actual amount of the pre-approved fees (a) actually incurred by SirsiDynix in connection with the services provided by such personnel and (b) for which SirsiDynix has provided the Library with the applicable invoice and proof of payment, plus (2) for overhead, to the extent applicable, twenty percent (20%) of the amount set forth in subitem (1) of this item (B); provided however that, notwithstanding the foregoing, SirsiDynix will not charge the Library for any services or other costs incurred in connection with the development of Software Customizations which are (V) Required Interfaces included as Required "Go-Live" Functionality; (W) GAP Analysis Functionality; (X) Proposed Functionality; (Y) modifications or corrections made to the Licensed Software or workarounds to correct a breach of warranty or to correct an error in accordance with its obligations pursuant to Schedule 10, and (Z) the screen customizations which are included as customizations to be performed as Implementation Services.

BRMFS1 627942v16

Notwithstanding the foregoing or any other provision to the contrary:

A. in the event that SirsiDynix fails to meet the Development Delivery Date for the applicable Software Customization or other deliverable(s) to be provided by the Custom Development Team, the Customization Services Fees for the applicable Software Customization or other deliverable(s) shall be reduced as follows:

(1) with respect to the portion of the Customization Service Fee for SirsiDynix employees described in item (A) of the preceding paragraph, (a) if SirsiDynix delivers the applicable Software Customization or other deliverable(s) thirty (30) to ninety (90) days after the Development Delivery Date for such Software Customization or other deliverable(s), the applicable portion of the fee will be reduced to equal fifty (50%) percent of the applicable salary and benefit costs instead of one hundred (100%) percent; and (b) if SirsiDynix delivers the applicable Software Customization or other deliverable(s) more than ninety (90) days after the Development Delivery Date for such Software Customization or other deliverable(s), the applicable portion of the fee will be reduced to equal ten (10%) percent of the applicable salary and benefit costs instead of one hundred (100%) percent;

(2) with respect to the portion of the Customization Service Fee for third party contractors described in item (B) of the preceding paragraph, (a) if SirsiDynix delivers the applicable Software Customization or other deliverable(s) thirty (30) to ninety (90) days after the Development Delivery Date for such Software Customization or other deliverable(s), the applicable portion of the fee will be reduced to equal fifty (50%) percent of the applicable pre-approved fees instead of one hundred (100%) percent of the actual amount of such pre-approved fees; and (b) if SirsiDynix delivers the applicable Software Customization or other deliverable(s) more than ninety (90) days after the Development Delivery Date for such Software Customization or other deliverable(s), the applicable portion of the fee will be reduced to equal ten (10%) percent of the applicable pre-approved fees instead of one hundred (100%) percent of the actual amount of such pre-approved fees; and

B. SirsiDynix hereby issues the following credits to the Library:

Maintenance Credits – for each year during the Term for which the Custom Development Team includes at least 2 FTE's, a credit equal to (a) for each year prior to the end of the "No Charge Period" (as defined in Section 6(A) of Schedule 10 to this Agreement), 40% of the total Annual Maintenance Fees which will be payable during the first year after the "No Charge Period", and (b) for each year after the No Charge Period, 40% of the total amount of the Annual Maintenance Fees payable for the applicable year, which credits are to be applied as a credit against the Annual Maintenance Fees for the next year for which Annual Maintenance Fees are payable by the Library to SirsiDynix.

## SCHEDULE 1 (continued)

## FEES FOR ADDITIONAL SERVICES

The parties agree that, during the term of this Agreement, unless another rate or fixed price is mutually agreed upon by the parties for a particular service(s) to be provided, SirsiDynix shall provide any services which are requested by the Library at the following not to exceed rates:

During the period of three (3) years after the Effective Date of this Agreement:

|                    | Service Rates    |
|--------------------|------------------|
| Project Manager    | $1200 per day    |
| Senior Consultant  | $2200 per day    |
| Consultant         | $2000 per day    |
| Analyst            | $1500 per day    |
| Training           | $1700 per day    |

For each year thereafter, a rate which is equal to the rate applicable to the immediately preceding year, increased by no greater than 5% or the CPI, whichever is less. SirsiDynix shall, prior to each anniversary of the Effective Date, provide the Library with written notice of the service rates to apply to the upcoming contract year.

**Schedule 2**
Schedule of Activities

## SCHEDULE 2

## SCHEDULE OF ACTIVITIES

SirsiDynix and the Library hereby agree to the following schedule for implementation of the System. This schedule may be amended as agreed upon in writing by the parties.

| | | Start Date | End Date | Primary Resp. | 2nd Resp. |
|---|---|---|---|---|---|
| **Project Start** | | **15-Feb-06** | **5-Feb-07** | | |
| | **Discuss Specific Details of Implementation Schedule** | | | | |
| | **Attend Profiling Classes** | | | | |
| | Discussions about procedures, process and finalizing schedules, Attending online profiling classes in preparation for System Profiling Sessions | | | | |
| | *Impact to Staff - Time needed to attend online classes (multiple session for an hour)* | | | | |
| | Approval of Implementation schedule | | | SD/Library | |
| | Discuss assignment of Implementation Team members | | | SD | Library |
| | **Discuss Data Cleanup** | | | | |
| | Introduction of SirsiDynix Data Services Consultant | | | SD | Library |
| | Confirm SirsiDynix access to current database | | | Library | SD |
| | Discuss data extraction schedule | | | SD | Library |
| | Discuss database cleanup *(Document: Dynis to Horizon Data Conversion Tips)* | | | SD | Library |
| | **Discuss Preparation for Profiling** | | | | |
| | Introduction of SirsiDynix Library Consultant | | | SD | Library |
| | Complete and return the Implementation Questionnaire | | | Library | SD |
| | Discuss schedule for profiling days | | | SD | Library |
| | Discuss due date for completion of profiling | | | SD | Library |
| | **Database Connection** | | | | |
| | Introduction of SirsiDynix Technical Consultant | | | SD | Library |
| | Review - Connecting to the Database *(Document: Load Client)* | | | SD | Library |
| | Discuss connection to WebEx *(Document: Connecting to WebEx)* | | | SD | Library |
| | Review Workstation Requirements *(See Release Notes)* | | | SD | Library |
| | **Network Preparation** | | | | |
| | Send network diagram | | | Library | |
| | Review network diagram | | | SD | Library |
| | Review Customer Access Requirements *(Document: Access Requirements)* | | | SD | Library |
| | **Discuss Project Training** | | | | |
| | Discuss types of training available *(Document: Training Options)* | | | SD | Library |
| | Review contracted training | | | SD | Library |
| | Schedule library's training facilities | | | Library | SD |
| | Identify appropriate library staff to attend training courses | | | Library | SD |
| | Discuss training database | | | SD | Library |
| | **Discuss the Ordering of Hardware** | | | | |
| | Establish a schedule for ordering and receiving software and hardware | | | SD | Library |
| | Specify guidelines for receiving equipment *(Document: Receiving & Returns Policd)* | | | SD | Library |
| **System Profiling** | | 63 days | 10-Apr-06 | 12-Jun-06 | SD | Library |
| | **Profiling Sessions #1 with Library Consultant** | 3 days | 10-Apr-06 | 12-Apr-06 | | |
| | *Setup of System Parameters, Locations, Collection Codes, Call Numbers, Indexing, Views, Day End Setup, Cataloging Import Sources* | | | | |

*Impact to Staff - 3 days with Consultant from Dynix, Multiple days after session making decisions & entering information into database*

| | | | | | |
|---|---|---|---|---|---|
| **Agency Setup** | | | | | |
|     Agency vs. Sub Agency | | | | SD | Library |
|     Contact | | | | SD | Library |
|     License manager | | | | SD | Library |
|     Scheduled Tasks | | | | SD | Library |
| **Barcode Admin** | | | | | |
|     Define item and patron barcodes | | | | SD | Library |
|     Define local item and patron barcodes | | | | SD | Library |
| **Codes Setup** | | | | | |
|     Collection | | | | SD | Library |
|     Item Type | | | | SD | Library |
|     Stat Categories | | | | SD | Library |
|     Patron Type | | | | SD | Library |
|     Blocks | | | | SD | Library |
| **Cataloging Setup** | | | | | |
|     Import Profile | | | | SD | Library |
|     Export Profile | | | | SD | Library |
|     Item Status Codes | | | | SD | Library |
|     Agency Rules | | | | SD | Library |
| **Profiling Session #2 with Library Consultant** | 3 days | 8-May-06 | 10-May-06 | SD | |

*Setup of System Codes, Item Codes, Borrower Codes, Circulation Privileges, Blocks and Security*

*Impact to Staff - 3 days with Consultant from Dynix, Multiple days after session making decisions entering information*

| | | | | | |
|---|---|---|---|---|---|
| **Circulation Setup** | | | | | |
|     General | | | | SD | Library |
|     Adminstration | | | | SD | Library |
| **Circulation Policy Setup** | | | | | |
|     General Policy | | | | SD | Library |
|     Loan, Recall, Renewal | | | | SD | Library |
|     Circulation reports, Workslips | | | | SD | Library |
|     Block Rules | | | | SD | Library |
| **Request Setup** | | | | | |
|     Request Rules | | | | SD | Library |
|     Pull List Setup | | | | SD | Library |
| **Searching Setup** | | | | | |
|     Search Groups | | | | SD | Library |
|     Search subtabs | | | | SD | Library |
|     Predefined Limits | | | | SD | Library |
|     Sorts | | | | SD | Library |
| **Notice Setup** | | | | | |
|     Notice Policy Rules | | | | SD | Library |
| **Security Setup** | | | | | |
|     Admin Groups | | | | SD | Library |
|     Role Manager | | | | SD | Library |
|     Security Groups | | | | SD | Library |
|     User Manager | | | | SD | Library |
| **Load Test Data in Horizon database** | 14 days | 12-Jun-06 | 26-Jun-06 | | |
|     Extract Data from DRA system for Test Load | 2 days | | | Library | SD |
|     Load the test records into Horizon database | 12 days | | | SD | Library |

*Extraction of Data from DRA System, then load into Horizon Database*

*Impact to Staff - Time to Extract Data from DRA system*

| | | | | | |
|---|---|---|---|---|---|
| **Testing** | 175 days | 26-Jun-06 | 18-Dec-06 | | |
|     Review Test data on Horizon System against the entered profiles | | | | Library | SD |

*Impact to Staff - Time to test setup in Horizon database*

**Hardware Installation***
**\*To be completed by Project Manager after initial project kick-off call. The test / training server will be the first to be ordered and installed so the Library can test Release 8.0 after it is in General Release. Installation will take place in April '06. All other servers will be ordered and installed by November 30 '06 as per the**

**Contract specifications.**

*Installation of Information Portal/Training Server* This Server will be ordered as soon as possible so that 8.0 can be installed and tested by the Library.  Target installation date is April 2006.*

| Task | Duration | Start | End | From | To |
|---|---|---|---|---|---|
| Order and Receive Server | 28 days | 12-Jun-06 | 10-Jul-06 | Library | SD |
| Stage Servers | 14 days | 10-Jul-06 | 24-Jul-06 | SD | Library |
| Remote Install | 1 days | 25-Jul-06 | 25-Jul-06 | SD | Library |

*Installation of HIP Server(s) in library environment*
*Impact to Staff - Working with engineer to remote install hardware in library environment, Setup of Customization to Information Portal*

| | 9 days | 6-Nov-06 | 15-Nov-06 | | |
|---|---|---|---|---|---|
| Dynix ships server and any additional hardware | 8 days | 6-Nov-06 | 13-Nov-06 | SD | Library |
| Install server and perform connectivity tests | 1 days | 30-Nov-06 | 30-Nov-06 | SD | Library |

*Installation of Server(s) in library environment*
*Impact to Staff - Working with engineer to install hardware in library environment, Staff to connect workstations to server*

| **Signoffs** | 0 days | 18-Dec-06 | 18-Dec-06 | | |
|---|---|---|---|---|---|
| Send Test load Data sign-off form to Dynix | | | | Library | SD |
| (Document:  Test load Acceptance) | | | | | |
| Send Profile Acceptance form to Dynix (Document: | | | | Library | SD |
| Profile Acceptance) | | | | | |
| Load copy of test load | | | | Library | SD |

*Signing of forms indicating that testing and profile setup has been completed*

| **Gap Analysis** | 0 days | 1-Aug-06 | | SD | Library |
|---|---|---|---|---|---|
| **Additional Go Live Functionality** | 0 days | 2-Oct-06 | | SD | Library |
| **Installation of Envisionware eCommerce Suite** | | 2-Oct-06 | | SD | Library |

| **Training** | | 22-Feb-06 | 5-Feb-07 | | |
|---|---|---|---|---|---|
| ONLINE Training | | | | Library | SD |

*Multiple Training sessions hosted through the web, Flexibility to when training is completed by staff.*
*Impact to Staff: - Attending Training Sessions*

| Onsite training | | | | SD | Library |
|---|---|---|---|---|---|

*Multiple Training sessions hosted onsite*
*Impact to Staff: - Attending Training Sessions*

| Complete Core Training | | | | Library | SD |
|---|---|---|---|---|---|
| Cataloging | | | | Library | SD |
| Circulation | | | | Library | SD |
| Searching | | | | Library | SD |
| System Administration | | | | Library | SD |
| HIP Adminstration | | | | Library | SD |
| Security | | | | Library | SD |
| Complete Additional Training* | | | 31-Dec-07 | Library | SD |

**There is not a deadline for the library to use additional training.  At the end of the first year, if the additional training has not been completely used, the Library may elect to receive a credit or carry-over the monies into 2008 for additional training.*

| Offline Circulation | | | | Library | SD |
|---|---|---|---|---|---|
| **Peripheral Setup** | 14 days | 18-Dec-06 | 1-Jan-07 | | |
| Setup Sessions with Peripheral Specialist | 2 days | 18-Dec-06 | 20-Dec-06 | SD | |

*Setup of Printers, Scanners, 3M Self Check, SIP, Telephone Messaging*
*Impact to Staff - Working with engineer*

| Introduction of SirsiDynix Peripheral Specialist | | | | SD | Library |
|---|---|---|---|---|---|
| Offline Circulation | | | | SD | Library |

BRMFS1 627942v16

| Task | Duration | Start | End | | |
|---|---|---|---|---|---|
| ESIP | | | | SD | Library |
| **Profiling Session #3 with Library Consultant** | **3 days** | **11-Dec-06** | **13-Dec-06** | SD | |
| *Setup of Notices, Circ Slips, Serials, Reports Manager, Home Services, Acquisitions and other modules purchased* | | | | | |
| *Impact to Staff - 3 days with Consultant from Dynix, Multiple days after session making decisions & entering information* | | | | | |
| Serials Setup | | | | | |
| General | | | | SD | Library |
| Forms | | | | SD | Library |
| Serials Receivers | | | | SD | Library |
| Run Types | | | | SD | Library |
| Schedule Prediction | | | | SD | Library |
| Serials Processes | | | | SD | Library |
| Codes | | | | SD | Library |
| Outreach | | | | | |
| Rules | | | | SD | Library |
| Z39.50 Server Setup | | | | SD | Library |
| **Production Data and Software Check** | **37 days** | **18-Dec-06** | **24-Jan-07** | | |
| Extract Data from DRA system for Production Load | **3 days** | 18-Dec-06 | 20-Dec-06 | Library | SD |
| Load Authorities | **35 days** | 20-Dec-06 | 22-Jan-07 | SD | Library |
| Discontinue Authority work | | | | Library | SD |
| Load Bib and Item Data | | | | SD | Library |
| Stop deleting Bib and Item records | | | | Library | SD |
| Adding new Bibs and items OK with the exception of changing barcodes on item records | | | | Library | SD |
| Stop merging Bib records | | | | Library | SD |
| Load Patron Data | | | | SD | Library |
| Stop Deleting Patron records, adds and modifications still allowed. | | | | Library | SD |
| Do not change unique identifier | | | | Library | SD |
| *Extraction of Completed Data from DRA System, then load into Horizon Database* | | | | | |
| *Impact to Staff - Stop Deleting Bibs & No Authority Work* | | | | | |
| *\*Services may not be impacted depending on data provided* | | | | | |
| **Perform Software Check (Document: Software Checklist)** | **2 days** | **25-Jan-07** | **26-Jan-07** | Library | SD |
| **Gap Load and Circulation Cutover** | **10 days** | **29-Jan-07** | **8-Feb-07** | | |
| **Cataloging and Patron Data Gap Load** | **8 days** | **29-Jan-07** | **5-Feb-07** | | |
| Stop cataloging and making patron record changes | **0 days** | 29-Jan-07 | 29-Jan-07 | Library | |
| Extract bib,item, and patron records | **0 days** | 29-Jan-07 | 29-Jan-07 | Library | SD |
| Load gap data for bib, item and patron records | **8 days** | 29-Jan-07 | 5-Feb-07 | SD | |
| If your serials checkin creates item records then this must also stop | | | | Library | |
| Load Community Resources data (If applicable) | | | | NA | |
| *Final extraction of cataloging, patron, acquisitions and serials data from DRA System* | | | | | |
| *Impact to Users - No Impact* | | | | | |
| *Impact to Staff - No Cataloging, Acquisitions or Serials - No Technical Services* | | | | | |
| **Circulation and Item Data Cutover** | **3 days** | **5-Feb-07** | **8-Feb-07** | SD | Library |
| Stop circulation and discontinue use of existing system | **0 days** | 5-Feb-07 | 5-Feb-07 | Library | SD |
| Start circulating with Offline Circulation | **0 days** | 5-Feb-07 | 5-Feb-07 | Library | SD |
| Extract circulation data | **0 days** | 5-Feb-07 | 5-Feb-07 | SD | Library |
| Load circulation data | **3 days** | 5-Feb-07 | 7-Feb-07 | SD | Library |

|  |  | days |  |  |  |  |
|---|---|---|---|---|---|---|
| | Process Horizon Offline Circulation data into Horizon | | 8-Feb-07 | 8-Feb-07 | SD | Library |
| | Confirm scheduled backups are running | | | | SD | Library |
| | *Final extraction of circulation from DRA System* | **0 days** | | | SD | |

*Impact to Users - No Circulation Services available on DRA – Check Out on Offline Circulation - Searching available on DRA system*

*Impact to Staff - No Circulation Services available on DRA – Check Out available using Offline Circulation, Limited Technical Services Available*

| **Horizon Go Live** | **0 days** | **5-Feb-07** | **5-Feb-07** | | |
|---|---|---|---|---|---|
| Library Consultant available for go live | | | | SD | Library |
| Begin circulation on 8.0 | | | | Library | SD |
| Send Production Data Load sign-off form to SirsiDynix *(Document: Production Load Signoff)* | | | | Library | SD |
| **Begin using your new Horizon system** | | | | Library | SD |
| **Project Wrap UP** | | | | SD | Library |

BRMFS1 627942v16

**Schedule 3**
Data Conversion, Data Mapping,
Data Load Services and
Authority Control Detail

**SCHEDULE 3**

## DATA CONVERSION, DATA MAPPING, DATA LOAD SERVICES AND AUTHORITY CONTROL DETAIL

**Preparing Library's Data.** SirsiDynix will conduct a check of the Library's data and will provide the Library with a report detailing problems with any data codes. SirsiDynix will then, upon approval by the Library, perform a data cleanup prior to the migration of data to Horizon based upon the report provided by SirsiDynix.

**Data Conversion and Data Mapping.** The Library will identify each data element (e.g. MARC bibliographic and serials, Patron, Transaction, and up to 200 Vendor records) in the DRA System which the Library wants to go into the Licensed Software (the "Identified Data Elements"). SirsiDynix will perform, upon receipt of the Library's approval in each instance, all data conversion and data mapping services, including without limitation, mapping each Identified Data Element to the appropriate data element in the Licensed Software. Data elements that do not have a match in Horizon will not be loaded unless the Library requests otherwise.

**Extraction of Sample Data.**

SirsiDynix will, with the Library's cooperation, develop data load specifications. These specifications (the "Load specifications") shall be set forth in writing by SirsiDynix and, once so set forth in writing provided to the Library. SirsiDynix will identify inaccuracies or deficiencies in the Load Specifications as revealed by actual loading and will revise the Load Specification to address any comments provided by Library and as otherwise appropriate based upon SirsiDynix's findings. Revisions made as the result of inaccuracies in the Load Specifications may result in delays in record processing.

SirsiDynix shall then pull up to fifty thousand (50,000) of the Library's bibliographic, item, and patron records, as identified by the Library (the "Test Set") that shall be used to verify that processing will be done according to specifications.

After SirsiDynix delivers the processed record information, Library shall promptly review the Test Set and identify any discrepancies between the processed data and the Load Specifications. Examples of discrepancies shall be clearly reported to SirsiDynix.

SirsiDynix will, in a timeframe consistent with the timeframes set forth in Section 3(H) of Schedule 10, correct all reported problems as identified pursuant to this Schedule 3. The steps set forth in this Schedule 3 will be repeated until the Test Set is properly loaded according to the Load Specifications.

The Data Load Test shall be successfully completed when the Test Sets have been processed to meet the Load Specifications. Following the Data Load Test, SirsiDynix shall proceed with the production data load.

**Submit Data to SirsiDynix.** SirsiDynix will extract all pertinent data files in standard MARC from Library's current system. After the data extraction, Library will continue working on its existing SirsiDynix system. Library may continue to catalog as normal.

BRMFS1 627942v16

**Production Data Load.** Once the Test Data Load Acceptance form is received, SirsiDynix will begin the Production Data Load onto Library's Database Server. Once the full data set has been received, all test data will be deleted from Library's database.

SirsiDynix will then load the Production data into Library's database. At this point, further changes to indexes and indexing MARC maps are difficult and change to authority control is impossible. These changes must be finalized during the Test Load.

Once Library has tested the production data load, it will be required to signoff on the production data load.

**Cutover to Horizon System.** At some point after the installation of the Database Server at Library, Library will stop cataloging on its current system. SirsiDynix will extract a gap file of all the bibliographic records that have been added or changed since the production data was extracted. The gap data shall then be loaded onto the Database Server. Once the gap bibliographic and item data is loaded, the other data sets can be loaded, and Library will be required to signoff on the final data. Library will then begin working on its new Horizon system. At this point, Library may discontinue use of its current system.

**Authority Records:** Library shall have the option to have SirsiDynix load a file of MARC authority records supplied by Library or have SirsiDynix create authority files of the headings in the bibliographic records.

Authority records can be output from the DRA System in MARC format. No modifications to the records should been necessary. The authority records each have a DRA-assigned key ranging from AAA-0001 to ZZZ-9999.

**Bibliographic Records/MARC load:** Load records from a single source creating one bibliographic record for each MARC record in the Licensed Software including electronic resource records. This includes non-MARC data cataloged on the Licensed Software: equipment, vertical file.

Bib records can also be exported in MARC format. The bib records each have a DRA-assigned key ranging from AAA-0001 to ZZZ-9999. Some items will reference a bib AAA-0000, but that bib doesn't exist.

**Holding Creation/Item Records:** Item records will be migrated from the current system. SirsiDynix will automatically assign collection codes, item loan types, and Library/branch designations to each item based on information supplied by Library.

SirsiDynix will extract the holdings data from the DRA System in a flat ASCII file and load this data into the appropriate columns in Horizon. Columns where there isn't a match in Horizon aren't loaded unless the Library requests custom item columns to be added in Horizon. SirsiDynix will replace any records matching on barcode during the gap process by the new gap versions. Items link to the bibs via the DRA key. Items that reference the bib AAA-0000 are 'On-the-fly' records and need to be attached to a place-holder bib.

**Patron File Load:** SirsiDynix will complete the initial patron file load. For Ongoing loads, SirsiDynix will provide a borrower import program to allow Library multiple loads of patron records in a published standard data format. SirsiDynix will provide and load ASCII delimited file format with field descriptions as identified by the Library.

SirsiDynix will extract patron data from the DRA System in MARC format unless otherwise agreed by the parties. As with the item records any data without a corresponding column in the Horizon system will not be loaded unless the library specifies it. SirsiDynix will prepare a gap of newly added patrons during the cutover period. Changes should not be made to existing patron records after the production data is extracted. In some cases the data will come in a flat file instead of a MARC file, but SirsiDynix has provisions for dealing with that type of data as well.

**Circulation Data Load:** SirsiDynix will transfer circulation transaction files from the existing DRA System (i.e., holds, delinquencies, fines, and loan information) onto the System. Histories (closed transactions) will migrate.

SirsiDynix will move the following circulation data from the DRA System to the Horizon portions of the Licensed Software:

- Currently checked-out items
    - Check-out date
    - Check-out location
    - Due date
    - Patron ID
- Holds (requests) (from the 'Request Master File' on DRA)
    - Title Control Number
    - Item number, if applicable (item specific requests)
    - Send to Agency
    - Priority
    - Request Date
    - Purge Date
    - Date Notified
    - Status
- Burb data (from the 'Patron Transaction' and 'Fines' files on DRA)
    - Number of overdues
    - Amount Forgive total
    - Number of bad checkins
    - Number of lost items
    - Number of claims returned
    - Status date
    - Last activity date
    - Expiration date
    - Collection Agency Status date
    - Number of transactions, lifetime
    - Number of transactions, year to date

- o  Date fine calculated
- o  Fine amount
- o  Date payment made
- o  Fine amount outstanding
- o  Agency charging fine
- o  Fine type
- o  Item barcode number
- o  Number of notices sent
- o  Item due date
- o  Item due time
- Item status data (comes from the 'Item Master' file)

**Acquisitions Data Load:** Open orders, vendor records, and fund accounts will be migrated. Histories (closed transactions) will not migrate, but can be set up in a history (view only) file.

Serials data can be exported from the DRA System in USMARC Holdings format and can be loaded into Horizon (including predictions and check-in history).
In some cases the serials data in provided in a flat file format instead of MARC format, but SirsiDynix has programs written to handle this type of data as well.

## AUTHORITY CONTROL

SirsiDynix will perform the following authority control services:

### Authority File Options:

1. LC Name/Series and Uniform Title Authority Control (i.e., process fields 100, 110, 111, 130, 240, 243, 700, 710, 711, 730, 400, 410, 411, 440, 800, 810, 811, 830)
2. LC Subject Authority Control (i.e., process fields 600, 610, 611, 630, 650 and 651 with a second indicator equal to **blank** or **zero**)
3. Special LCCN Matching of Customer file against LC MARC Bibliographic file. This option resolves most split headings, in records with LCCN's, by replacing the subject headings in customer's record with LC's most current subject headings for that record.
4. Annotated Card headings (i.e., process fields 600, 610, 611, 630, 650 and 651 with a second indicator equal to **1**)
5. GSAFD Genre Subject Authority Control (i.e., process fields 655 with a second indicator equal to 7 and the term **gsafd** in subfield $2 against the GSAFD genre authority file).
6. Change the second indicator in 650 and 651 fields with a second indicator of 4 to **blank** (i.e., all unknown subject headings will be processed as if LC)

### Pre-Processing and Normalization Options:

1. Strip specific subfields from all occurrences of the following tags.  Can accept 2 subfields per tag and up to 20 tags may be specified.
   - 100       $e, $h
   - 110       $e, $h

- 111      $h
- 130      $h
- 240      $h
- 440      $h
- 490      $h
- 600      $e, $h
- 610      $e, $h
- 611      $h
- 630      $h
- 700      $h
- 705      $e, $h
- 710      $e, $h
- 711      $h
- 715      $e, $h
- 730      $h
- 800      $h
- 811      $h
- 830      $h

2. Special 700 $e processing. Current Library of Congress standards allow $e illustrator relators in bibliographic records. We will delete all non-illustrator relators in 700 $e and normalize all illustrator relators.

3. Strip any leading article occurring in the first subfield of tags 130, 240, 490, 630, 730 and 830.

4. Validate, convert or correct general material designators found in $h of titles fields. This step includes the capability of correcting subfield codes, i.e., changes some $h in tags 246 and 247 to the currently used $g for miscellaneous information. Note: Some automated systems insert the brackets around $h data when the data is loaded and do not expect the brackets to be present in incoming records. The net result of the authority control process will be that $h data will be enclosed in brackets.

5. In authorizing the 240 tag, indicator value "1" (default) for the first indicator is required

**Output Processing:**

1. Authority File of authority records which matched customer data and replaced it in bibliographic records will be created

2. File of Authority Control numbers pertinent to customer's bibliographic file to be maintained at LSSI for future updating purposes.

3. Our standard procedure is to return the matching authority records in two files: 1) name authority records, and 2) subject authority records, based upon whether they were derived from the LC Name Authority file or the LC Subject Authority file. Some automated library systems require that the authority records be separated by their bibliographic usage, rather than by the LC authority source file. For example, if a name is used as a subject, it will be placed in the subject authority file, even though it was derived from the LC name authority file. The records to be sorted by source or as most expeditious to data migration to Horizon 8.0.

4. All authority records that matched any bibliographic headings will be delivered, not just those that contain cross references (tags 4XX and 5XX)
5. All authority records that match any portion of hierarchical headings will be delivered.
6. Files of non-matched Names and Subject headings will be delivered for customer review

**Special Notes and Instructions:**
1. Add $h [DVD] $h[VCD] to the legitimate GMD list in #4 in the pre-processing and normalization option portion.

**Schedule 4**
Payment Schedule

## SCHEDULE 4

## PAYMENT SCHEDULE

**LICENSE FEES**

With respect to the Licensed Software which, as of the Effective Date, the parties agree shall be installed by the Library, SirsiDynix shall invoice the Library as follows: (A) for seventy-five (75%) percent of the Total Price set forth in Schedule 1 for the license for such Licensed Software (other than Horizon Enriched Content, the Envisionware eCommerce Suite and the IVR software included in the IVR System) on or after the date which is thirty (30) days after Day 1 of Production Operations; (B) for the remaining twenty-five (25%) percent of the Total Price set forth in Schedule 1 for the license for such Licensed Software (other than Horizon Enriched Content, Envisionware eCommerce Suite and the IVR software included in the IVR System) on or after the date on which the Library has successfully completed the Response-Time Acceptance Test of the production system (as used in production) as described in Schedule 5, Exhibit D, below; and (C) for the Total Price set forth in Schedule 1 for the license of the Horizon Enriched Content, the Envisionware eCommerce Suite and the IVR System, on or after the date which the applicable Licensed Software is delivered to the Library and successfully installed by SirsiDynix on the Library's hardware (or such other hardware designated by the Library) and accepted by the Library. With respect to software products for which the parties agree, after the Effective Date, that SirsiDynix will grant a license to the Library hereunder, SirsiDynix shall invoice the Library for the mutually agreed upon license fee for such product on or after the date on which the applicable portion of the Licensed Software is first delivered to, installed and accepted by the Library. The Library shall pay each such undisputed invoice by not later than thirty (30) days after the date of the Library's receipt of such invoice.

**IMPLEMENTATION SERVICE FEES**

SirsiDynix shall invoice the Library for the Total Price for a service included on Schedule 1 under the heading "Implementation Service" on or after the date on which the applicable service is successfully completed by SirsiDynix. The Library shall pay each such undisputed invoice by not later than thirty (30) days after the date of the Library's receipt of such invoice.

**MAINTENANCE FEES**

For each annual period for which an annual maintenance fee will be charged, SirsiDynix shall invoice the Library for such annual maintenance fee on or before the date which is ninety (90) days prior to the commencement of such annual period. For avoidance of doubt, the annual maintenance fee for a particular period will not include any maintenance fee for product for which the Library has "dropped maintenance" as contemplated in Section 2 of Schedule 10. For each year during which the terms of the Maintenance and Support Agreement are in effect, the Library shall pay, by not later than the later of (i) thirty (30) days after the commencement of the applicable annual period or (ii) sixty (60) days after the date of the Library's receipt of the invoice, the amount due in connection with each such undisputed invoice after any applicable credits are applied.

**CUSTOMIZATION SERVICES FEES**

SirsiDynix shall invoice the Library on a monthly basis for the Customization Services Fees due for the services provided for each month beginning with July 1, 2006 or at a time sooner if specified by the Library by not later than thirty (30) days after the end of the month in which such services are rendered. The Library shall pay the amount due in connection with each such undisputed invoice by not later than thirty (30) days after the date of the Library's receipt of such invoice.

**FEES FOR ADDITIONAL SERVICES**

Unless otherwise agreed by the parties, SirsiDynix shall invoice the Library on a monthly basis for the fees due for an Additional Service by not later than thirty (30) days after the end of the month in which such services are successfully completed by SirsiDynix. The Library shall pay the amount due in connection with each such undisputed invoice by not later than thirty (30) days after the date of the Library's receipt of such invoice.

BRMFS1 627942v16

**Schedule 5 – Exhibit A**
Acceptance Tests
Data Load Test

## SCHEDULE 5

## ACCEPTANCE TESTS

## SCHEDULE 5 - EXHIBIT A

## DATA LOAD TEST

**PURPOSE:**

The purpose of the Data Load Test is to verify that Library's data files will be properly processed. The test will be repeated when the production and gap loads have been completed.

**TIMING:**

The test will be performed after all test records have been loaded and processed and may overlap other tests.

**PERFORMED BY:**

Library staff in conjunction with SirsiDynix staff.

**TEST METHODOLOGY:**

(1)  SirsiDynix will, with the Library's cooperation, develop data load specifications (the "Load Specifications") which shall be set forth in writing by SirsiDynix and, once so set forth in writing, provided to the Library. SirsiDynix will identify inaccuracies or deficiencies in the Load Specifications as revealed by actual loading and will revise the Load Specification to address any comments provided by Library and as otherwise as appropriate based upon SirsiDynix's findings. Revisions made as the result of inaccuracies in the Load Specifications may result in delays in record processing.

(2)  Library shall identify by control number (e.g. ISBN, LCCN, OCLC) up to fifty thousand (50,000) bibliographic, item and/or patron records and matching authority records, if applicable, (the "Test Set") that shall be used to verify that processing will be done according to Load Specifications. SirsiDynix shall then pull the records identified by the Library to be included in the Test Set.

(3)  SirsiDynix shall, by not later than March 31, 2006, develop and/or modify programs on Library's system to process the data files according to the Load Specifications. SirsiDynix will then load the Test Set from tape via all SirsiDynix documentation described methods. Thereafter, the Library will execute all appropriate searching commands as described by current SirsiDynix documentation.

(4)  Following SirsiDynix's delivery of the processed record information for examination (which will be not later than June 26, 2006), Library shall promptly review the Test Set and notify SirsiDynix of any discrepancies between the processed data and the Load Specifications.

(5)     SirsiDynix will, in a timeframe consistent with the timeframes set forth in Section 3(H) of Schedule 10, correct all reported problems as identified in (4) above. Steps 3-4 will be repeated until the Test Set is properly loaded according to the Load Specifications.

(6)     SirsiDynix shall, by not later than December 18, 2006, modify programs on Library's system to process the data files according to the Load Specifications. SirsiDynix will then load the Test Set from tape via all SirsiDynix documentation described methods. Thereafter, the Library will execute all appropriate searching commands as described by current SirsiDynix documentation.

(7)     Following SirsiDynix's delivery of the processed record information for examination (which will be not later than 30 days following Day One of Production Operations), Library shall promptly review the Test Set and notify SirsiDynix of any discrepancies between the processed data and the Load Specifications.

## ACCEPTANCE:

1)     The Data Load Test shall be successfully completed when the Test Set has been processed to meet the Load Specifications.

2)     The Production Load Test shall be successfully completed when the Production and Gap Loads have been processed to meet the Load Specifications.

## SCHEDULE 5 - EXHIBIT B

## MODULE FUNCTIONALITY TEST

**PURPOSE:**

The purpose of the Module Functionality Test is to verify that the functional capabilities of the Licensed Software purchased have been delivered.

**TIMING:**

Commencement of testing will coincide with the installation of the various modules and shall be commenced or waived within thirty (30) days of Day 1 of Production Operations of a given module.

**PERFORMED BY:**

Library staff.

**TEST METHODOLOGY:**

(1)     Library may compare the Software with the applicable user manuals, other Documentation and the contract documents and other agreements made by the parties regarding functionality to ensure that the functions exist and operate in accordance with the Documentation and any other agreement between the parties.

(2)     Functions which do not operate properly shall be noted and reported in writing to SirsiDynix.

(3)     SirsiDynix shall clarify and resolve all reported problems in a reasonable timeframe consistent with the timeframes set forth in Section 3(H) of Schedule 10.   Within a reasonable timeframe after the Library's receipt of notice of resolution from SirsiDynix, Library shall retest the function and confirm that the problem with the function has or has not been resolved.

(4)     SirsiDynix and Library agree that not all aspects of the software are reasonably testable in the time frame given (e.g. "two-year cumulative statistics"). Untestable features or aspects of the Licensed Software shall not prevent the Module Functionality Test from being accepted.

**ACCEPTANCE:**

The Module Functionality Test for a given module will be successfully completed when each problem properly reported in the test (or retest) period has been resolved.

In the event that SirsiDynix has not received any notice regarding non functioning items on the date which is one hundred and twenty (120) days after Day 1 of Production Operations, then the Module Functionality Test will be deemed to have been successfully completed.   The foregoing

does not relieve SirsiDynix of any obligation to make operational each function as per the Warranties section of this Agreement.

**Schedule 5 – Exhibit C**
System Reliability Tests

SCHEDULE 5 - EXHIBIT C

SYSTEM RELIABILITY TESTS

**PURPOSE:**

The purpose of the System Reliability Test is to demonstrate and verify that the System operates at a 99.9% reliability level for an extended period of time.

**TIMING:**

Preliminary testing will begin upon completion of installation of the Horizon Database Server and Horizon Information Portal and Test Database servers and installation of the Licensed Software with functionality described in Schedules 12 and 14 (other than that which is to be provided after October 1, 2006 pursuant to the due dates listed on such schedules) on such servers, and after completion of training in connection with the Licensed Software.

Formal testing will begin on Day One of Production Operations.

**PERFORMED BY:**

Library staff.

**TEST METHODOLOGY:**

(1)   For purposes of this Exhibit, the System is defined as all Hardware and Software installed as of the commencement of the test.

(2)   Commencing on Day One of Production Operations, within a total test period of ninety (90) days, a successful performance period of thirty (30) consecutive days must be completed. The total test period and the successful performance period are calendar days, excluding holidays.

(3)   This test may be overlapped with other testing procedures.

(4)   Other than in the case of a Hardware failure, network failure, natural disaster, computer virus, an error in software owned by a party other than SirsiDynix or its parent or affiliate or Library operator error which causes the Licensed Software to be unavailable for a reason other than (i) an error in the Database Software licensed hereunder and/ or the Licensed Software which is owned by SirsiDynix, its parent or affiliate, or (ii) a failure of SirsiDynix to perform its maintenance and/or support obligations hereunder, including without limitation those set forth in Schedule 10, the Licensed Software must be Available ninety-nine and nine-tenths (99.9%) percent of the time on a 24x7x365 basis (and on the last day of leap year), including without limitation during the performance of file maintenance, back-ups and/or file purges, regardless of what other operations are taking place in connection with the Licensed Software and Hardware, such as the performance of file maintenance, back-ups and/or file purges.

(5)     Library may stop and restart the test, and the time during which the test has been stopped at Library's option solely for its convenience shall not count as downtime nor as part of the performance or test period.     In no event shall such interruption(s) of the test extend beyond a total of five (5) days per test.

(6)     Library and SirsiDynix will each maintain an operations log. Each time when the System is not Available shall be measured, calculated, and logged separately into the operations log.

(7)     In the event that at any time during the test the cumulative amount of time when the System is not Available exceeds the allowable one-tenth of one percent (.1%) for the entire test, the test shall automatically restart at the point the problem has been solved. Library shall notify SirsiDynix in writing within seven (7) days of the date the System Reliability Test is restarted. Notification shall include a copy of the log.

## ACCEPTANCE:

The System Reliability Test shall be successfully completed when the System has run thirty (30) consecutive days with ninety-nine and nine-tenths percent (99.9%) or greater uptime.

**Schedule 5 – Exhibit D**
Response-Time Acceptance Test

## SCHEDULE 5 - EXHIBIT D

### RESPONSE-TIME ACCEPTANCE TEST

Performance of a Response-Time Acceptance Test following Day 1 of Production Operations shall be according to the provisions of Section 10.A.4 of this Agreement, for a 30-minute response–time test.

Library must attempt or waive such Response-Time Acceptance Test of the production system within ninety (90) days of Day One of Production Operations and the successful completion of the following tasks:

(1) the conversion and loading of Library's data as described in Schedule 3 has been successfully completed; and
(2) the System Reliability Acceptance Test has been successfully completed or waived; and
(3) the Module Functionality Test has been successfully completed or waived.

The purpose of the Response-Time Test is to verify that the System is performing at the warranted performance levels. Library will conduct or waive the Response-Time Test as an acceptance test, after the acceptance tests described above have been successfully completed. Should the System demonstrate acceptable levels of performance through daily operations, Library may choose to waive the acceptance test. Waiving the test at such time will not waive Library's right to conduct such tests in the future and require full warranty performance by SirsiDynix in the event of test failure.

The delivered System operating with the Hardware will provide transaction response times at user Workstations meeting the recommended specifications provided by SirsiDynix, at the rates set forth in Schedule 17.

A "transaction" is defined as a complete unit of work achieved by an individual using an online workstation in interactive mode. Such unit of work will consist of one (1) or more inputs by the individual, and a responding output by the System for each input. Each input will consist of one (1) or more characters of information resulting from a keystroke or operation of an input device. Each response by the System will consist of one (1) or more characters of information transmitted to the workstation at which the individual made the corresponding input. Transactions with multiple steps shall include timings for each step. Each search shall consist of the following steps: (1) select search option, (2) enter request, (3) review summary screen (if any), (4) review full bibliographic display, and (5) review holdings/status displays. Boolean keyword searches shall exclude the top five percent most frequently occurring words in the file. The average response time is computed by summing the response times for all steps for a given type of transaction and dividing the total by the number of timings.

A given transaction is completed once the individual at the workstation has received the last character of response from the System (other than a "transaction in process" response) at the point where no more inputs or outputs are required to complete a unit of work.

SirsiDynix will not be held responsible for the response times of networks, middle tier servers, or workstations.

BRMFS1 627942v16

**Schedule 6**
Intentionally Left Blank

## SCHEDULE 6

## [SCHEDULE INTENTIONALLY LEFT BLANK]

BRMFS1 627942v16

**Schedule 7**
System Capacity and
Growth Path Warranties

## SCHEDULE 7

### SYSTEM CAPACITY AND GROWTH PATH WARRANTIES

The following requirements are the specifications for Horizon 8.0 through 8.2.

| **MINIMUM SPECIFICATIONS** | **RECOMMENDED SPECIFICATIONS** |
|---|---|
| **Staff Workstation** | **Staff Workstation** |
| Pentium III | Pentium IV or greater |
| 256 MB RAM | 512 MB RAM |
| 1.0 GB Free Disk Space Required | 1.0 GB Free Disk Space Required |
| Network Interface Card | Network Interface Card |
| TCP/IP Connectivity | TCP/IP Connectivity |
| Windows 2000, NT v4.0 or XP Professional | XP Professional |
| Color SVGA Monitor | Color SVGA Monitor |
| 2x CD-ROM | 20/48X CD-ROM |
| Mouse or track ball | Mouse or track ball |

| **MINIMUM SPECIFICATIONS** | **RECOMMENDED SPECIFICATIONS** |
|---|---|
| **PAC Client Workstation** | **PAC Client Workstation** |
| Pentium III | Pentium IV or greater |
| 128 MB RAM | 256 MB RAM |
| 100 MB Free Disk Space Required | 100 MB Free Disk Space Required |
| Network Interface Card | Network Interface Card |
| TCP/IP Connectivity | TCP/IP Connectivity |
| Windows 98 or higher | XP Professional |
| Color SVGA Monitor | Color SVGA Monitor |
| 2x CD-ROM | 20/48X CD-ROM |
| Mouse or track ball | Mouse or track ball |

BRMFS1 627942v16

**MINIMUM SERVER SPECIFICATIONS:**

**DATABASE SERVER**
1 Sun Fire E2900 Server
8 x 1.35 GHz UltraSparc IV Processor(s) with 16 MB cache
32768 MB ECC DIMM Memory
2 x 73 GB GB 10000 rpm Hot Swappable Disk(s)
3350 W/ HW RAID Dual CNTRL
12 x 73 GB GB 15000 rpm Disk(s)
Media: DVD-ROM , No Floppy
L8 Autoloader LTO Gen II Tape Drive
19 Inch Monitor (part of Blade 150 for console.)
Solaris 9
SunRack 900
Sun Blade workstation 150 (To act as Console.)
w/ 650 MHz SPARC CPU, 1024 MB ram,
2 X 80 GB hard drive, Solaris 9

**Dell PowerEdge Enclosure for the 1855 Blades**
1 Enclosure win no Blades
1.44 3.5 In External USB Floppy Drive
CDROM , 24x External, USB
2 GB Enet PowerConnect Switch IO BAY
FC Pass Through Module
Rack Chassis for Dell Rack

1 Embedded 2 GB 14 Port FC Brocade FC Switch
For PE 1855 Enclosure

1 PowerValul 132T, 4U, Tape drive
2 Drives LTO-2
10M FC Cable LC-LC
Rails for a Dell Rack
Tape Media for LTO-2 (200/400 GB, 30 Pack)

1 PowerEdge 4210 Rack
16 AMP PDU 208V
1 U 15FP Rack Console with RapidRails
1 8 Port Keyboard/Video/ Mouse Analog Switch

**HORIZON APPLICATION SERVER**
**5 PowerEdge 1855 Blades**
2 X 3.6 GHz /2 MB Cache, Xeon, 800MHz FSB
8 GB RAM
2 X 36 GB 15K RPM disk drives (RAID1)
Red Hat Enterprise Linxu ES 3 3Yr Subscription
Veritas Backup Exec agent

**WEB REPORTER SERVER**
**1 PowerEdge 1855 Blades**
2 X 3.6 GHz /2 MB Cache, Xeon, 800MHz FSB
4 GB RAM .
2 X 300 GB 10K RPM disk drives (RAID1)
Windows Server 2003 Standard edition
Veritas Backup Exec agent

TABLE 7-1

CONFIGURATION #1 ESTIMATES FOR CONCURRENT LICENSED USERS

The Library plans initially to support an estimated 3,000 concurrent users (1,000 Staff Users who will have access to all modules, and 2,000 Public Access Users Web Portal and Public Access Catalog Users – with unlimited Public Access). The hardware servers should be scaled to support 2,000 Public Access Users and to allow for unlimited use via the Web. For the avoidance of doubt, and notwithstanding any other provision to the contrary, nothing herein limits the Library's right to use the Licensed Software as otherwise set forth in this Agreement (including use by an unlimited number of users and use for unlimited access via the Web).

## TABLE 7-2

## TRANSACTION VOLUMES

Data Storage and Processing Requirements:

|          | 2005       | 2006       | 2008       | 2009       | 2010       |
|----------|------------|------------|------------|------------|------------|
| Titles   | 1,100,000  | 1,100,000  | 1,265,000  | 1,454,750  | 1,672,963  |
| Items    | 7,000,000  | 7,000,000  | 8,050,000  | 9,257,500  | 10,646,125 |
| Loans    | 20,000,000 | 20,000,000 | 23,000,000 | 26,450,000 | 30,417,500 |
| Patrons  | 1,500,000  | 1,500,000  | 1,725,000  | 1,983,750  | 2,281,313  |

For the avoidance of doubt, and notwithstanding any other provision to the contrary, nothing herein limits the Library's right to use the Licensed Software as otherwise set forth in this Agreement, (including use by an unlimited number of users and use for unlimited access via the Web).

**Schedule 8**
Intentionally Left Blank

# SCHEDULE 8

## [SCHEDULE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL AND PROPRIETARY

**Schedule 9**
Clarifications

## SCHEDULE 9

## CLARIFICATIONS

### Custom Development

It is the understanding of SirsiDynix that the Library requires a development team assigned specifically to projects for the Library. It is the goal of the Library to provide enhancements to the Software that are important to fulfilling the mission of the Library, the community it serves and in a timeframe that is not dependent on SirsiDynix scheduled General Release dates for the Software.

SirsiDynix uses the Agile software development method. **Agile software development** is a conceptual framework for undertaking software engineering projects. There are a number of agile software development methodologies, such as those espoused by the Agile Alliance, a non-profit organization. As of the Effective Date, it is SirsiDynix's intent to initially perform all Software Customizations using the Agile software development method. If SirsiDynix chooses to use a software development methodology other than the Agile software method, or if SirsiDynix chooses at any time to change the software development methodology it uses, SirsiDynix will provide the Library with at least sixty (60) days prior written notice prior to such change.

Agile software development methods attempt to minimize risk by developing software in short timeboxes, called iterations, which typically last one to four weeks. Each iteration is like a miniature software project of its own, and includes all the tasks necessary to release the mini-increment of new functionality: planning, requirements analysis, design, coding, testing, and documentation. While an iteration may not add enough functionality to warrant releasing the product, an agile software project intends to be capable of releasing new software at the end of every iteration. At the end of each iteration, the team reevaluates project priorities.

Agile methods emphasize real-time communication, preferably direct communication, over written documents. Most agile teams are located in a bullpen and include all the people necessary to finish software. At a minimum, this includes programmers and their customers. (Customers are the people who define the product. They may be product managers, business analysts, or actual customers.) The bullpen may also include testers, interaction designers, technical writers, and management.

Custom code created expressly for QBPL will be rolled into the general release of the software by no later than the second (2nd) general release of the software subsequent to the creation of the custom code, so that it may be used by all customers, and also to protect the custom work for QBPL during the next system upgrade. If not, how the custom feature is protected during system upgrade will be dependent upon how that feature was implemented. For example, if the feature was simply added using an API, it will be easy to roll that development over into the next version without needing to re-create the work already done.

We have found this goal-achievement based development method to be extremely beneficial; it allows our development staff to communicate and work collaboratively very effectively, and it enables development goals to be readily met.

In the case of QBPL, QBPL would in essence play the part of the Technical Product Manager, as well as the Executive Review Team. As such QBPL would be responsible for defining the functionality and creating a user story that explains the proposed functionality. This process involves QBPL designating a product manager who will develop the use case for the new feature. After internal review and approval of the use case, the Library's product manager will submit the use case to SirsiDynix product management which will review the use case and provide feedback, including estimate development time, to the Library's product manager

Once turned over to the Custom Development Team, the engineers would work in a sprint to complete the programming needed to implement the functionality. Once the sprint was completed, QBPL would do an executive review. The team will beginning coding and prepares the first review, also called a Scrum, two weeks after the use case is approved. The Library's product manager will be involved in the two week Scrums as part of SirsiDynix's development process until the coding is complete.

Upon completion the Library will beta test the code in its testing environment and report any bugs to SirsiDynix product management team. When known bugs are fixed to the satisfaction of the Library the software will be considered released and formally accepted by the Library and once the new feature was completed, the QBPL code would be incorporated into the general release of the Licensed Software and the Horizon code base.

Because of the speed, in depth interaction with developers, feature based methodology and executive review leading to a release of the new features, we see QBPL and SirsiDynix as ideal partners to work together.

The custom development team skill set is focused on development rather than support. They will have adequate training and experience to deliver the custom development projects to the Library in a timely manner and according to the agreed upon schedule. If the Library desires to change the focus on the custom development team, SirsiDynix reserves the right to provide a new annual price to accommodate the potential for higher costs.

SirsiDynix recognizes that the custom development projects for the Library may provide SirsiDynix with functionality that it can provide its' customers at an accelerated rate. This is a benefit to SirsiDynix. As a result, SirsiDynix will provide the Library a maintenance credit each year that the Library uses the custom development team. This credit will be applied as set forth in Schedules 1 and 4.

**Schedule 10**
Maintenance and Support
Agreement

**SCHEDULE 10**

## MAINTENANCE AND SUPPORT AGREEMENT

This Maintenance and Support Agreement is included in and is part of the Purchase and License Agreement to which it is attached (the "Agreement").

**1. DEFINITIONS**

*OS (or Operating System):* Software installed on Servers that controls the execution of computer programs.

*Peripherals:* Hardware other than a Server.

*Server:* A computer that processes database queries or provides other services for client workstations, including without limitation the Database Server, Horizon Information Portal Servers, Horizon Web Reporter Server and the Test Database Server and the other hardware set forth in Exhibit A to Schedule 10.

*System:* For purposes of this Schedule only, this term means the total complement of Servers, Licensed Software, the IVR system and Peripherals covered by maintenance with SirsiDynix.

**2. TERM**

The initial term of this Maintenance and Support Agreement shall begin upon Day 1 of Production Operations and shall continue until the date which is six years from Day 1 of Production Operations (the "Initial Term"). During the Initial Term, the maintenance fees (if any) will be as set forth in Sections 6(A) and (B) of this Schedule 10 minus any available credit, including without limitation any credit as set forth in Schedule 1 to the Agreement. After the Initial Term, unless at least one hundred and eighty (180) days' prior notice of intent not to renew is given by SirsiDynix prior to the applicable anniversary date or this Maintenance and Support Agreement is otherwise terminated pursuant to the terms of this Agreement, this Maintenance and Support Agreement will automatically renew for additional one-year terms. After the Initial Term, (i) sixty (60) days prior to each anniversary date, SirsiDynix shall provide Library with written notice of any rate increases for the following maintenance year and (ii) one hundred and eighty (180) days prior to the end of the Initial Term and each subsequent anniversary date, SirsiDynix shall provide Library with written notice of which items, if any, have reached end-of-life status and cannot receive continued support and maintenance in the following maintenance year. Such rate increases for the Licensed Software shall be no greater than 3% or the CPI, whichever is less, of the maintenance fee for the immediately preceding annual period. For avoidance of doubt, SirsiDynix will support and maintain all of the Licensed Software at all times prior to the end of the Initial Term and shall not discontinue support and maintenance for any such product prior to the end of the Initial Term. Notwithstanding the foregoing or any other provision to the contrary, the Library may, at any time during the term of this Maintenance and Support Agreement drop maintenance of any portion(s) of the System which it stops using in which case the Library will have no further obligation to make any further maintenance fee payments with respect to such portion(s) of the System.

**3. SUPPORT**

SirsiDynix will maintain an organization and process to provide support for the System as follows.

*A.   TELEPHONE SUPPORT*

SirsiDynix will provide telephone support on a 24x7x365 basis.  Onsite service will be provided as required; which onsite service, with respect to onsite service in connection with Hardware and Peripherals, will be dependent on level of service acquired from Server or other third party vendor.

*B.   LOG EXPRESS*

SirsiDynix will provide an Internet based support system for logging support issues which generally shall be available seven (7) days a week, twenty-four (24) hours a day, each day of the year.

*C.   SYSTEM ACCESS*

For diagnosis of problems, SirsiDynix technical personnel shall be able to access the System directly via a dedicated data-grade phone line, via direct IP address and/or VPN (Microsoft or Cisco VPN must be used).  In the event access to the System via Internet or VPN is not available, Library shall be responsible for providing access via a modem to the applicable portions of the Hardware on which the Licensed Software is operated.

*D.   LICENSED SOFTWARE SUPPORT*

1.   Licensed Software support shall include diagnosis and resolution of problems or performance deficiencies of the Software.

2.   Except under circumstances described by Section 20 of the Purchase Agreement, should Library be more than two major releases back from the current release of the Software, there may be an additional premium charged above Library's then-current annual support fee and Library may experience delays in receiving support. Except for circumstances described by Section 20 of the Purchase Agreement, if Library is more than two (2) major releases back from the current release and does not agree to upgrade to the current Software release, then SirsiDynix shall have no further obligation to provide the services described in this Maintenance Agreement.  A major release is labeled as X.x, e.g., 7.3; 7.31 is classified as an interim release.

3.   SirsiDynix can provide support for the installation of patches, updates, and releases. Such support will be provided to the Library upon the Library's request and at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*.

*E.   THIRD PARTY SOFTWARE AND OS SUPPORT*

1.   Subject to the provisions of Section 3(I) of this Maintenance and Support Agreement, in order to receive support for Third Party Software and OS, Library (a) must use the version of the Third Party Software/OS that SirsiDynix indicates is to be used with the Licensed Software or Servers or such other version which SirsiDynix has approved for use by the Library and (b) must be in compliance with any third party licenses.

2.   In addition to its other obligations for all Licensed Software, including Third Party Software, SirsiDynix will diagnose problems with the Third Party Software and OS as they relate to operation of the rest of the Licensed Software and work with the third party vendors to resolve the problems.

3.   SirsiDynix will support industry standard interface framework (SIP, SIP2, SIP with Custom Extensions, NCIP, or custom interfaces created using Horizon APIs for connection to 3rd Party Products) and will adjust OS parameters for the Licensed Software as needed to ensure that they function with the Licensed Software, and that all Licensed Software functions together, when used on the applicable hardware.

4. Third Party Software and OS support does not include the installation of patches or upgrades by SirsiDynix unless required for continued System operation. Patches and upgrades not required for continued System operation will be made available upon the Library's request at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*.

5. SirsiDynix will provide technical assistance with standard OS tasks relating to running of the System and will adjust OS parameters to ensure that the Licensed Software and Servers function together.

## F. *SERVER SUPPORT*

1. Server support shall consist of the diagnosis of Server problems. Following diagnosis, SirsiDynix shall contact the Server maintenance vendor and onsite Server support shall be performed in accordance with the Server maintenance plan purchased by Library.

2. In order to receive Server maintenance coverage, Library must provide an uninterruptible power supply ("UPS") for each Server.

3. Subject to the provisions of Section 3(I) of this Maintenance and Support Agreement, in order to receive support for the OS, Library must use the version of the OS indicated by SirsiDynix and must be in compliance with the OS licensing terms.

4. SirsiDynix will provide technical assistance with standard OS tasks relating to running of the System.

5. Server support includes the installation of OS patches and upgrades required for continued System operation. Installation of OS patches or upgrades not required for continued System operation will be made available upon the Library's request at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*.

## G. *IVR SYSTEM SUPPORT*

If the IVR system malfunctions, SirsiDynix will (a) for hardware problems, dispatch a service technician for next business day service and (b) for software problems, diagnose and repair remotely. SirsiDynix shall provide labor and parts (excepting consumable supplies and expendable items), if any, required for SirsiDynix to fulfill its obligations under this provision.

## H. *RESPONSE TIMES*

SirsiDynix will respond to and correct each reported problem and performance deficiency as follows:

1. **Level 1** - For errors which create a situation where (A) users cannot use the applicable Software, (B) the production system is down, (C) data corruption is occurring and/or (D) a failure which severely limits use of a major function in the application and no effective detour or other workaround is provided to the Library, including without limitation (i) an inability for the Library to circulate, use PAC for searching, (ii) an inability to search local bibliographic database, (iii) an inability to connect to the Server(s) that is not a result of down network, (iv) transaction processing has failed, including without limitation a failure of any of the payment functions to work, inability to process the collection of fines and fees or any other circulation transaction and/or an inability to use My Account features, provided such failures affect all users system-wide  (failures that are isolated to one or two users will be treated as Level 2 or Level 3 depending on the severity of the issue);

(iv) a situation where data corruption has been identified and/or (v) an error in the Licensed Software which causes the Licensed Software to fail to be Available ninety-nine and nine-tenths (99.9%) percent of the time on a 24x7x365 basis (and on the last day of leap year) as required pursuant to Section 10(A)(5) of the Agreement, SirsiDynix will:

o   Respond to any message from the Library with respect to an error within (a) fifteen (15) minutes of notification for messages left from 6:30 AM EST until 9:30 PM EST for the first three months after Day 1 of Production Operations; and thereafter for messages left from 8:00 AM EST until 8:00 PM EST; and (b) thirty (30) minutes for all messages left between 9:30 PM EST and 6:30 AM EST for the first three months after Day 1 of Production Operations; and thereafter for messages left from 8:00 PM EST until 8:00 AM EST.

o   Begin work on the error correction as soon as practicable, but not later than within one hour of notification, engage staff in SirsiDynix's technical support group continuously thereafter until the error is corrected or reduced to an error of the type described in the following subitem 3(H)(2), and if staff in SirsiDynix's technical support group cannot correct the error or reduce the error to the type described in the following subitem 3(H)(2) without the support of SirsiDynix's development team, provide continuous effort of staff in the development group and provide continuous efforts of such staff during normal business hours to the extent necessary to correct the error or reduce the error to the type described in the following subitem 3(H)(2).

o   without limiting the foregoing, assemble the best team of SirsiDynix personnel to fix the error and make such personnel available (including onsite at the Library's location where necessary) at all times necessary to fix such error.

o   SirsiDynix will use its best efforts to resolve the problem or provide an acceptable workaround within four (4) hours of the original report of the error.

o   Escalation to SirsiDynix management after 4 hours, if not resolved.

o   Provide updates to the Library on status every 4 hours or as otherwise mutually agreed.

The hours set forth in this subitem 3(H)(2) refer to actual clock hours as opposed to business hours and the intent is to obtain the efforts of staff on the development team if applicable on a 24 hour a day, 7 day a week basis.

2.   **Level 2** - For errors (A) which create a failure which severely limits use of a major function in the application and an effective detour or other workaround is provided to the Library, or (B) which require support during off hours (8pm to 8am Eastern Time) where the Library IT Department notifies SirsiDynix at least two (2) business days prior of planned maintenance work being performed on the system outside of normal support hours where this work involves one or more of the following – database maintenance, fees, fines notices, Configuration changes to Horizon, HIP, IVR or SIP :

o   Respond to any message from the Library with respect to an error within

two hours of notification during normal support hours 8am to 8pm Eastern Time or, where the Library has notified SirsiDynix as set forth in item (B) above of this 3(H)(2), within two hours of notification. The Library will have an option to extend support to at a 24x7x365 basis when such support is made available by SirsiDynix, which extended support (i) will be made available by not later than July 31, 2007 (unless extended by SirsiDynix) and (ii) will be provided at no additional cost to the Library.

o   Begin work on the error correction as soon as practicable, but not later than within twenty-four (24) hours of notification, engage staff in SirsiDynix's technical support group continuously thereafter until the error is corrected or reduced to an error of the type described in the following subitem 3(H)(3), and if staff in SirsiDynix's technical support group cannot correct the error or reduce the error to the type described in the following subitem 3(H)(3) without the support of SirsiDynix's development team, provide commercially reasonable efforts of staff in the development group during business hours to the extent necessary to correct the error or reduce the error to the type described in the following subitem 3(H)(3).

o   SirsiDynix will use its best efforts to resolve the problem or provide an acceptable workaround within two (2) business days of the original report of the error; provided however that if the problem is not resolved within forty-eight (48) hours of the original report of the error, the error will be reclassified and treated as a Level 1 error.

o   Escalation to SirsiDynix's management after one (1) business day, if not resolved.

o   Provide updates to the Library on status every twenty four (24) hours or as otherwise mutually agreed.

The hours set forth in this subitem 3(H)(2) refer to actual clock hours as opposed to business hours.

3.   **Level 3** - For errors which create a failure of an application function that results in the service not meeting full functionality.

o   Respond within one business day.

o   SirsiDynix will begin work on the error correction by not later than two (2) business days after the original report of the error and will use commercially reasonable efforts to resolve the problem or provide an acceptable workaround within five (5) days of the original report of the error.

o   Discuss with the Library propriety of providing permanent solution with next maintenance release.

Library IT staff have the right to request the level of the call as they deem it appropriate. Notwithstanding the foregoing, SirsiDynix reserves the right to review with the Library cases where high priority levels are requested on a regular basis and the problem does not merit the higher priority level. This is to avoid overuse by a Library employee for priority level calls.

For each identified error to which SirsiDynix responds pursuant to the terms of this Agreement, (i) SirsiDynix will document (a) the work done to resolve such error, (b) the resolution of such error and (c) any technical changes made to and/or detours and/or other

workarounds provided for such identified error; and (ii) SirsiDynix may, as per (i) above close calls it deems resolved and will notify the Library that the call has been closed. The Library has the right to re-open any closed calls it regards as unresolved, in which case the error will be treated as if it had not been closed.

### I. COMPATABILITY

Notwithstanding the foregoing or any other provision to the contrary, support provided hereunder shall include the obligation for SirsiDynix to create and provide to the Library all Updates necessary to ensure that the Licensed Software operates and remains compatible with the version of the Oracle database then being used by the Library and/or The Queens Library Foundation and with newly-released and generally available versions of all other third-party applications and hardware which Library and/or The Queens Library Foundation uses in conjunction with the Licensed Software, including those set forth in Schedule 14 of the Agreement. Notwithstanding the foregoing, the Library agrees that the obligations of SirsiDynix as set forth in this Section 3(I) are subject to the Library obtaining certification by SirsiDynix (which certification will not be unreasonably delayed or withheld by SirsiDynix) of the version of the Oracle database or any other third-party application which the Library desires to use in conjunction with the Licensed Software prior to changing to such new version.

## 4. MAINTENANCE

### A. LICENSED SOFTWARE MAINTENANCE

During the term of this Maintenance and Support Agreement, SirsiDynix will provide Library with copyrighted patches, updates, and releases and other Updates of the Licensed Software if and when released as they become commercially available to SirsiDynix's customers in general, along with appropriate documentation for successful installation and implementation thereof. All patches, updates, release and new versions shall be subject to the license agreement relating to the Software.

### B. SERVER UPGRADES

Except as otherwise set forth in the Agreement, Library shall be responsible for the purchase of any Server upgrades which may be required due to installation of patches, updates, and releases of the Licensed Software. Library shall have no obligation to purchase Server upgrades in order to install patches, updates, and releases of the Licensed Software as described in Section 20 of the Purchase Agreement.

## 5. CONDITIONS OF SIRSIDYNIX'S OBLIGATIONS

### A.

Time spent by SirsiDynix resolving or attempting to resolve problems subsequently determined to be caused by products not covered by this Maintenance Agreement shall be billed to Library at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services.* SirsiDynix shall: (i) when possible under the circumstances, give Library prior notice if the work is not covered by this Maintenance Agreement together with an estimate of the cost thereof and, (ii) if such prior notice is not possible, give the Library notice of the same as soon as reasonably practicable after SirsiDynix becomes aware that the work is not covered. Unless the applicable error or problem would still have occurred in the absence of the items set forth in items (a) or (b) of this sentence, SirsiDynix shall have no obligation to provide assistance in correcting errors or problems (a) arising in connection with any modifications or alterations to any System

      component which have been made by anyone other than SirsiDynix or its agent, unless such modification was performed with SirsiDynix's prior written consent or under the direction of SirsiDynix's customer support and the Library or its agent performs the changes in accordance therewith or (b) for System components to the extent such error or problem is caused by abuse by the Library or use by the Library contrary to the manufacturer's specifications.

B.   All maintenance services provided hereunder are remedial only; no preventative maintenance services are offered.

C.   SirsiDynix hereby accepts full responsibility for the obligations outlined by this Maintenance Agreement. Subject to the immediately preceding Sentence and the provisions of Section 7(L) of the Agreement, Library agrees that SirsiDynix may subcontract some or all of the performance of its duties provided for herein. Nothing in this paragraph shall be interpreted as authorizing the assignment of this Maintenance Agreement by SirsiDynix.

D.   It is acknowledged and understood that the maintenance and support service to be provided by SirsiDynix hereunder is not intended to supplant Library's day-to-day operation and support for the System.

E.   SirsiDynix will not be responsible for its failure to provide maintenance or support required hereunder, to the extent such failure is caused directly by the Library's failure to provide SirsiDynix with access to each item covered by maintenance or a suitable place in which to perform such service, if SirsiDynix reasonably requested such access and/or facility and such access and/or facility is necessary to allow SirsiDynix to provide maintenance service hereunder. A designated representative of Library shall be in Library's premises whenever SirsiDynix personnel are present.

F.   SirsiDynix is not responsible for verifying the success of System and data backups; provided however that the foregoing does not limit SirsiDynix's obligations pursuant to Section 10(A)(5) of the Agreement.

G.   Library will be allowed one Library contact person and two designated Library contact backups. Said contacts shall be the only Library personnel contacting SirsiDynix regarding maintenance issues.

H.   SirsiDynix is not responsible for the security of the System; provided however that the foregoing shall not constitute a waiver of, or be construed in any way to diminish, (i) SirsiDynix's obligations to provide any particular functionality (including without limitation any functionality relating to security) as part of the Licensed Software, or (ii) SirsiDynix's other obligations expressly set forth in the Agreement (including without limitation its obligations under Section 7(G) or any warranty) or (iii) any other agreement for the performance of services, and/or (iv) SirsiDynix's responsibility for its failure to fulfill its obligations under the Agreement, including without limitation those set forth in items (i) through (iii) of this sentence or a breach of security (or related damages) caused by such failure and/or the negligence or willful misconduct of SirsiDynix, its personnel, and/or any service provider, supplier and/or other contractor or agent of SirsiDynix.

## 6. CHARGES AND PAYMENTS

A. For a period of one (1) year from Day 1 of Production Operations (the "No Charge Period"), SirsiDynix will provide the services described in this Schedule 10 to the Library at no charge.

B. For each of the five (5) years immediately following the No Charge Period, maintenance charges will equal the annual maintenance fees set forth in Schedule 1 to the Agreement.

C. Maintenance charges are based on annual prepayment as further described in Schedule 4. In addition to the maintenance charges set forth in Sections 6(A) and (B) and 5(A), in the event that the Library requests and approves the performance of onsite services ("Approved Onsite Services"), the Library shall (i) reimburse SirsiDynix for the actual cost of Reimbursable Expenses (as defined below) with respect to such Approved Onsite Services, and (ii) pay SirsiDynix, at the rates set forth on Schedule 1 under the subheading *Fees for Additional Services*, for Approved Onsite Services actually performed hereunder in connection with the resolution of problems for which SirsiDynix would not otherwise be responsible pursuant to the terms of this Schedule 10 (e.g. problems caused by products not covered by this Maintenance Agreement). SirsiDynix will invoice the Library for the fees and expenses set forth in this Section 6(C) monthly, as rendered and/or incurred, as applicable, and the Library will pay each undisputed invoice by not later than thirty (30) days after the date of the Library's receipt of such invoice. For purposes of the preceding sentence, "Reimbursable Expenses" means pre-approved (which pre-approval must be in writing) reasonable out-of-pocket expenses, including travel and lodging, which are actually incurred in the performance of the onsite services in accordance with the Library's expense policies and for which all documentation deemed necessary by the Library (which documentation shall include without limitation receipts for all such expenses) has been provided to the Library.

D. Library is solely responsible for payment of all undisputed invoices in accordance with the terms of the Agreement.

E. Should Library desire to renew maintenance coverage on any item previously terminated from coverage, SirsiDynix will renew such maintenance and Library shall be liable for 100% of the maintenance charges that would have been charged on the item during the period when maintenance coverage was terminated.

## 7. CHANGES TO AGREEMENT TERMS

No modification to these Maintenance and Support Agreement terms will be binding, unless in writing and signed by an authorized representative of each party.

Exhibit A
to Schedule 10

# EXHIBIT A TO SCHEDULE 10

## HARDWARE CONFIGURATION

Part Detail for Sun Equipment

| Qty | Description |
|-----|-------------|
|     | Sun Part # |
| 5 | W9D-E29-4-24-1 |
| 3 | W9D-E29BDDPLs-24-1G |
| 1 | W9D-E49-24-1G |
| 2 | W9D-S4BDPLUS24-1-G |
| 2 | W9D-SE3120-24-2G |
| 5 | VVMGS-2C99-1PR |
| 1 | VVMGS-3B99-1PR |
| 2 | EBA9S-E9M9-1PR |
| 2 | CLSIS-A999-1PR |
| 1 | VSTOR-9999-Medai |
| 2 | CLuZs-99M9-Media |
| 1 | CLAIS-XR-9999-1PR |
| 1 | W9D-SE3120-24-1G |

**Schedule 11**
DSI Source Code
Escrow Agreement

## SCHEDULE 11

### DSI SOURCE CODE ESCROW AGREEMENT

SirsiDynix covenants that the following is an accurate reproduction of its current source code escrow agreement with DSI.

### DSI DEPOSIT AGREEMENT
Account Number 0425005-0P002

This Deposit Agreement is effective this 1st day of September, 1991, by and between Data Securities International, Inc. ("DSI"), a Delaware corporation, and SirsiDynix ("Licensor").

Notices to Licensor should be sent to:

|  |  |
|---|---|
| Licensor: | SirsiDynix |
| Address: | 400 West 5050 North |
|  | Provo, Utah 84604-5650 |

All contracts, deposit materials and notices to DSI must be sent to:

Data Securities International, Inc.
Attn: Contract Administration
6165 Greenwich Drive, #220
San Diego, CA 92122
(619) 457-3199

WHEREAS, Licensor has or will enter into a contract(s) with a person(s) or a corporation(s) ("Licensee(s)") for the use of proprietary technology and other materials;

WHEREAS, availability of or access to certain proprietary data related to the proprietary technology and other materials is critical to certain Licensees in the conduct of their business;

WHEREAS, Licensor has deposited with DSI the related proprietary data to provide for retention and controlled access for certain Licensees under certain conditions;

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and in consideration of the promises, mutual covenants and conditions contained herein, the parties hereto agree as follows:

### ARTICLE 1

**Deposit of Material.** The Deposit consists of all material currently supplied to DSI as specified by an accompanying document called a "Description of Deposit Materials" hereinafter referred to as Exhibit B(s). Licensor represents that it is lawfully possessed of all deposit materials stored under this Agreement and has the authority to store them in accordance with the terms thereof.

Queens Borough Public Library- Page S-47
CONFIDENTIAL AND PROPRIETARY

**Deposit Changes.** Pursuant to this Agreement, Addenda or Exhibits incorporated herein, the Licensor has the option to update the Deposit with supplemental or replacement materials to maintain the currency of the deposit materials. Upon acceptance of any deposit change, DSI shall acknowledge same to Licensor by issuing a signed copy of the Exhibit B(s).

**Supplemental Deposit.** The Supplemental Deposit will include any materials added to the Deposit. Licensor will submit the Supplemental Deposit accompanied by an Exhibit B(s).

**Replacement of Existing Deposit.** Replacement materials replace the complete existing Deposit. Licensor will submit the Replacement materials accompanied by an Exhibit B(s).

**Deposit Inspection.** Upon receipt of an Exhibit B, DSI will visually match the listed items on the Exhibit B to the labeling of the material ("Deposit Inspection"). DSI will not be responsible for verifying the contents or for validating the accuracy of Licensor's labeling. Acceptance will occur when DSI concludes that the Deposit Inspection is complete.

## ARTICLE 2

**Registered Licensee.** Licensor, and only Licensor, may enroll certain Licensee(s), participating user(s), as Registered Licensee(s) to this Agreement. Licensor must submit to DSI a "Participating User Licensee Registration Document," hereinafter referred to as an Exhibit A, for each Licensee to be Registered under this Agreement. DSI shall issue to the Registered Licensee a Licensee registration packet including a copy of Exhibit A, Participating User Agreement, to be executed by the Registered Licensee.

**Other Licensees.** DSI shall have no obligation to any Licensee or other third party of Licensor except Registered Licensees accepted by DSI, to the extent provided in a writing signed by DSI. DSI shall have the right to modify or cancel this Agreement without the consent of any third party unless expressly prohibited from doing so by an agreement signed by DSI.

## ARTICLE 3

**Obligations of DSI, Inc.** DSI agrees to establish a receptacle in which it shall place the Deposit and shall put the receptacle under the control of one or more of its officers, selected by DSI, whose identity shall be available to Licensor at all times. DSI shall exercise that high level of care in carrying out the terms of this Agreement as DSI would use to protect items of this nature which DSI might own.

DSI understand (i) that Licensor claims that Deposit contains information that is trade secrets of itself and (ii) that Deposit is intended to constitute items useful to persons reasonably skilled in computer technology for providing maintenance support for computer software programs Licensor licensed to its Registered Licensees, in the even that any of these Registered Licensees becomes entitled to receive it.

DSI shall bear no obligation or responsibility whatsoever to determine the completeness or accuracy of the Deposit or whether what is deposited is or is not proprietary data as contemplated herein.

## ARTICLE 4

**Term of Agreement.** This Agreement will have an initial term of one year. This Agreement may be renewed for additional one-year periods upon receipt by DSI of the specified renewal fees prior to the last day of the term (expiration date). In the event that the renewal fees are not received within thirty (30) days before the expiration date, DSI shall so notify Licensor and all Registered Licensees of the thirty (30) day expiration period. If the renewal fees are not received within the subsequent thirty (30) days, DSI may terminate this Agreement without further notice and without liability to any other party.

## ARTICLE 5

**Expiry.** Upon non-renewal of this Agreement, all duties and obligations of DSI to Licensor, and Registered Licensee(s) will terminate. If Licensor requests the return of the Deposit, DSI shall return the Deposit to Licensor only after the deposit return fee is paid. If the deposit return fee is not received by the anniversary date of this Agreement (terminal day), DSI may destroy the Deposit.

**Expiry of Registered Licensee.** Licensor may request DSI to terminate a Registered Licensee separate from termination of this Deposit Agreement by notice to DSI or by Licensor's non-payment of the annual renewal fee for that Registered Licensee.

**Filing for Release of Deposit by Registered Licenses.** If DSI is notified by a Registered Licensee of the occurrence of a release condition as defined in Article 7 and includes at that time the filing for release fee, DSI shall so notify Licensor at the last known address by certified mail with a copy of the notice from the Registered Licensee. If Licensor provides contrary instruction, as defined in this Article within fifteen (15) working days of the emailing of the notice to Licensor, DSI shall not deliver a copy of the Deposit to the Registered Licensee who is filing for the release of the Deposit.

Contrary instruction for the purpose of this article means the filing of an affidavit or declaration with DSI by an officer of Licensor stating that a Release Condition has not occurred, or has been cured. DSI will send a copy of the affidavit or declaration by certified mail to the Registered Licensee who is filing for the release of the Deposit materials. Upon receipt of contrary instruction, DSI shall not deliver a copy of the Deposit and shall continue to store the Deposit until otherwise directed by Registered Licensee and Licensor jointly, or until resolution of the dispute by a court of competent jurisdiction.

In the event that DSI does not receive contrary instruction, DSI is authorized to release a copy of the entire Deposit to the Registered Licensee requesting the release. Release processing fees will be paid by the Registered Licensee. DSI may duplicate the Deposit only as necessary to preserve and safely store the Deposit, and to provide copies thereof, as authorized herein, to Registered Licensee.

## ARTICLE 7

**Release Conditions.** Licensor's failure, without cause on the Registered Licensee's part, to furnish the Registered Licensee with maintenance support to the extent provided for in the applicable maintenance agreement with Licensor.

## ARTICLE 8

**Non-Disclosure.** Except as provided in this Agreement, DSI agrees that it shall not divulge, disclose, make available to third parties, nor make any use whatsoever of the Deposit, or any information provided to it by Licensor in connection with this Agreement of Exhibits. Without the express written consent of Licensor.

## ARTICLE 9

**Indemnification.** Licensor agrees to defend and indemnify DSI and hold DSI harmless from and against any and all claims, actions and suits, and from and against any and all liabilities, losses, damages, costs, charges, penalties, counsel fees, and other expenses of any nature (including, without limitation, settlement costs) incurred by DSI on account of any act or omission of DSI in respect to or with regard to this Agreement except as specified in Articles 1 and 8 herein.

## ARTICLE 10

**Audit Rights.** DSI agrees to keep written records of the activities undertaken and materials prepared pursuant to this Agreement. Licensor will be entitled at reasonable times during normal business hours and upon reasonable notice to DSI during the term of this Agreement to inspect the records of DSI with respect to this Agreement.

Licensor will be entitled, upon reasonable notice to DSI and during normal business hours, at the facilities designated by DSI, accompanied by a designated employee of DSI, to inspect the physical status and condition of the Deposit. The status of the Deposit may not be changed by Licensor during the audit.

## ARTICLE 11

**Designated Representative.** Licensor agrees to designate one individual to receive notices from DSI and to act on behalf of Licensor with respect to the performance of its obligations as set forth in this Agreement and to notify DSI immediately in the event of any change from one designated representative to another.

## ARTICLE 12

**General.** DSI may act in reliance upon any instruction, instrument, or signature believed to be genuine and may assume that any person giving any written notice, request, advice or instruction in connection with or relating to this Agreement has been duly authorized to do so.

This Agreement will be governed by, and construed in accordance with the laws of the Commonwealth of Massachusetts.

This Agreement, including the Exhibits and Addenda hereto constitutes the entire Agreement between the parties concerning the subject matter hereof and will supersede all previous communications, representations, understandings, and agreements, either oral or written, between the parties.

If any provision of this Agreement is held by any court to be invalid or unenforceable, that provision will be severed from this Agreement and the remaining provisions will continue in full force.

## ARTICLE 13

**Fees.** All service fees will be due in full at the time of the request for service. Renewal fees will be due in full upon the receipt of invoice unless otherwise specified by the invoice. For the purpose of annual renewal fees the effective date of this Agreement will be the anniversary date. Fees for this Deposit Agreement will be paid within sixty (60) days of execution of this Agreement or this Agreement will be automatically terminated. Fees for other service requests must be paid within sixty (60) days or such service will be automatically terminated.

All service fees and annual renewal fees will be those specified in DSI's schedule of fees in effect at the time of renewal, or request for service, except as otherwise agreed. For any increase in DSI's standard fees, DSI shall notify Licensor at least ninety (90) days prior to any renewal of this Agreement. For any service not listed on the schedule of fees, DSI shall provide a quote prior to rendering such service.

**Schedule 12**
Required "Go-Live" Functionality

## SCHEDULE 12

### REQUIRED "GO-LIVE" FUNCTIONALITY

**[Section C contains functionality identified by the formal Gap Analysis conducted in December 2005. Section D contains additional Gap Analysis functionality required by the Library which was identified subsequent to the formal Gap Analysis. Section E contains additional Required "Go-Live" Functionality (not otherwise set forth in Sections A through D of this Schedule 12) which was identified subsequent to the formal Gap Analysis.]**

### A. Proposed Functionality (Due August 1, 2006)

    a) The proposed functionality as specified in:

- Dynix Proposal
- Dynix response to Request for Clarification
- Dynix response to Request for Best and Final Offer

### B. Interfaces with Third-Party Software and Services  (Due October 1, 2006)

    a) As described in Schedule 14.

### C. Functionality identified by Gap Analysis (Due August 1, 2006)

#### 1. Cataloging

    a) CHECK_MARC_RECORDS_ANALYSIS report needed to analyze MARC data files and report errors.

Technical specifications from DRA Technical Services Operations Manual:

CHECK_MARC_RECORDS_ANALYSIS.COM reads a MARC data file and reports errors. It does not attempt to correct the errors. Instead, it identifies them and reports them to the log. You can then check each error and decide the best method to correct the problem.

The program prompts for the name of the MARC data file, range of DBCNs, and report type (analysis mode or full mode).

CHECK_MARC_RECORDS_ANALYSIS.COM is designed to run CHECK_MARC_RECORDS in analysis mode only. The procedure writes errors to three output files:

CHECK_MARC_RECORDS.RESULTS

- Lists errors by database control number.
- Includes record type and description of the problem.

CHECK_MARC_RECORDS.ANALYSIS
- Lists errors by error type.
- Assigns a code to each error.

- Includes record type and a description of the problem.

CHECK_MARC_RECORDS.008_FIELDS
- Lists records with errors in the 008 field.
- The program assigns these possible codes to a problem:
  - o   HIGH--Correct as soon as possible. For example, a MFHL record does not have a valid 004 field. These problems hinder the indexing or retrieval of a record.
  - o   MODR--Correct as time permits. For example, a record has two 245 fields.
  - o   CHK--Correct with a DRA batch program. For example, if the error is that a field length is too short, run MARC_VERIFY_RUN.COM.

Problems Identified by CHECK_MARC_RECORDS_ANALYSIS: Because CHECK_MARC_RECORDS_ANALYSIS runs CHECK_MARC_RECORDS in analysis mode, CHECK_MARC_RECORDS_ANALYSIS.COM performs the same checks that CHECK_MARC_RECORDS_RUN.COM. See the "Problems Identified by CHECK_MARC_RECORDS_RUN.COM" section to review these checks.

The program CHECK_MARC_RECORDS_RUN.COM reads a MARC data file and reports errors. It does not attempt to correct the errors. Instead, it identifies them and reports them to the log. You can then check each error and decide the best method to correct the problem.

The program prompts for the name of the MARC data file, a range of DBCNs, and report type. You can report in Full mode or Analysis mode.

If you choose Full mode, program prints the DBCN and record type once and then describes each problem identified in the record. A message also indicates if this is a workform or a deleted record. The default is Full mode.

If you choose Analysis mode, a separate message exists for each error. This message includes the control number, record type, a label that describes the error, and a text description of the problem.

Use CHECK_MARC_RECORDS_RUN.COM when you expect a relatively small number of errors. If you expect the program will report more than a few hundred errors, use CHECK_MARC_RECORDS_ANALYSIS.COM. This procedure reports similar errors together and reports to special output files rather than the log.

CHECK_MARC_RECORDS_RUN.COM, in each of its steps, identifies these problems:

**MARC_VERIFY_RUN.COM Checks**
- Field lengths should match end-of-field markers.

- Logical record length should match physical record length.

**MARC_AUDIT_FIELDS_RUN.COM Checks**
- Field tag must be in range 001-999, or 1115 (workform)
- Indicators must be blank, or a digit (0-9).
- Ownership code must be blank or 0-99, or 128.
- Subfield code must be either a lower case letter or a digit.
- The length of no fields should exceed 10,004.

**Global Content Checks**
- Leader control number is a valid DRA control number.
- Leader record type is a lower case letter, or blank.
- Leader bibliographic level is a lower case letter or blank.
- Leader status is a, c, d, n, s, u, or x.
- Leader Date Entered is a valid DRA date in the range of 01/01/1971 through TODAY (system date).
- Date Modified is a valid DRA date, greater than or equal to Date Entered, and less than or equal to today.
- Exactly one 001 field, which is first field in the record. Field length is 19, blank indicators, ownership null-null. Field has exactly one 001$a containing a valid DRA control number that matches the control number of this record.
- Exactly one 008 field or no 008 field. If found, must have exactly on subfield a, blank indicators, null ownership, and no other subfields.
- For 002, 003, 005, 006, and 009 fields, there should be blank indicators, a single subfield a (no other subfields), and null ownership values.
- For 1115 field (DRA-local field for workform name), must have exactly one subfield a (no other subfields). Must have blank indicators. Length of text, when normalized, must be greater than zero.
- If a 245 field is present, cannot have more than one. Must have a subfield a, and this subfield must contain data. Length of the text in the first subfield a must have a length that is less than or equal to the value of the second indicator.
- Field zero (not visible in NETCAT) must exist and be the last field in the record.

**Bibliographic Record Checks**
These checks apply to any record with a type of a-r or t. Not performed on deleted records or workforms.
- Must have one 008 field with 40 or more characters.
- Must have no 004 fields.
- Must have exactly one 245 field.
- Must have zero or one 1XX field.

**Authority Record Checks**

These checks apply to any record with a type of z. Not performed on deleted records or workforms.
- Must have no 004 fields.
- Must have exactly one 1XX field.
- Must have one 008$a field of 40 or more characters.
- Byte 11 in the 008$a field must be a lower case alpha character.
- Bytes 14, 15, and 16 in the 008$a field must be either "a," "b," or fill characters such as "|."

**I&R Record Checks**
These checks apply to any record with a type q. Not performed on deleted records or workforms.
- Must have no 004 fields.
- Must have either a 1XX field or a 245 field, or both.
- Should not have more than one 245 field.
- Should not have more than one 1XX field.

**Holding Record Checks**
These checks apply to any record with a type of v, x, or y. Not performed on deleted records or workforms.
- Can have none, one, or more than one 004 fields.
- Each 004 field has a length of exactly 19, blank indicators, null ownership, and one subfield a containing a valid DRA control number.
- Must have exactly one 852 field, which contains exactly one subfield b. This subfield b must contain exactly one six-digit agency code. (No check, however, is made against the policy file for codes valid at your library.)
- Must have no fields in range 100-499.
- If value in 004 is a valid DRA control number, make sure the control number exists in the MARION_DATAFILE and that the record type indicates it is a Bibliographic record.

**Miscellaneous Record Checks**
These checks apply to any record with a type of w. Not performed on deleted or workform records.
- Must have exactly one 1xx field

b) Ability to distinguish between provisional and full authority records in MARC editor

c) Granulated editing privileges for item records. CRUDO-type functionality for call number, collection, price, etc.

d) Pull price from ISBN field in MARC record on item record creation. Bonus: If multiple ISBNs, pull price corresponding to ISBN.

Technical specification from DRA Technical Services User Manual:

Type **Y** if the price should come from the bibliographic record. NETCAT checks the

bibliographic record first for the presence of a 037$c field and attempts to take the
price from there. If no 037$c exists, it checks for the presence of a 020$c field. If
there is no 020$c, it checks for a 350$a field. If NETCAT is successful in finding a
price in one of these three subfields, it writes this price to the item record. If it is not
successful, the price will default to the Circulation Policy File price that is set for
each material code.

Type **N** if you want the price to come directly from the Circulation Policy File instead
of the bibliographic record. In this case, the item price will change as the price
defaults in the Circulation Policy File change. Many libraries choose to use the
Circulation Policy File price instead of the price in the bibliographic record because
the latter may not reflect the cost of replacing the item at current market prices. The
price is used when billing for lost items.

The program defaults to **N**.

e) Ability to establish default price for each material type.  If item price is not pulled
from ISBN field in MARC record or entered during item record creation, assign
default price from policy file.

f) Ability to configure Item Editor header.  For now, Imprint field (260 w/ all subfields)
needed in Item Editor header

g) Batch holdings transfer by unique identifier.

Technical specification from DRA Technical Services User manual (19.1):

The Transfer Holdings program, DRAPGM:TRANSFER_HOLDINGS.EXE, moves
holdings attached to one Bibliographic record to another. Use this program when
holdings have been attached to a duplicate Bibliographic record mistakenly.  The
program moves all holdings (or specific groups of holdings, such as all item holdings
or all serial holdings, and so on) to another Bibliographic record. You can transfer
these groups of holdings:

- Items
    - Item records
    - Request records
    - Material booking records
    - Item booking records
- Serials
    - Serial pattern records
    - Copy records
    - Issue records
    - Summary holding records
    - Copy profile records
    - ULP (also known as Union List of Serials) records
    - Bindery records
- Acquisitions Order
    - Order records

- o   PO Line Item records
- Acquisitions Invoice
    - o   Invoice Line Item records
    - o   Invoice Location records
    - o   Receipt records
- Acquisitions Selection
    - o   Selection records
    - o   Selection Title records

h) Item record needs a Reading Level field (codes = A, Y, J, or AD, YA, JU i.e., Adult, Young Adult, Juvenile)

i) Item data needs to be visible from staff client; e.g., transaction counts, status, last transaction date, etc. (see Appendix 1)

j) Sorting in the vernacular (not demonstrated)

k) 880 field indexing (not demonstrated)

## 2. Circulation

a) Alert: When scanning a barcode marked lost an alert should appear

b) Alert: Checkout of a lost item should display an alert

c) Alert: Deleting Patron records or barcodes should ask for confirmation before committing

d) Agency Requests

Normally, a request is placed on behalf of a borrower. This borrower may be an individual or an institution. However, you may have requests placed by a particular library department. These are called Agency Requests. When the item arrives at its pickup location, the request is automatically deleted. The item status becomes Available. The item does not go to hold, and no type of notice is generated. If the item is borrowed and returned, on discharge the item is routed back to its permanent location.

e) Forced Patron Registration De-duplication

Technical specifications as defined in DRA (see Circulation User Manual 3-21):

The system automatically checks for duplication of the borrower's name, address, student ID, and Social Security number. If there are any duplicate records, a list of matching entries appears along with the following message:

> Duplicate entries found on XXXX. Check
> carefully. Enter Y to continue, N to
> cancel this registration, or borrower hit
> list number to get a brief display.

You have several options:

If the duplicate information is valid (such as a duplicate address for roommates), type Y and press ENTER. The next information screen appears. If you create a duplicate record, both records will remain in the system.

To cancel the registration, type N and press ENTER. The cursor moves to the ID Number field. The new record is not entered into the system.

To access a brief display, type the line number of the record you want to view from the hit list and press ENTER. The hit list remains on the top of the screen. The bottom of the screen displays the brief record. If this is not enough information to help you decide if this is a duplicate, press F10 to cancel the registration. Enter the Inquire function to view the full record(s) of the possible duplicate entries.

If there are no duplicate matches, you will be prompted to view other screens (for other addresses or for telephone notices) or to exit without saving the record.

See Appendix 2.

N.B., ideally, we like de-duplication on any borrower field (keyword), minimally Surname (Boolean) and DOB.

f) Patron Registration: Patron search by:
- Borrower Name
- Borrower Address
- Drivers License
- Borrower ID
- Borrower Previous ID
- Company name
- Social Security No.
- Keyword

g) Patron Registration

Add a Company field or Corporate Name & Address to Patron Registration

h) Fines: Ability to associate an item with a manual charge

i) Fines: When handling payments, it should show change from amount tendered.

j) Thresholds: Need to set thresholds, by agency, on:
- Overrides
- Total item
- MarketValue
- Bad Checkins
- Claims Returns
- Overdue Items

CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

N.B., reaching any threshold places hard block on patron account.

k) Requests: Ability to make specific material types request exempt.

l) Requests: Ability to prohibit renewal on items for which the parent bib record has outstanding requests.

m) Patron record can be displayed on two separate workstations simultaneously.

n) Ability to place requests on titles with no items attached must be optional.

3. **OPAC**

a) Chinese (Simplified) skin

b) Chinese (Traditional) skin

c) Russian skin

d) Korean skin

e) Ability to have both trans-literated and vernacular descriptive bibliographic data in the header.

f) Ability to pre-limit searches by location.

g) Due date column in item holdings table

4. **Online Account Management**

a) Ability for customer to change expiration date on outstanding requests.

5. **Systems**

a) E-mail address validation

In DRA, if email addresses do not contain an @ symbol or have a blank spaces within them, they are rejected.

## D. Additional Gap Functionality (Due August 1, 2006)

| Function # | Brief Description | Notes | # of Sprint Cycles | # Develop ers |
|---|---|---|---|---|
| 1a | Cataloging | Moved to Section E. | | |
| 1b | | Field level security in Item Record [Current functionality in DRA Classic]. The ability to add, edit, or delete the contents of the item call number and list price fields in the item record should be limited to authorized individuals and/or groups without impinging on the ability to add or edit the shelf location or enumeration fields of the same record. These prohibitions can be overridden by password. | Available in 8.0 | |
| 2a | Circulation | Social Security Numbers masked or not visible on default patron information screen of staff client. [This is custom programmed functionality currently in Queens Library iteration of DRA Classic] I.E., SSN hidden from certain classes of staff users; Ability to enter/edit SSN limited to certain classes of staff users | | |
| 2b | | Moved to Section E | | |
| 2c | | Request Substitutions [This is custom programmed functionality currently in Queens Library iteration of DRA Classic]. Request system will allow any item regardless of title record to be substituted for any other item in order to fill a customer request (e.g., a trade paperback edition for hardcover novel). | 2 | 2 |
| 2d | | Moved to Section E | | |
| 3a | Reports | The reports listed in Table 7.10-1 of the Dynix Proposal must be readily available on the "go-live" date, with the exception of those listed in Sections 5 and 11. | Available in 8.0 | |

## E. Additional Required Functionality

| Due | Function # | Brief Description | Notes | # of Sprint Cycles | # Developers |
|---|---|---|---|---|---|
| 10/01/06 | 1 | Lending Limits by Item Type(s) | Ability to limit the number of items belonging to a specific item type (code) or groups of item types that can be borrowed by a individual customer. (TG 12/2/2005) For example, a customer can only borrow up to 10 DVDs. However, there will be more than one item type for DVDs—Adult and Juvenile—so Adult and Juvenile DVDs would need to grouped together to prohibit customers from borrowing 10 Adult DVDs plus 10 Juvenile DVDs. | 2 | 2 |
| 10/01/06 | 2a | Print Cost Recovery Account Management | The system will manage customer print balances for Comprise SAM system, either directly or via Tech-Logic self-service software. | 3 | 2 |
| 10/01/06 | 2b | Print Cost Recovery Account Management | Patron must be able to designate specific monies to print cost recovery regardless of account balance. E.G., if patron has $20 in outstanding fines and fees, he should still be able to put $1.50 on his account in order to pay for printing | 1 | 2 |
| 10/01/06 | 3a | Online Customer Registration | Customer completes and submits online registration form. | Available in 8.0 | |
| 10/01/06 | 3b | Online Customer Registration | Customer selects PIN | Available in 8.0 | |

| | | | | | |
|---|---|---|---|---|---|
| 10/01/06 | 3c | Online Customer Registration | System creates new customer account with submitted data; account is flagged as unverified. | Available in 8.0 | |
| 10/01/06 | 3d | Online Customer Registration | Unverified flag can be removed once customer presents valid identification | Available in 8.0 | |
| 10/01/06 | 4 | URL Verification | URL links contained in bibliographic records can be verified in a batch process | Available in 8.0 | |
| 10/01/06 | 5a | Circulation | Waive codes. When fines and fees are waived, a set of codes specify the reason for the waive. | 1 | 2 |
| 10/01/06 | 5b | Circulation | Tabs for inactive functions i.e. Reservations or Stack Requests should not appear | Available in 8.0 | |
| 10/01/06 | 6 | E-Commerce | The system will allow electronic interaction with a debit/credit card system such as Verisign both at the Circ Desk and online. | Available with purchase of Envisionware E-Commerce Module | |
| 10/01/06 | 7 | Language Selection | In HIP, customers will be able to save their language preference between sessions | Available in 8.0 | |
| 10/01/06 | 8 | Cataloging | Ability to conduct search in Cyrillic vernacular that are case sensitive | Available in 8.0 | |
| | | | Total | 7 | 2 |
| 01/01/07 | 9a | Email Alerts / Courtesy Notices | Email alert goes out to warn user that items will soon be overdue. (TG 11/30/2005 | 1 | 2 |

| 01/01/07 | 9b | Email Alerts / Courtesy Notices | Managed by customer using My Account feature: a) Customer can specify which items he would like to receive notices for, b) Customer can specify how many days (hours) prior to due date he wants to receive notices. | 2 | 2 |
|---|---|---|---|---|---|
| 01/01/07 | 9c | Email Alerts / Courtesy Notices | Option to issue notices to all customers: a) Variable: Number of days (or hours) prior to date due, b) Variable: Item type(s) | 1 | 2 |
| 01/01/07 | 9d | Email Alerts / Courtesy Notices | In either case, system makes note (or, at the very least, count) of notiee sent: a)If the latter, notices are purged after 6 months | 1 | 2 |
| 01/01/07 | 10 | "Unable to Fill Request" Notices | In addition to the typical "Unable to fill request" notice which is produced after a pre-defined period. If a title has holdings but all of these holdings are lost, missing, etc., then a notice is produced immediately to inform customer that the Library is unable to fill the request at this time. | 1 | 2 |
| 01/01/07 | 11 | Inability to Renew Item(s) Explanation in My Account | Reason for customer's inability to renew materials is displayed on My Account display. Example: You are unable to renew materials because you have exceeded the 25 item borrowing limit. TG 12/9/2005 | 1 | 2 |
| 01/01/07 | 12 | Circulation Counts by Titles and Pieces | Ability to calculate circulation by a) titles circulated and b) pieces circulated. Notes: A 20 piece DVD set will be counted as one item in the first report and 20 items in the second. (TG Fall 2005) | 1 | 2 |
| | | | **Total** | **8** | |
| 02/01/07 | 13 | Customer Contact Management | The Library uses MailDog to distribute its electronic newsletters. The system will allow customers to choose which newsletters they will receive and what delivery method they would prefer, both at initial registration or, using My Account, at a later date. | 2 | 2 |
| | | | **Total** | **2** | |
| 04/01/07 | 14 | Multi-tiered Collection Agency Fee | Ability to implement a progressive collection agency fee (aka service charge) schedule such that small | 1 | 2 |

| | | Schedule | balances sent to Collections can be assessed a smaller amount. | |
|---|---|---|---|---|
| 04/01/07 | 15 | Multiple Parameters to Determine When Accounts Are Sent to Collection Agency | The Library would like to pursue small balance accounts less aggressively than large balance accounts. For example, accounts with balances over $25 will be sent to Collections after 56 days but accounts with balances between $10 and $24.99 will be sent after 70 days. Fines and fees notices would also have to reflect this bifurcation of policy. | Feature same as #14 with slight modifications. No additional time needed to estimate in #14. |
| | | **Total** | | 1 |

Appendix 1 - 3

Appendix 1



Appendix 2



Queens Borough Public Library- Page S-66
CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

Appendix 3



BRMFS1 627942v16



**Material Holdings Report for December 2005**

Back to Normal

**Branch Libraries**

**Material Types Report for December 2005**

Back to Normal

**Branch Libraries**



BRMFS1 627942v16



BRMFS1 627942v16

## Staff Accounts Reported to Collection Agency



| Patron ID | Patron | Last Trans | Rec Modified | Status | Money | Class | Itm |
|---|---|---|---|---|---|---|---|
| 09940607335 | AAI-2686 | 11/22/2005 | 10/4/2005 | MoneyOwe/FnExmt/Hold/ColAgency/ColBlock/ | $43.95 | ST | 25 |
| 09940569634 | AHD-4413 | 10/7/2005 | 8/25/2005 | FnExmt/ColAgency/ColBlock/ | $31.00 | ST | 25 |
| 09940599535 | AAF-9245 | 11/9/2005 | 11/3/2003 | MoneyOwe/Lost/FnExmt/Hold/ColAgency/ | $200.84 | ST | 25 |
| 09940790132 | AKC-8825 | 10/18/2005 | 2/26/2005 | FnExmt/ColAgency/ | $49.00 | ST | 0 |
| 11843530328 | AJZ-1635 | 9/13/2004 | 9/13/2004 | OvrDue/Lost/FnExmt/NtExmt/ColAgency/ColBlock/ | $103.00 | MB | 75 |
| | AHC-4077 | 9/7/2000 | 10/1/2004 | MoneyOwe/OvrDue/Lost/FnExmt/NtExmt/ColAgency/ColBlock/ | $321.93 | MB | 50 |
| 11840235682 | ABI-4740 | 3/2/2004 | 6/18/2004 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $80.40 | MB | 25 |
| 11840338320 | AGO-7240 | 2/7/2000 | 10/1/2003 | Inactive/FnExmt/NtExmt/ColAgency/ColBlock/ | $6.00 | MB | 25 |
| 11840521806 | AGV-5870 | 9/18/2003 | 12/29/2003 | MoneyOwe/OvrDue/Lost/FnExmt/NtExmt/ColAgency/ColBlock/ | $102.78 | MB | 25 |
| 11840621721 | AGV-7895 | 11/20/2001 | 10/16/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $92.95 | MB | 25 |
| 11841132783 | AHO-3611 | 7/29/2004 | 3/8/2004 | OvrDue/MaxCk/Lost/FnExmt/NtExmt/ColAgency/ColBlock/ | $245.93 | MB | 25 |
| 11841137152 | AHR-2295 | 4/29/1999 | 5/3/1999 | Inactive/FnExmt/NtExmt/ColAgency/ColBlock/ | $34.95 | MB | 25 |
| 11841620017 | AHZ-5810 | 10/22/2003 | 12/29/2003 | Lost/FnExmt/NtExmt/ColAgency/ColBlock/ | $229.79 | MB | 25 |
| 11841620132 | AIB-9726 | 3/24/2005 | 2/23/2004 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $33.00 | MB | 25 |
| 11841620413 | AIO-5512 | 9/25/2000 | 10/22/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $62.00 | MB | 25 |
| 11841620253 | AIF-9660 | 12/2/2002 | 10/23/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $84.95 | MB | 25 |
| 11841620579 | AIF-9664 | 5/11/2005 | 9/14/2004 | FnExmt/NtExmt/ColAgency/ColBlock/ | $30.00 | MB | 25 |
| 11841620883 | AIJ-1004 | 7/21/2005 | 10/4/2004 | FnExmt/NtExmt/ColAgency/ColBlock/ | $6.00 | MB | 25 |
| 11841620928 | AIK-3644 | 3/25/2003 | 10/23/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $60.90 | MB | 25 |
| 11841620049 | AIJ-5297 | 10/12/2001 | 10/23/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $69.95 | MB | 25 |
| 11841203304 | AIH-5136 | 3/4/2003 | 10/23/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $33.00 | MB | 25 |
| 11841621814 | AIF-1110 | 11/16/2001 | 10/22/2003 | FnExmt/NtExmt/ColAgency/ColBlock/ | $8.00 | MB | 25 |
| 11841214970 | AIJ-8001 | 12/10/1999 | 10/23/2003 | Inactive/FnExmt/NtExmt/ColAgency/ColBlock/ | $6.00 | MB | 25 |
| 11842304702 | AJF-3404 | 2/12/2002 | 12/4/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $49.90 | MB | 25 |
| 11842304866 | AJ0-7245 | 12/10/2001 | 12/4/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $61.95 | MB | 25 |
| 11842304808 | AJC-9281 | 3/11/2003 | 12/4/2003 | FnExmt/NtExmt/ColAgency/ColBlock/ | $63.00 | MB | 25 |
| 11842431052 | AIX-6850 | 12/2/2002 | 12/4/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $60.90 | MB | 25 |
| 11842431926 | AJC-4903 | 1/29/2003 | 12/4/2003 | MoneyOwe/FnExmt/NtExmt/ColAgency/ColBlock/ | $60.90 | MB | 25 |

BRMFS1 627942v16

## Staff with more than 25 items



## List of items in "En-Route" status



| | LAST LOC | PERM LOC | NEXT LOC | CALL_NO | MAT CODE | STATUS | CKNUM | #TRANS | INVENT_DATE | STATUS_DATE | TRANS_DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 090101 | 091600 | 091600 | 704.0395 K | 0 | Route/ | AJE-3142 | 0 | 8/5/2004 | 1/30/2005 | |
| 3 | 090101 | 090100 | 090100 | 709 A | | Route/Notes/ | AJM-8600 | 0 | 12/10/2004 | 1/31/2005 | |
| 4 | 091500 | 090101 | 090101 | 700.105 M | 4 | Route/ | AJF-6967 | 0 | 4/13/2004 | 1/31/2005 | |
| 5 | 099901 | 090101 | 090101 | [R] 709.22 A | 18 | Route/NonReq/ | AGD-5195 | 0 | 1/19/2005 | 1/19/2005 | |
| 6 | 099901 | 090101 | 090101 | [R] 611.6205 A | 18 | Route/NonReq/ | ACN-6416 | 0 | 1/19/2005 | 1/19/2005 | |
| 7 | 091600 | 090102 | 090102 | [J] 979.4 R | 19 | Route/ | AIL-0037 | 0 | 1/6/2005 | 1/31/2005 | |
| 8 | 096100 | 090102 | 090102 | [EASY] J | 19 | Route/ | AIM-6549 | 0 | 12/23/2004 | 1/18/2005 | |
| 9 | 096400 | 090102 | 090102 | [J] 598.47 S | 19 | Route/ | AIN-3352 | 0 | 1/7/2005 | 1/26/2005 | |
| 10 | 090103 | 090103 | 096400 | 974.71 M | 0 | Route/ | AHH-6933 | 0 | 2/2/2002 | 1/31/2005 | |
| 11 | 090103 | 090103 | 094100 | 915.933 O | 0 | Route/ | ACA-3739 | 0 | 9/18/2001 | 1/31/2005 | |
| 12 | 093200 | 090103 | 090103 | 9 Shakur | 4 | Route/ | AIL-1835 | 0 | 1/26/2004 | 1/13/2005 | |
| 13 | 090300 | 090103 | 090103 | 9 Goldman | 0 | Route/ | AHY-5109 | 0 | 9/9/2004 | 1/7/2005 | |
| 14 | 093700 | 090103 | 090103 | 975.0049 W | 0 | Route/ | ABP-4679 | 0 | 4/18/2001 | 1/28/2005 | |
| 15 | 099900 | 090103 | 090103 | | 5 | Route/NonReq/ | AEH-5793 | 0 | 12/30/2004 | 1/10/2005 | |
| 16 | 099901 | 090103 | 090103 | [R] 928.1 C | 18 | Route/NonReq/ | ACJ-0571 | 0 | 1/10/2005 | 1/10/2005 | |
| 17 | 099901 | 090103 | 090103 | [R] 909 H | 18 | Route/NonReq/ | AGL-7713 | 0 | 1/26/2005 | 1/26/2005 | |
| 18 | 099901 | 090103 | 090103 | [R] 909 H | 18 | Route/NonReq/ | AGL-7713 | 0 | 1/26/2005 | 1/26/2005 | |
| 19 | 090104 | 090104 | 090300 | 839.72 Strindberg T | 4 | Route/ | ACC-5887 | 0 | 5/15/2003 | 1/31/2005 | |
| 20 | 093100 | 090104 | 096200 | 991.72 Pushkin | 4 | Route/ | AIO-8756 | 0 | 3/31/2004 | 1/27/2005 | |
| 21 | 097200 | 090104 | 090104 | S | 0 | Route/ | AER-8945 | 0 | 9/17/1996 | 1/6/2005 | |
| 22 | 099901 | 090104 | 090104 | [R] 822.3 S | 18 | Route/NonReq/ | AEG-4195 | 0 | 1/12/2005 | 1/12/2005 | |
| 23 | 099901 | 090104 | 090104 | 306.7 F | 4 | Route/ | AFS-1360 | 0 | 1/31/2005 | 1/31/2005 | |
| 24 | 090106 | 090106 | 096900 | FIC | 0 | Route/ | AIN-2803 | 0 | 11/26/2004 | 1/31/2005 | |
| 25 | 090106 | 090106 | 097100 | [WESTERN] | 4 | Route/ | AHR-2431 | 0 | 5/1/2003 | 1/31/2005 | |
| 26 | 090106 | 090106 | 091000 | [LrgPrint] FIC | 0 | Route/ | AIO-0257 | 0 | 12/9/2004 | 1/31/2005 | |
| 27 | 090106 | 090106 | 091000 | | 4 | Route/ | AIO-8090 | 0 | 1/31/2005 | 1/31/2005 | |
| 28 | 090106 | 090106 | 097100 | FIC | 0 | Route/ | ABK-7631 | 0 | 5/16/1990 | 1/31/2005 | 5/16/1990 |
| 29 | 091400 | 090106 | 090100 | | 0 | Route/ | AIC-6752 | 0 | 11/2/2004 | 1/31/2005 | |

CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

Back

## Low Circ Report

This report represents the Multimedia items that were linked in the month of November and have not circulated before December 15th, 200

# Jackson Heights

| Mark Found | Mark Missing | Mark Withdrawn | Item ID | Title | Call # | Material Code | Status | Title CNUM | Inventory Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | 0228414688967 | ADULT GUJARATI MATERIAL | [GJ] | 11 | NonReq/ | ACI-5997 | 10/4/2005 | 10/4/20 |
| ☐ | ☐ | ☐ | 0228409697091 | ALMA CARIBENA (CD) CARIBBEAN SOUL / | SPA CD | 11 | NonReq/ | AGQ-9132 | 10/14/2005 | 10/14/2 |
| ☐ | ☐ | ☐ | 0228409696788 | BUBBLEBEE (CD) [SONG55 FOR THE YOUNG AT HEART] | CD | 11 | NonReq/ | AIW-9657 | 10/6/2005 | 10/6/20 |
| ☐ | ☐ | ☐ | 0228405669086 | NADIA SALERNO-SONNENBERG, SÉRGIO AND ODAIR ASSA | CD | 11 | NonReq/ | AIN-2049 | 9/13/2005 | 9/13/20 |
| ☐ | ☐ | ☐ | 0228407309871 | NATHAN, MICHAEL, SHAWN, WANYA (CD) | CD | 11 | NonReq/ | AGW-2360 | 9/27/2005 | 9/27/20 |
| ☐ | ☐ | ☐ | 0118496073271 | NORTH STAR (CD) | CD | 11 | NonReq/ | AIX-5481 | 11/3/2005 | 11/3/20 |
| ☐ | ☐ | ☐ | 0228407327394 | ON THE LAST FRONTIER (CD) FLUTE CONCERTO ; ANAD | CD/Ondin ODE9212 | 11 | NonReq/Notes/ | AGI-1862 | 9/27/2005 | 9/27/20 |
| ☐ | ☐ | ☐ | 0228405777541 | | | | | AIN- | | |

Back

## Missing Items Report

## Corona

| Mark Found | Mark Missing | Item ID | Title | Author | Call # | Material Code | Title CNUM | Inventory Date | Status Date | Last Transaction Date |
|---|---|---|---|---|---|---|---|---|---|---|
| ☑ | ☐ | 0228420302090 | Review guide to RN pre-entrance exam / | | [STDY AID] 610.7307 R | 4 | AGJ-4923 | 12/1/2000 | 12/28/2005 | 11/13/2001 |
| ☐ | ☐ | 0228447716652 | Objetos en crochet / | Buerba, Marta. | S 747.434 B | 4 | AIS-2558 | 10/7/2005 | 12/28/2005 | 11/10/2005 |
| ☐ | ☐ | 0228447722122 | Time to say please! / | Willems, Mo. | [PICTURE] J | 19 | AIW-9793 | 10/6/2005 | 12/30/2005 | 12/16/2005 |
| ☐ | ☐ | 0228447723526 | JLA : pain of the gods / | Garney, Ron. | GRAPHIC | 4 | AIT-8505 | 7/5/2005 | 12/28/2005 | 11/18/2005 |
| ☐ | ☐ | 0228486158873 | eBay : the missing manual / | Connar, Nancy. | [COMPUTER] 381.177 C | 4 | AIW-6918 | 12/9/2005 | 12/28/2005 | |
| ☐ | ☐ | 0228486158931 | XML for dummies / | Dykes, Lucinda. | [COMPUTER] 005.72 XML D | 4 | AIT-3633 | 12/9/2005 | 12/28/2005 | |

Submit List

## SCHEDULE 13

### ADDITIONAL REQUIRED FUNCTIONALITY

**[Schedule 13 contains additional functionality that will be required by the Library subsequent to the "go-live" date.]**

### 1. SAP Integration

- The Library's acquisitions workflow is currently being revised.   Therefore, exact nature of this functionality has yet to be determined.
- Essentially, the Horizon Acquisitions module will communicate with the Library's SAP system in real time such that SAP will be the Library's accounting system of record and the Library will maximize the benefit of collection development and management functionality of the Acquisitions module.

### 2. Automated renewals

- Option to have Horizon automatically renew renewable items on Due Date.  TG 11/2005

### 3. Customers will have the option of buying library holdings from specific branches

- Customers will have the ability to buy items that are checked out to their accounts and are identified as "Available for Sale" in a dedicated field of the item record.
- The purchase can take place online or at a customer service station within the library
- The price of the item will be based on an algorithm similar to the following:
  - o    $s = p - (p \times t \times 2\%)$, where
  - o    s = sale price
  - o    p = item list price
  - o    t = number of transactions against item
  - o    and $s > (p * 25) / 100$

### 4. Photocopier Account Management

- The system will manage customer balances for photocopiers.
- Patron must be able to designate specific monies to print cost recovery regardless of account balance.  E.G., if patron has $20 in outstanding fines and fees, he should still be able to put $1.50 on his account in order to pay for printing.

### 5. Interface with commercial address verification service

- Service would automatically verify names and address in customer database on a regular basis.

### 6. Forgotten PIN retrieval

- Either ask secret question then reset password or email existing PIN to email account on file methodology

7. **Fee-Based home-delivery service for any requestable material.**
   - Using the Netflix model, customers could elect to have materials delivered to the home or office for a fee.
   - Fee would be based on shipping fees and labor costs.

8. **Floating Collections**
   - Items borrowed from one library and returned to another become attached to the returning library

9. **Required Interfaces**
   - The interfaces identified in Schedule 14 which are not marked as "Need for Go-Live" in Schedule 14

**Schedule 14**
Required Interfaces

## SCHEDULE 14

## REQUIRED INTERFACES

SirsiDynix will provide the following interfaces as described by the Library. The Need for Go Live interfaces will be delivered with the GAP and required Go-Live functionality. Other interfaces will be delivered at a mutually agreed upon schedule after Go-Live.

| Product | Function | Type of Interface Needed | Need for Go-Live |
|---|---|---|---|
| 8e6 | CIPA Filtering | Configure SIP interface to meet 8e6 requirements. The 8e6 appliance communicates via Radius to SAM to determine filter settings. SAM communicates to the ILS via SIP to check birth date. | x |
| 3M Self-Check | Self Service | Modify SIP interface to meet 3M requirements | x |
| AquaBrowser | Search Engine | Run an initial report to extract bibliographic & Holdings data, subsequently run daily extracts to add new, updated & deleted records. Aquabrowser search results link to full record in catalog; title, author and subject entries are hyperlinks to display those entries. | x |
| BlueSocket | Wireless Gateway | Configure SIP interface to meet BlueSocket requirements. Uses SIP to authenticate barcode and PIN | x |
| Horizon Information Portal | OPAC/MyAccount | Develop plan to design integrate HIP into Library website | x |
| Lason | Print & mail notices | Generate notices that meet Lason's printing requirements | x |
| Licensed database vendors (as set forth in the RFP) | | Two products, Global Books in Print & Fiction Connection, offer the ability to link to our catalog to check local holdings. Global Books in Print has "Hooks to Holdings" that uses Z39.50 to perform and ISBN search in the OPAC. Fiction Connection uses an OPAC URL structured to do an ISBN lookup. | x |
| SAM | Desktop Management | Configure SIP interface to meet SAM requirements | x |

| | | | |
|---|---|---|---|
| SAP/BW | Data Warehouse | Run an daily extract to export fee & fine payments and circulation data to data warehouse. | x |
| Syndetics | Enriched Content | Integrate Syndetics content in HIP | x |
| Tech-Logic | Self Service | Modify SIP interface to meet Tech-Logic requirements. SIP Interface should enable the ACS to Charge, Discharge, Renew, Pay fines sort materials and perform inventory functions. See the attached SIP Protocol and SIP Extensions Specs | x |
| Unique | Debt Collection | Manage delinquent accounts (This is a component of the Horizon system we are installing) | x |
| WebFeat | Federated Searching | Webfeat Horizon translator | x |
| Oracle | Horizon System DBMS | System DBMS & access by 3rd Party tools i.e. Crystal Reports | x |
| Apabi.com | e-books in Chinese | Add MARC Records | |
| DearReader.com | online book club | Manage Membership from My Account. Add a link to the club's membership page from the "My Account" page. | |
| MailDog | e-mail tool, allows users to sign-up for e-newsletters | Link to data in Patron database/MyAccount to join or leave a library e-newsletter. | |
| Omniture | provides website usage tracking uses JavaScript on every page to track user activity | track user activity in ILS/HIP managed web pages | |
| Overdrive | ebooks and e-audio | Add MARC Records | |
| Qiken.com | e-magazine in Chinese | Add MARC Records | |
| QuestionPoint | OCLC's software to provide email and chat reference service | Offer enhanced services from My Account | |
| Serial Solutions | portal to A-Z & Subject listing of online full-text journals | Add MARC records for online journal holdings | |
| Tumblebook.com | multimedia e-books in English & Spanish for children | Add MARC Records | |

Queens Borough Public Library- Page S-79
CONFIDENTIAL AND PROPRIETARY

**Schedule 15**
Intentionally Left Blank

# SCHEDULE 15

## [SCHEDULE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

**Schedule 16**
**Project Leaders**

**SCHEDULE 16**

PROJECT LEADERS

SirsiDynix Project Leader:

Sheryl Wray
400 W. 5050 North
Provo, UT 84604
Tel:  (801) 223-5248
e-mail:  sheryl.wray@sirsidynix.com

Library Project Leader:

Philip Darsan
Chief Technical Officer
Queens Borough Public Library
89-11 Merrick Boulevard
Jamaica, NY 11432
Tel: (718)990-8516
e-mail:  PDarsan@queenslibrary.org

**Schedule 17**
Guaranteed Response Times

**SCHEDULE 17**

<u>GUARANTEED RESPONSE TIMES</u>

The guaranteed response time for a particular task equals the shorter of: (a) $\leq 2$ seconds minus any network latency for users whose Workstations are connected to the System server via a $\geq 1.5$mbps WAN; and (b) the response time set forth in SirsiDynix's response in its proposal dated June 15, 2005 to Section 8.9.1 of the Library's Request for Proposals for a Next-Generation Integrated Library System and Related Services, Specification #0405-1

BRMFS1 627942v16

**Schedule 18**
Parent Guarantee

## SCHEDULE 18

### PARENT GUARANTEE

## GUARANTY AGREEMENT

This GUARANTY AGREEMENT (the "Agreement"), dated March 6, 2006, is between Queens Borough Public Library  ("Library") and Sirsi Holdings Corp. ("Sirsi Holdings").

## W I T N E S S E T H:

WHEREAS, Library and Dynix Corporation ("SirsiDynix") have entered into the Purchase and License Agreement, dated as of the same date as this Agreement (the "License Agreement");

WHEREAS, SirsiDynix is a subsidiary of Sirsi Holdings, and Sirsi Holdings will receive substantial economic and other benefits from Library entering into the License Agreement with SirsiDynix; and

WHEREAS, as an inducement to Library to enter into the License Agreement, Sirsi Holdings has agreed to guarantee the performance of SirsiDynix pursuant to this Agreement.

NOW, THEREFORE, for and in consideration of the agreements set forth below, the parties agree as follows:

1.      Guaranty. Sirsi Holdings hereby irrevocably and unconditionally guarantees to Library the prompt and full performance and discharge by SirsiDynix of all of SirsiDynix's covenants, agreements, obligations, warranties, indemnities and other liabilities under the License Agreement and all amendments and all other documents executed pursuant thereto (collectively, the "Obligations"), in accordance with the terms hereof.  If SirsiDynix shall default in the due and punctual performance of any Obligation, Sirsi Holdings will forthwith perform or cause to be performed such Obligation; provided that Library shall not be bound or obligated to exhaust its recourse against SirsiDynix or any other Person (as defined herein), and provided further that Library shall not seek recourse against Sirsi Holdings or any other Person if SirsiDynix's failure to perform any Obligation is due to (i) a default by Library under the License Agreement or failure of Library to perform its Obligations under the License Agreement or (ii) any other circumstance for which SirsiDynix's performance of the Obligations would be delayed or excused under the terms of the License Agreement.   Sirsi Holdings expressly acknowledges and agrees that this Agreement covers the Obligations, whether presently outstanding or arising subsequent to the date hereof. The guaranty by Sirsi Holdings under this Agreement is a continuing one and all Obligations shall be conclusively presumed to have been created in reliance hereon. The guaranty of Sirsi Holdings as set forth herein is a continuing guaranty of performance and payment.

2.  <u>Liabilities and Obligations</u>.  The liabilities and obligations of Sirsi Holdings pursuant to this Agreement are direct, immediate and primary obligations and liabilities (and not secondary obligations and liabilities) and are unconditional and absolute.  Sirsi Holdings hereby waives any right, whether legal or equitable, statutory or non-statutory, to require Library to proceed against or take any action against or pursue or exhaust any remedy with respect to SirsiDynix or any other party or to join SirsiDynix or any others liable for performance or payment of the Obligations in any action or (except to the extent the License Agreement provides for presentment, demand or notice to SirsiDynix or Sirsi Holdings) make presentment or demand for performance or give any notice of nonperformance or to resort to any other means of obtaining performance or payment of the Obligations before Library may enforce its rights under this Agreement.  Sirsi Holdings' obligations hereunder shall remain in full force and effect until the Obligations shall have been performed in full.  No discharge, modification, renewal, extension, impairment or limitation of SirsiDynix's or Sirsi Holdings' obligations under the License Agreement or hereunder or to its creditors generally, in each case, under or in connection with any bankruptcy, insolvency or similar proceeding or arrangements with creditors or corporate reorganizations shall in any way affect or discharge Sirsi Holdings' obligations under this Agreement, it being expressly acknowledged and agreed by Sirsi Holdings that if any such discharge, modification, impairment or limitation, in whole or in part, is so ordered in any such proceeding, Sirsi Holdings' obligations under this Agreement will nevertheless continue to be determined as if such order had not been issued.

3.  <u>Warranties</u>.  Sirsi Holdings hereby represents and warrants that (a) it is a corporation duly incorporated, validly existing and in good standing under the laws of the state of Delaware, (b) it is in good standing under the laws of, and is authorized to transact business in, all jurisdictions where it conducts business; (c) it has all requisite power and authority to own its properties and to carry on its business as now being conducted; (d) the execution, delivery and performance by Sirsi Holdings of this Agreement are within Sirsi Holdings' corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental authority, do not contravene, or constitute a default under, any provision of applicable law or regulation or of the organization or internal governance documents of Sirsi Holdings or of any agreement, judgment, injunction, order, decree or other instrument binding upon Sirsi Holdings and will not result in the creation or imposition of any lien on any asset of Sirsi Holdings; (e) this Agreement has been duly authorized, approved, executed and delivered by Sirsi Holdings and constitutes the legal, valid and binding obligations of Sirsi Holdings, enforceable against Sirsi Holdings in accordance with its terms; (f) there are no actions, suits or proceedings pending, or to the knowledge of Sirsi Holdings after due inquiry threatened, against or affecting Sirsi Holdings or any of its property or rights which, if adversely determined, would have a material adverse effect on Sirsi Holdings' ability to uphold its obligations under this Agreement; (g) Sirsi Holdings is not, and will not be after giving effect to the consummation of the transactions contemplated hereby, in default under or in violation of any federal, state, local or foreign statute or order, which default or violation, individually or in the aggregate together with any or all other such defaults and violations, will have or is reasonably likely to have a material adverse effect on Sirsi Holdings' ability to uphold its obligations under this Agreement; and (h) Sirsi

Holdings is and, after giving effect to all of the transactions contemplated by this Agreement and the License Agreement, shall continue to be solvent. As used herein, **"solvent"** means, when used with respect to any Person (which term **"Person"** shall mean any individual, corporation, general or limited partnership, limited liability corporation or any other legal entity), that (i) the present fair saleable value of such Person's assets is in excess of the total amount of its liabilities (including contingent liabilities); (ii) such Person is able to pay its debts as they become due; and (iii) such Person does not have unreasonably small capital to carry on such Person's business as previously operated and all businesses in which such Person is about to engage. Sirsi Holdings has not entered into this Agreement with the actual intent to hinder, delay, or defraud any creditor, and Sirsi Holdings has received reasonably equivalent value in exchange for its obligations under this Agreement. Giving effect to the transactions contemplated by this Agreement, the fair saleable value of Sirsi Holdings' assets exceeds and will, immediately following the execution and delivery of this Agreement and the License Agreement, exceed Sirsi Holdings' total liabilities, including subordinated, unliquidated, disputed or contingent liabilities and the maximum amount of its debts as such debts become absolute and matured.

4.      Waiver. Sirsi Holdings hereby (i) waives and relinquishes all rights and remedies accorded by applicable law to guarantors (except for such rights and remedies contained herein, in the License Agreement or any related document, agreement or schedule) and (ii) waives notice of acceptance of this Agreement and (except, in each case, as provided herein, in the License Agreement or any related document, agreement or schedule) notice of any liability to which it may apply, and waives diligence, presentment, demand of payment, protest, notice of dishonor or nonpayment or notice of any kind in connection with this Agreement. Sirsi Holdings further waives, to the maximum extent permitted by law, (a) any defense based upon an election of remedies (including, if available, an election to proceed by non-judicial foreclosure) by Library, (b) any rights or defenses created by any anti-deficiency statutes applicable to the License Agreement, (c) all suretyship defenses it otherwise might or would have under applicable law, (d) any right to require Library to marshal assets or proceed against or exhaust its recourse against SirsiDynix or any other Person or any security for the Obligations or to pursue any other remedy before being entitled to payment from Sirsi Holdings or before proceeding against Sirsi Holdings for payment and performance of the Obligations, (e) the defense of the statute of limitations in any action hereunder or for the collection or the performance of the Obligations, and (f) any defense that may arise by reason of (I) the lack of authority of SirsiDynix or any officer or director thereof, Sirsi Holdings, or any other Person (other than Library), (II) the revocation or repudiation hereof by Sirsi Holdings, or the revocation or repudiation of the License Agreement by SirsiDynix or any other Person (other than Library), (III) the failure of Library to file or enforce a claim against the estate (either in administration, bankruptcy or any other proceeding) of SirsiDynix or any other Person, (IV) the unenforceability in whole or in part of the License Agreement, (V) Library's election, in any proceeding instituted under the United States Bankruptcy Code, of the application of Section 1111(b)(2) of the United States Bankruptcy Code, or (VI) any borrowing or grant of a security interest under Section 364 of the United States Bankruptcy Code; it being the intention hereof that Sirsi Holdings shall remain liable as

principal, to the extent set forth herein, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of Sirsi Holdings.

5.   [This Section intentionally left blank]

6.   [This Section intentionally left blank]

7.   Assignment. Neither party may, without the prior written consent of the other party, assign this Agreement or any right or obligation pursuant to this Agreement. Any consent of a party to any assignment of this Agreement shall not constitute such party's consent to further assignment. This Agreement shall be binding on the parties and their respective successors and permitted assigns. Any assignment in contravention of this subsection shall be void.

8.   Notices. All notices, requests, consents, approvals, agreements, authorizations, acknowledgements, waivers and other communications required or permitted under this Agreement shall be in writing and shall be deemed given when sent by certified mail, return receipt requested, or a reputable overnight carrier with receipt confirmed, or delivered by hand to the address specified below. A copy of any such notice shall also be sent by express air mail on the date such notice is sent to the address specified below:

Library:            Name: Library Director
                    Attn.: Thomas W. Galante,
                    Address:  89-11 Merrick Boulevard
                                 Jamaica, NY  11432
                    Tel:    (718) 990-0796
                    Fax:   (718) 291-8936
                    e-mail: Tgalante@queenslibrary.org

with a copy to:
                    Name: General Counsel
                    Attn.: Darlene Askew Robinson,
                    Address:  89-11 Merrick Boulevard
                                 Jamaica, NY  11432
                    Tel:    (718) 990-0796
                    Fax:   (718) 291-8936
                    e-mail: DAskew@queenslibrary.org

Sirsi Holdings:     Name: Don McCall
                    Address: 101 Washington St. SE
                                 Huntsville, AL  35801
                    Tel: 800-917-4774
                    Fax: 256-704-7007
                    e-mail: don.mccall@sirsidynix.com

with a copy to:
Name: Mike Casale
Address: 400 W 5050 N.
        Provo, UT 84604
Tel: 801-223-5200
Fax: 801-223-5202
e-mail: mike.casale@sirsidynix.com

Either party may change its address or telecopy number for notification purposes by giving notice of the new address or telecopy number and the date upon which it will become effective pursuant to this Agreement.

9.   Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which taken together shall constitute one single agreement between the parties.

10.  Invalidity. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, then the remaining provisions of this Agreement, if capable of substantial performance, shall remain in full force and effect.

11.  No Waiver. No delay or omission by either party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the party waiving its rights.

12.  Entire Agreement. This Agreement represents the entire agreement between the parties with respect to its subject matter, and there are no other representations, understandings or agreements between the parties relative to such subject matter.

13.  Amendment. No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing.

14.  Governing Law. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles thereof relating to the conflicts of laws.

15.  Venue and Jurisdiction. Any legal action, suit or proceeding brought by a party in any way arising out of or relating to this Agreement shall be brought solely and exclusively in the state courts located in Queens County, New York, or the federal courts located in New York City, New York, and each party irrevocably accepts and submits to the sole and exclusive personal jurisdiction of such courts.

16.  Construction. The parties agree that the terms and conditions of this Agreement are the result of negotiations between the parties and that this Agreement shall not be construed

in favor of or against any party by reason of the extent to which any party or its professional advisors participated in the preparation of this Agreement.

[Remainder of page intentionally left blank]

CONFIDENTIAL AND PROPRIETARY

BRMFS1 627942v16

IN WITNESS WHEREOF, each of Library and Sirsi Holdings has caused this Agreement to be signed and entered into by its duly authorized representative.

Sirsi Holdings Corp.

By: _____

Name: _PATRICK C. SOMMERS_

Title: _CEO_

Queens Borough Public Library

By: _____

Name: _____

Title: _____

Queens Borough Public Library- Page S-89
CONFIDENTIAL AND PROPRIETARY